UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DAVID H. DEAN,<br>        Plaintiff,<br>v.<br><br>LOWE'S HOME CENTERS, INC.,<br>        Defendant. | )<br>)<br>)  CA No. 04-12605-mel<br>)<br>)<br>)<br>)<br>) |

**DEFENDANT'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT**

Under Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, defendant Lowe's Home Centers, Inc. (hereinafter "Lowe's") submits the following statement of undisputed facts in support of its motion for summary judgment.

1. Mr. Dean was hired as the Return to Manufacturer ("RTM") clerk at Lowe's newly opened Danvers, Massachusetts store in January 2001. (Deposition of David Dean, hereinafter "Pl. Dep.," p. 103; deposition of plaintiff's manager, Robert Estes, hereinafter "Estes Dep.," pp. 24-26).[1]

2. On November 8, 2001, one of Dean's friends and co-workers, Daniel Puccio, placed a noose on plaintiff's desk. (Ex. 4 to Pl. Dep.; Pl. Dep., pp. 60–64; Ex. C to the Affidavit of Amy L. Nash ("Nash Aff.")," submitted herewith).

3. Immediately after Dean reported the incident, Lowe's investigated the matter, placed Puccio on a "final" written warning and accepted his resignation. (Pl. Dep., pp. 63-64; Exs. 3 and 4 to Pl. Dep.; Ex. C to Nash Aff.).

---

[1] The transcripts from the depositions of plaintiff and Estes are attached to the Affidavit of Amy L. Nash, hereinafter "Nash Aff.," as Exs. A and B.

- 2 -

4. This process was completed the day after the incident occurred. (Pl. Dep., pp. 63-64; Exs. 3 and 4 to Pl. Dep.; Exs. C and E to Nash Aff.).

5. Puccio apologized to plaintiff immediately after Dean expressed his upset over the matter. (Pl. Dep., p. 74).

6. At the time, Dean told Lowe's that he did not want Puccio to lose his job (Pl. Dep., pp. 66, 73-74), but that he was satisfied with the manner in which it handled his complaint. (Pl. Dep., p. 64).

7. During his two week notice period, Lowe's moved Puccio to a store department away from plaintiff, and the two had no further contact or problems. (Pl. Dep., pp. 60-64).

8. Other than the November 2001 noose incident, plaintiff alleged no other race-based harassment or discrimination during his two years at Lowe's.

9. As the RTM clerk, Dean was responsible for processing merchandise that had been returned to the store by Lowe's customers. (Pl. Dep., pp. 58-59).

10. To that end, various store employees regularly and customarily placed "returns" outside the locked holding area where Dean worked, which was also known as "the cage." (Estes Dep., pp. 17-18, 52).

11. Over the course of a workday, numerous store employees, working different shifts, placed "returns" in front of the cage. (Affidavit of Robert Estes, hereinafter "Estes Aff.," ¶¶ 5-7; Pl. Dep., pp. 53-56).

12. Because the surrounding area was quite confined, "returns" sometimes were left in front of the door to the cage. (Estes Dep., p. 79; Pl. Dep., p. 52; Estes Aff., ¶ 6).

13. Other than Dean, only the department manager and senior store managers had a key to the cage, so employees generally were unable to place returns inside. (Estes Aff., ¶ 6; Estes Dep., pp. 19-20).

14. "Returns" were left in front of the door to the cage <u>before</u> and after the November 8, 2001 incident with Puccio. (Pl. Dep., pp. 60 and 105).

15. Plaintiff does not know which employees placed the returned merchandise in front of his "office"[2] door, or what motivated them to do so. (Pl. Dep., pp. 54-56).

16. In August 2001, three months before the Puccio incident, plaintiff received his first written performance review. (Ex. 9 to Pl. Dep.; Pl. Dep., pp. 101-02).

17. In this August 2001 performance review, Estes noted that plaintiff took too much time away from work, was "real[l]y grasping at . . . aspects of the RTM position. . . . [and] need[ed] some improvement on his attendance and on the organization [of] his paperwork, like OFR and Cleared RTM report." (Ex. 9 to Pl. Dep.).

18. Plaintiff signed the August 2001 evaluation and felt that, "it fairly and accurately reviewed [his] work during the first eight months of [his] tenure at Lowe's." (Pl. Dep., p. 101).

19. In January 2002, plaintiff received his second written evaluation in which Estes again criticized him for "constant time away from work" and lack of organization, in particular with respect to the reports associated with his position. (Ex. 10 to Pl. Dep.).

20. Plaintiff agreed with this evaluation, too. (Pl. Dep., pp. 106-07).

21. Plaintiff did not note on any of his performance evaluations, which contained a section specifically reserved for employee concerns, either that employees "blocked" his office door with "returns" or that anyone at Lowe's mistreated him after

---

[2] Plaintiff sometimes refers to the cage as his office.

- 3 -

the Puccio incident. (Pl. Dep., pp. 104-05; Exs. 9 through 13 to Pl. Dep.; Estes Aff., ¶¶ 10-11).

23. In January 2002, plaintiff also received a written warning for poor performance which once again focused on the disorganization of the RTM area. (Pl. Dep., p. 109; Ex. 11 to Pl. Dep.). Plaintiff did not disagree with the warning. (Id.).

23. On April 1, 2002, Dean received two more written warnings from Estes. (Exs. 12 and 13 to Pl. Dep.).

24. In the first written warning, Estes criticized plaintiff for failing to properly complete the "RTM cleared report."

25. In the second, Estes reprimanded him for keeping the RTM area in "atrocious" condition. (Exs. 12 and 13 to Pl. Dep; Pl. Dep., p. 113).

26. Plaintiff agreed with these warnings as well. (Pl. Dep., pp. 113-15). Plaintiff also agreed with Estes' offer, explained in the final written warning, to transfer him to a comparable position in the Lawn and Garden department so that he could have an opportunity to succeed at Lowe's "instead of decline." (Pl. Dep., pp. 78-79, 115; Ex. 13 to Pl. Dep.; Estes Aff., ¶ 13; see Ex. D to Nash Aff.).

27. Plaintiff believed that Estes was fair to him. Plaintiff did not disagree with any of the warnings or his transfer. (Pl. Dep., pp. 77-78, 101-07, 113-15).

28. Plaintiff admitted that by April 2002, he felt his job responsibilities in the RTM department "became too overwhelming" because he "had too much stuff to do." (Pl. Dep., pp. 112-14).

29. Dean's transfer to the Lawn and Garden department resulted in no loss in pay and had no adverse effect on the terms and conditions of his employment. (Pl. Dep., p. 79; Estes Aff., ¶ 16; see Ex. D to Nash Aff.).

30. Dean testified that "[he] didn't have any problems with . . . Lowe's management . . . after [he was] transferred into the lawn and garden center . . . [.]" (Pl. Dep., pp. 79-80).

31. There is no evidence that Dean's manager in the Lawn and Garden department, Glen DesLauriers, knew of Dean's historic complaint against Puccio, which occurred a year earlier and involved employees in another department (Pl. Dep., pp. 82-83), or that DesLauriers was motivated by same in supervising Dean.

32. During Dean's employment at Lowe's, Lowe's employed scheduling software known as "Staffworks" to set the hours of employees in various positions at its stores. (Estes Aff., ¶¶ 17-18).

33. Staffworks generates schedules for all hourly employees, and unless scheduling restrictions are programmed into the software, Staffworks automatically schedules all employees for night and weekend work. (Estes Aff., ¶ 19).

34. In fact, nearly every hourly employee at Lowe's, and especially those in sales areas such as the Lawn and Garden department, must work what is called a "flexible schedule" involving regular night and weekend shifts. (Estes Aff., ¶¶ 19-20).[3]

35. At the time Dean worked in the Lawn and Garden department at the Danvers store, Staffworks determined his work schedule. First-level supervisors such as

---

[3] The RTM clerk position is one of the few hourly positions at Lowe's that has a fixed schedule. RTM clerks normally work from 7:00 a.m. to 4:00 p.m. on Monday through Friday. (Estes Aff., ¶ 21).

DesLauriers and second-level supervisors such as Assistant Store Managers had little control over or ability to set Dean's schedule. (Estes Aff., ¶¶ 18-22).

36. Dean never complained to anyone at Lowe's about how he was treated in the Lawn and Garden department in general (Pl. Dep., p. 84), or about his schedule there in particular. (Pl. Dep., p. 83).

37. In October 2002, six months after his transfer and without prior complaint or notice to anyone at Lowe's, plaintiff simply abandoned his job. (Pl. Dep., p. 84).

38. During his employment at Lowe's, Dean was aware of Lowe's open door policy (Pl. Dep., pp. 88-89; Ex. 5 to Pl. Dep.), which provided that he could contact persons outside of the Danvers store concerning any issues he had with management. (Pl. Dep., pp. 48-49).

39. Dean also understood that he was permitted to report and should have reported any instance of discrimination or retaliation by Estes to persons superior to him in the organization, to Lowe's internal audit department or to human resources. (Pl. Dep., pp. 45, 49-50, 90-91, 71-72).

40. Dean regarded all Lowe's employees with whom he dealt outside of the Danvers store to be decent, fair-minded and responsive people (Pl. Dep., pp. 47-48), including, in particular, the regional human resources representative, Cheri Smith. (Pl. Dep., pp. 37-38 and 44-47).

- 7 -

                    LOWE'S HOME CENTERS, INC.

                    By its attorneys,

                    _____
                    David C. Casey (BBO # 77260)
                    Amy L. Nash (BBO # 647304)
                    LITTLER MENDELSON, P.C.
                    One International Place
                    Suite 2700
                    Boston, MA 02110
                    (617) 378-6000

Dated: June ___, 2005

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon counsel for the plaintiff by mail on this ___ day of June 2005.

                    _____
                    Amy L. Nash