UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| DAVID H. DEAN, | ) | |
| Plaintiff, | ) | CA No. 04-12605-mel |
| v. | ) | |
| | ) | |
| LOWE'S HOME CENTERS, INC., | ) | |
| Defendant. | ) | |
| | ) | |

**AFFIDAVIT OF AMY L. NASH IN SUPPORT
OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

I, Amy L. Nash, do depose and state as follows:

1.      I am an attorney at the law firm of Littler Mendelson, P.C., One International Place, Suite 2700, Boston, Massachusetts 02110. Throughout this Affidavit, I refer to Lowe's Home Centers, Inc. as "Lowe's" or "the Company."

2.      Attached hereto as Exhibit A is a true and accurate copy of the deposition of plaintiff David H. Dean and selected exhibits thereto, which was taken on March 10, 2005 during discovery in this matter.

3.      Attached hereto as Exhibit B is a true and accurate copy of the deposition of Robert Estes, which was taken on April 29, 2005 during discovery in this matter.

4.      Attached hereto as Exhibit C is a true and accurate copy of an Employee Performance Report for Daniel Puccio, dated November 9, 2001. This document, which bears the Bates number L0026, was produced during discovery in this matter.

5.      Attached hereto as Exhibit D is a true and accurate copy of an Online Personnel Data Change Form for David Dean. This document, which bears the Bates number L0001, was produced during discovery in this matter.

6.      Attached hereto as Exhibit E are true and accurate copies of Lowe's

Incident Reports, dated November 8 and November 9, 2001.  These documents, which

bear the Bates numbers L0029 through L0033, were produced during discovery in this

matter.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY ON THIS 6 DAY
OF JUNE 2005.

AMY L. NASH

2

```
 1                              Volume:    I
                                Pages:     1 to 120
 2                              Exhibits:  1 to 13

 3

 4              UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS
 5
        * * * * * * * * * * * * * * * *
 6    DAVID H. DEAN,
                            Plaintiff,
 7
          vs.                      Civil Action
 8                                 No. 04-12605-MEL
      LOWE'S HOME CENTERS, INC.,
 9                          Defendant.
        * * * * * * * * * * * * * * * *
10

11

12

13              DEPOSITION OF DAVID H. DEAN, a witness
      called on behalf of the Defendant, taken pursuant to
14    the applicable provisions of the Federal Rules of
      Civil Procedure before Cynthia A. Powers, Shorthand
15    Reporter and Notary Public in and for the
      Commonwealth of Massachusetts, at the law offices of
16    Littler Mendelson, P.C., One International Place,
      Suite 2700, Boston, Massachusetts, on Thursday,
17    March 10, 2005, commencing at 10:10 a.m.

18

19

20                      * * * * *

21

22
                     KACZYNSKI REPORTING
23               72 Chandler Street, Suite 3
                 Boston, Massachusetts 02116
24                    (617) 426-6060
```

Page 2

1    APPEARANCES:
2        ROBERT K. RAINER, P.C.
         Daniel C. Federico, Esquire
3        60 VFW Parkway
         Revere, Massachusetts 02151
4        (781) 289-7900
         Representing the Plaintiff
5
         LITTLER MENDELSON, P.C.
6        David C. Casey, Esquire
         Amy L. Casey, Esquire
7        One International Place, Suite 2700
         Boston, Massachusetts 02110
8        (617) 378-6000
         Representing the Defendant
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1                    INDEX
     Examination by:  Direct  Cross  Redirect  Recross
2    Mr. Casey        4
     Afternoon Session 88
3              EXHIBITS
     Exhibit                              Page
4       1    Plaintiff's Answers to First    30
             Set of Interrogatories Propounded
5            by the Defendant
6       2    MCAD Complaint                  41
7       3    Lowe's Incident Report          65
             dated November 9, 2001
8
        4    Lowe's Incident Report          74
9            dated November 8, 2001
10      5    Lowe's Employee Orientation     88
             Training Record
11
        6    Acknowledgement dated           89
12           January 6, 2001
13      7    Application for Employment       92
             dated January 2, 2001
14
        8    Complaint and Jury Claim        100
15
        9    Lowe's Strategic Training &     101
16           Achievement Review/Career
             Development Review dated
17           August 31, 2001
18      10   Lowe's Strategic Training &     104
             Achievement Review/Career
19           Development Review dated
             January 30, 2002
20
        11   Lowe's Employee Performance     108
21           Report dated January 20, 2002
22      12   Lowe's Employee Performance     109
             Report dated April 1, 2002
23
        13   Lowe's Employee Performance     114
24           Report dated April 1, 2002

Page 4

1              P R O C E E D I N G S
2              MR. CASEY:  Dan, in terms of
3    stipulations, I suggest that we reserve all
4    objections to the time of trial and motions to strike
5    and that the only exception be that with respect to
6    objections as to the form of the question.  I further
7    suggest that the witness have an opportunity for
8    thirty days after your receipt of a copy of the
9    transcript to review and make any changes he thinks
10   necessary and then to sign under the penalties of
11   perjury only, which will obviate the need for his
12   signing before a notary public, and that if he
13   doesn't make any corrections in thirty days after
14   your receipt his opportunity will be deemed waived.
15   Is that acceptable?
16             MR. FEDERICO:  That is acceptable.
17             DAVID H. DEAN,
18
19        having been satisfactorily identified
20        and duly sworn by the Notary Public,
21        was examined and testified as follows:
22             DIRECT EXAMINATION
23   BY MR. CASEY:
24        Q.   Good morning, Mr. Dean.

Page 5

1        A.   Good morning, sir.
2        Q.   My name is David Casey.  I am with the
3    law firm Littler Mendelson.  I represent Lowe's.
4        A.   Yes.
5        Q.   And I'm going to be asking you a
6    series of questions today about the lawsuit that
7    you've brought against my client.  As I do that, I'd
8    like to keep a few things very much in the front
9    of your mind throughout.
10             First, if at any time you don't
11   understand a question or any phrase or word in a
12   question that I put to you, please tell me that you
13   don't understand my question, and I will rephrase it
14   until it's clear to you what I'm getting at.  Is that
15   agreeable?
16       A.   Yes, sir.
17       Q.   Second, and similarly, if at any time
18   you don't hear a question in its entirety, because
19   there's noise outside the room or I garble my words
20   or the like, tell me --
21       A.   Yes, sir.
22       Q.   -- and I will have Cindy, the
23   stenographer, read it back for you.
24       A.   Okay.

2 (Pages 2 to 5)

Page 6

1   Q.   Is that agreeable?
2   A.   Yes.
3   Q.   Along the same lines I want to
4   emphasize, and I cannot emphasize too strongly, that
5   this is a process about trying to understand your
6   thoughtful, considered, careful testimony. This is
7   not about trying to trick or intimidate or harass or
8   confuse you. I want you to understand that and the
9   following comments: If you get tired, if you lose
10  your concentration, if you get upset, if you get
11  confused, if you need to take a break or clear your
12  mind or for any reason are having difficulty
13  answering any -- I underscore "any" -- of my
14  questions, I want to you tell me and we'll take a
15  break.
16  A.   All right.
17  Q.   Okay?
18  A.   Yep.
19  Q.   Finally, before -- and you're doing a
20  good job on this point -- before you even begin to
21  say anything in response to any of my questions,
22  please wait until you're absolutely certain that I've
23  finished my question, okay? And there are several
24  reasons for that. First, the last word in a question

Page 7

1   can fundamentally alter its meaning, and I don't want
2   you to think you know what I'm asking you before I've
3   completed my question, understand?
4   A.   Yes.
5   Q.   Second, if you try to answer my
6   question before I've got it out, you may not be
7   reflecting and carefully considering your answers,
8   and I want your very carefully considered testimony
9   and only your very carefully considered testimony
10  today; agreed?
11  A.   Yes, sir.
12  Q.   Finally, as terrific as Cindy is, it's
13  hard for her to take down two people who are speaking
14  at the same time.
15  A.   Okay.
16  Q.   So again, I'm going to be asking you a
17  bunch of questions; I want you to take your time with
18  every one of them; I want you to wait until you're
19  certain I've finished the question before you even
20  begin to answer; and if at any time you don't
21  understand or hear a question or you're losing your
22  concentration or focus for any reason, I want you to
23  tell me immediately so that you can take a break,
24  clear your head, regain your composure, whatever the

Page 8

1   case may be, so that at the end of the day you will
2   have heard and understood each of my questions and
3   you will have been certain to reflect carefully on
4   them and provide me with your very best answer. Is
5   that agreeable?
6   A.   Yes, sir.
7   Q.   Great. Now, are you under any
8   medication today?
9   A.   No, I just have my inhaler with me.
10  Q.   I understand you have asthma. When
11  you make reference to your inhaler, is that what you
12  are referring to?
13  A.   My Albuterol, that's all the only
14  medication I'm under right how.
15  Q.   Can you spell that medication for the
16  record?
17  A.   Spell "medication"?
18  Q.   Albuterol.
19  A.   Oh, A L B U T E R O L, I guess.
20  Q.   And have you had any -- and I
21  apologize in advance for asking this question, but I
22  really need to -- have you had any alcohol this
23  morning or are you under the influence of any illegal
24  drugs?

Page 9

1   A.   No.
2   Q.   As far as you know, there's nothing
3   whatsoever that would adversely affect your ability
4   to hear and understand and respond carefully and
5   thoughtfully to my questions today?
6   A.   No, sir.
7   Q.   Is that correct?
8   A.   Oh, that's correct.
9   Q.   Have you ever been deposed before?
10  A.   I don't understand that question.
11  Q.   Have you ever been in a process like
12  this where a lawyer asked you questions under oath?
13  A.   Oh, no, sir.
14  Q.   Have you ever been involved in
15  litigation of any kind before?
16  A.   I guess, yeah.
17  Q.   What litigation have you been involved
18  in?
19  A.   I was in a car accident and my
20  insurance company went after the person that was
21  involved in the accident. I had to sit down and talk
22  to their people, I guess, and that was pretty much
23  it.
24  Q.   Were you a party to that lawsuit, or

Page 10

1  was there a lawsuit?
2      A.  I was the victim. I was hit. I was
3  in an automobile accident.
4      Q.  When did that happen?
5      A.  I'd say '96 maybe.
6      Q.  Did you receive any money as a result
7  of that accident and the litigation associated with
8  it?
9      A.  Yes.
10     Q.  How much?
11     A.  There was a settlement for, I guess,
12 maybe ten thousand dollars or something.
13     Q.  What lawyer, if any, represented you
14 in that matter?
15     A.  Rosencranz.
16     Q.  Is that the last name?
17     A.  Rosencranz, that's the only name I can
18 remember.
19     Q.  And what city or town did that lawyer
20 work out of?
21     A.  Boston, here.
22     Q.  Do you recall what county the lawsuit
23 was filed in, whether it was Middlesex or Suffolk or
24 the like?

Page 11

1      A.  What is this county here, Suffolk
2  County, I guess.
3      Q.  Where did you live at the time of this
4  car accident?
5      A.  In Lynn.
6      Q.  Okay. Did you ever actually go into a
7  courtroom?
8      A.  No.
9      Q.  Other than the litigation associated
10 with the car accident, have you had any other
11 involvement with courts or the law; and by that I
12 mean have you been divorced, have you been involved
13 in restraining orders, have you been involved in any
14 criminal matters or the like?
15     A.  I don't understand that question. You
16 know, I've had, you know, I've had a restraining
17 order where I've taken out on a young lady, you know,
18 because she was harassing me.
19     Q.  In what court?
20     A.  That would be in Lynn court, Essex
21 County, I guess.
22     Q.  Lynn district court or superior court?
23     A.  Lynn district.
24     Q.  What was the name of the woman against

Page 12

1  whom you received this restraining order?
2      A.  Her name is Tabitha Murkison.
3      Q.  Spell the last name as best you can?
4      A.  M U R K I S O N.
5      Q.  When did you obtain that restraining
6  order?
7      A.  I'd say it was around between
8  2000-2001, I guess.
9      Q.  Have any restraining orders ever been
10 taken out as against you?
11     A.  No.
12     Q.  Have you been involved in any other
13 kind of criminal or civil matter involving a court?
14     A.  Are you asking me if I have a record?
15     Q.  Have you ever been arrested?
16     A.  Yes.
17     Q.  Have you ever been convicted or pled
18 guilty or no contest of any kind to any --
19     A.  No.
20     Q.  -- criminal charge?
21     A.  No.
22     Q.  For what have you been arrested?
23     A.  Shoplifting.
24     Q.  On how many occasions have you been

Page 13

1  arrested for any crime or alleged crime?
2      A.  You know, um, in my past, coming from
3  the area where I come from, there was a lot of
4  incidents, there was numerous incidents.
5      Q.  And for what alleged crimes were you
6  arrested, other than shoplifting?
7      A.  Assault and battery, possession of a
8  Class B substance, that's it pretty much.
9      Q.  Do you remember what the Class B
10 substance was?
11     A.  Marijuana.
12     Q.  And it's your testimony that you were
13 never convicted of any of these crimes?
14     A.  No.
15     Q.  And you never pled guilty or no
16 contest or agreed to a continuance without a finding;
17 is that correct or not correct?
18     A.  Yes, correct.
19     Q.  What's your date of birth?
20     A.  July 17, 1954.
21     Q.  And what's your Social Security
22 number?
23     A.  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.
24     Q.  Have you ever gone by any name other

Page 14

1  than David Dean?
2      A.    I did use an alias one time, and I
3  think it was David Brown, I think.
4      Q.    When was that?
5      A.    Somewhere back in the eighties. I
6  can't quite remember.
7      Q.    For what reason?
8      A.    Possession of a Class B substance.
9      Q.    Was any kind of guilty finding or no
10 contest plea or continuance without a finding entered
11 as against David Brown relative to that charge of
12 possession of a Class B substance?
13     A.    There was no -- there was a continuing
14 without a finding.
15     Q.    In what state?
16     A.    Massachusetts.
17     Q.    County?
18     A.    Suffolk.
19     Q.    Do you recall what Social Security
20 number, if any, you provided at that time?
21     A.    Same one.
22     Q.    Did you review any documents or papers
23 or any material or evidence before coming to testify
24 today?

Page 15

1      A.    No.
2      Q.    Other than with counsel, did you speak
3  with anybody --
4      A.    No.
5      Q.    -- about this matter in preparation
6  for your deposition today?
7      A.    No.
8      Q.    What is your full name?
9      A.    David Harden, H A R D E N, Dean.
10     Q.    What's your address?
11     A.    36 Sagamore Street, Apartment 1, Lynn,
12 Mass.
13     Q.    How long have you lived there?
14     A.    Just over a year now.
15     Q.    With whom, if anyone, do you live?
16     A.    My girlfriend.
17     Q.    Her name?
18     A.    Marilyn Cox, C O X.
19     Q.    Are you married?
20     A.    Yes.
21     Q.    Are you separated from your wife?
22     A.    Yes.
23     Q.    Her name?
24     A.    Tanya.

Page 16

1      Q.    Last name?
2      A.    Dean.
3      Q.    When were you and she married?
4      A.    I'd say in 1980.
5      Q.    When did you first separate?
6      A.    Let's see, I'd say around '85, '86.
7      Q.    Did you reconcile at any point since
8  then, or have you been separated since 1985 or '6?
9      A.    We've been separated since then.
10     Q.    Do you have any children?
11     A.    One son. I have two children. By
12 her, one son.
13     Q.    Two children total, one by Tanya Dean?
14     A.    Yes, that's my son, David Jr.
15     Q.    How old is he?
16     A.    He's 26.
17     Q.    Where does he live?
18     A.    In Boston.
19     Q.    And your other child?
20     A.    Her name is Dara.
21     Q.    Dara?
22     A.    Dara, D A R A.
23     Q.    How old is she?
24     A.    I believe 31.

Page 17

1      Q.    Where does she live?
2      A.    In Boston.
3      Q.    Do you see David Jr.?
4      A.    All the time.
5      Q.    Do you see Dara?
6      A.    All the time.
7      Q.    Where does David Jr. live, what
8  street?
9      A.    I don't know their streets.
10     Q.    What's his telephone number?
11     A.    His home number is (617) 427-2372 and
12 his cell number is 480, no, (617) 480-4504.
13     Q.    Where does Dara live?
14     A.    I don't -- I mean, I know, but I don't
15 know the street.
16     Q.    In what section of the city?
17     A.    Between Andrew Station and Jackson
18 Station.
19     Q.    What section of the city does David
20 live in?
21     A.    In the Delhi Street area.
22     Q.    What is Dara's telephone number?
23     A.    That I don't know, I mean, because she
24 has a different number; like every time I see her she

Page 18

1  has a different phone number or different cell
2  number.
3     Q.   When did you last see Dara?
4     A.   About two weeks ago.
5     Q.   Do you use a cell?
6     A.   No.
7     Q.   You use your home number?
8     A.   Yes.
9     Q.   What's your home telephone number?
10    A.   (781) 592-6563.
11    Q.   Six-five-six --
12    A.   Three.
13    Q.   Is that phone in your name?
14    A.   Yes.
15    Q.   How long have you had that telephone
16 number?
17    A.   Maybe twelve years.
18    Q.   What's your educational background?
19 Did you graduate from high school?
20    A.   Yes, sir.
21    Q.   When?
22    A.   In 1971, '72.
23    Q.   What high school?
24    A.   It used to be a high school here in

Page 19

1  downtown Boston called Don Bosco Tech.
2     Q.   Have you taken any courses in college
3  or post high school?
4     A.   I went to University of Massachusetts
5  in Amherst right after my graduation from Don Bosco
6  on an academic and sports scholarship there.
7     Q.   What sport?
8     A.   Basketball.
9     Q.   Did you graduate from UMass?
10    A.   I had to withdraw in my sophomore
11 year.
12    Q.   Why?
13    A.   My parents were elderly at the time,
14 and my dad got kind of sick, and I needed to be home
15 with my mom.
16    Q.   Did you withdraw for any other reason?
17    A.   No.
18        Excuse me. Can I get some more water?
19    Q.   Sure.
20        Are you currently employed?
21    A.   No.
22    Q.   When last were you employed?
23    A.   Last year.
24    Q.   When last year?

Page 20

1     A.   I'd say around September.
2     Q.   Of 2004?
3     A.   Yes.
4     Q.   By whom were you employed at that
5  time?
6     A.   W&W Construction.
7     Q.   In what capacity were you employed by
8  W&W Construction?
9     A.   A laborer.
10    Q.   What were you making on an hourly
11 basis?
12    A.   I'd say about fourteen dollars an
13 hour.
14    Q.   How long did you work with W&W
15 Construction?
16    A.   I'd say for about three years.
17    Q.   So sometime in, roughly speaking, the
18 fall of 2001 through the 2004; is that correct?
19    A.   Yes.
20    Q.   Did you work full-time for W&W
21 Construction during that three-year period?
22    A.   As needed. I mean, as needed. I
23 mean, like, when work was available for me I was
24 there, and then there was a lot of time, you know,

Page 21

1  there was no work for me.
2     Q.   Why did you leave in September 2004?
3     A.   Well, my asthma condition is seasonal
4  and, you know, I usually get congested by just a
5  change of the weather and, like, when it goes from
6  the fall to the winter my condition gets bad.
7     Q.   So do I understand your testimony to
8  be that you left work with W&W Construction in or
9  about September of 2004 because your asthma was
10 making it impossible for you to continue to work?
11    A.   Yes.
12    Q.   And does asthma frequently adversely
13 affect you and your ability to work in the fall of
14 the year?
15    A.   Well, it's seasonal like.
16    Q.   And I understand and does it typically
17 adversely affect you in the fall?
18    A.   Yes. Just like right now, going from
19 the winter to the spring, I get that same, you know,
20 problem.
21    Q.   Are you receiving any kind of
22 disability benefits either from a private insurance
23 source or from the government?
24    A.   No, sir.

Page 22

1    Q.    How do you support yourself?
2    A.    My landlord, I do a lot of odd jobs
3  around my property for him.
4    Q.    What's your landlord's name?
5    A.    Peter Mazereas.
6    Q.    Spell it.
7    A.    M A Z E R E A S, I think. I'm not
8  sure.
9    Q.    For how long have you been doing odd
10  jobs for Peter Mazereas?
11    A.    I've known Peter for I'd say over
12  seven years now.
13    Q.    Have you been doing work for him for
14  around seven years?
15    A.    Off and on.
16    Q.    For how long have you been living in
17  one of his units?
18    A.    One year, a little over one year.
19    Q.    And prior to your current address
20  where were you living?
21    A.    I lived at 26 Broad Street in Lynn.
22    Q.    For how long?
23    A.    I lived there for I'd say maybe close
24  to seven, eight years.

Page 23

1    Q.    How long have you lived with Marilyn
2  Cox?
3    A.    I've been living with Marilyn for now
4  I'd say the last three years.
5    Q.    Do you have a good relationship with
6  her?
7    A.    Very good.
8    Q.    Has it been bad at all in the last two
9  years?
10    A.    I don't understand.
11    Q.    Has your relationship been adversely
12  affected with her in the last two years?
13    A.    Oh, no, no, no. I thank God for her.
14    Q.    Are you currently treating with any
15  physicians or mental health clinicians or any other
16  kind of healthcare provider?
17    A.    Yes, I am. His name is David Joseph.
18  He's my clinician. He's helping me with my stress
19  and my conditions.
20    Q.    David Joseph Alpert?
21    A.    Yes.
22    Q.    When first did you see David Joseph
23  Alpert?
24    A.    Yesterday.

Page 24

1    Q.    First time you ever saw him?
2    A.    Yesterday.
3    Q.    Why did you go to see him yesterday?
4    A.    That's when he was able to see me.
5    Q.    When first did you contact him to see
6  him?
7    A.    About maybe -- oh, God -- maybe two
8  weeks ago.
9    Q.    Why did you contact him at that time?
10    A.    Because I had just received my Mass
11  Health because I -- I didn't have no insurance, and
12  in order for me to be seen by him, I imagine I needed
13  to have Mass Health, and I finally got activated.
14    Q.    How did you get activated on Mass
15  Health?
16    A.    I do not know. I've been going over
17  to the Lynn Community Health Center into their
18  walk-ins for so long and then I guess one of the
19  doctors, you know, said, you know, you need to go see
20  somebody, you know, because your asthma is getting
21  worse, you're falling apart. I guess he took it upon
22  himself to file the information that he had in to
23  Mass Health.
24    Q.    And who helped you with that, what

Page 25

1  doctor?
2    A.    I don't remember the doctor's name. I
3  really don't know his name.
4    Q.    But he's affiliated with Lynn
5  Community Health Center?
6    A.    Yes, sir.
7    Q.    Is Mass Health some sort of government
8  sponsored health insurance program?
9    A.    I might think it's state funded. I'm
10  not sure. I know they help people who are dire
11  straits, who don't have insurance, or you know. This
12  doctor here, Dr. Alpert, he also gave me directions
13  on how I can go and get, you know, like a lot of
14  benefits that fits people like me who don't have
15  anything. He says you can go get fuel assistance and
16  food stamps. And I said, cool, I could use it.
17    Q.    What was the reason why you decided to
18  see David Joseph Alpert?
19    A.    Because -- you know, there's a lot of
20  different reasons -- I just needed somebody to talk
21  to, you know, somebody who I didn't know, somebody
22  who would maybe -- I don't know. I just needed
23  somebody to talk to.
24    Q.    About what?

7 (Pages 22 to 25)

Page 26

1    A.  About a lot of things.
2    Q.  Tell me.
3    A.  Well, you know, it's hard, you know,
4  it's just, you know, you know, just a lot of things.
5  Like, you know, I wanted to stop smoking cigarettes
6  because the doctors are telling me it's killing me.
7  He says, this is insane; you have asthma, you can't
8  breathe and here you are, reaching for a cigarette.
9  You need to talk to somebody about that. And I said,
10  yeah. And I've been doing this all my life, you
11  know. And I am glad he took the time to talk to me
12  because I'm sure I'm going to be all right with him.
13    Q.  Are there any other things that you
14  wanted to see Alpert or someone like him to talk
15  about other than trying to stop smoking cigarettes?
16    A.  You know, like I've always been the
17  type to keep a lot of stuff bottled up inside of me.
18  And I don't talk a lot, but people have been telling
19  me for a long time, you know, you need help, you need
20  to talk to somebody, man -- because I'm not suicidal
21  or homicidal or nothing like that -- but, you know,
22  David, you're depressed, man, come up out of it, man,
23  snap out of it. I don't want to be out, I don't want
24  to be bothered, leave me alone.

Page 27

1    Q.  People have been telling you that for
2  a long time?
3    A.  Ever since a few years now.
4    Q.  Who's been telling you that?
5    A.  My closest friend, you know, he's,
6  he's a real buddy.
7    Q.  His name?
8    A.  His name is Levi Downing Jr., D O W N
9  I N G, junior.
10    Q.  Where does he live?
11    A.  In Brockton.
12    Q.  The stenographic record is not going
13  to reflect this, but it's obvious that you're
14  emotionally affected by talking about Levi Downing.
15    A.  No, because like when I get emotional
16  like this is because like he's, he's been a childhood
17  friend, we've been friends for over thirty years, and
18  he's like a spiritual brother to me. I don't have no
19  mother, no father, no sisters, no brothers, you know.
20  That's when I get like this, because I don't have
21  nobody to talk to.
22    Q.  Other than wanting to talk about
23  stopping smoking cigarettes and about being depressed
24  I think you said, was there any other reason why you

Page 28

1  wanted to see David Joseph Alpert?
2    A.  Yeah, to talk about, you know, like
3  letting go of things that I've been holding onto and
4  like, and like every time I think about my family,
5  you know, I get like this, you know, and I need to
6  let that go.
7    Q.  What kinds of things have you been
8  holding onto; what are the major reasons, the major
9  reasons why you wanted to see David Alpert?
10    A.  You know, the cigarettes, leave the
11  cigarettes alone, my girlfriend says. Like now she
12  says, when your kids come over, no one smokes
13  cigarettes, you're the only one smoking, you have to
14  go outside to smoke, and then where is this drinking
15  pattern coming from, why do you drink like this all
16  of a sudden. I said, I don't know.
17    Q.  So you've been trying to stop drinking
18  and trying to stop smoking cigarettes?
19    A.  I'm willing to go and try the patch,
20  do the pills, whatever they got, you know, let's stop
21  it.
22    Q.  Other than trying to stop drinking and
23  trying to stop smoking cigarettes, are there any
24  other reasons why you have gone to see David Joseph

Page 29

1  Alpert?
2    A.  No, sir.
3    Q.  Do you have any idea as to why you've
4  been drinking or drinking too much?
5    A.  Yes.
6    Q.  Why do you think you have?
7    A.  Just to keep the, to keep the, to
8  block things out, you know.
9    Q.  What kinds of things have you been
10  trying to block out?
11    A.  Like what happened, you know, why I'm
12  out of work; how come, you know, why my parents had
13  to go so quickly, you know what I mean. Even though
14  they were elderly, even though they were in their
15  nineties, it just hurt, you know. And then there was
16  another thing with one of my sister-in-laws. She
17  stole my whole estate. There was nothing I could do
18  about that.
19    Q.  When you say she stole your whole
20  estate, what do you mean by that?
21    A.  I don't know, it just -- I know like
22  when my -- she was my mom's beneficiary or something,
23  man, and one day a lot of stuff just came up missing;
24  I mean everything, all my mother's personal

8 (Pages 26 to 29)

Page 30

1  belongings and stuff, you know, and --
2      Q.  When did that happen?
3      A.  I'd say around, my mom passed in 2003,
4  I believe, yeah.
5      Q.  When did your dad die?
6      A.  I'd say in '99.
7          MR. CASEY:  I'd like to have marked as
8  Exhibit No. 1 to this deposition a six-page document
9  which appears to be Plaintiff's Answers to
10  Defendant's First Set of Interrogatories in this
11  matter.
12          (Marked Exhibit 1; Plaintiff's Answers
13          to First Set of Interrogatories
14          Propounded by the Defendant)
15      Q.  Mr. Dean, do you recognize the
16  document that's been marked as Exhibit No. 1?
17      A.  Do I recognize this?
18      Q.  Yes.
19      A.  Yes, sir.
20      Q.  Is that your signature on the
21  second-to-last page of Exhibit No. 1?
22      A.  Second to the last page, yes, sir.
23      Q.  You signed this document on March 4th
24  of this year?

Page 31

1      A.  I believe so, yes.
2      Q.  Just a few days ago; right?
3      A.  Yes, sir.
4      Q.  Did you review the document carefully
5  before you signed it?
6      A.  Yes, sir.
7      Q.  You knew you were signing it under the
8  penalties of perjury; correct?
9      A.  Yes, sir.
10      Q.  By that you knew if you did not tell
11  the truth completely that you literally could be
12  prosecuted criminally for lying?
13      A.  Okay, right.  Yes, sir.
14      Q.  So you reviewed the document carefully
15  to ensure that it was accurate and truthful before
16  you signed it; correct?
17      A.  Like, I spoke to my counsel, and
18  there's a lot of things I don't quite understand; and
19  what I did understand, that's what I --
20      Q.  Okay.  Now, if you'll turn to the
21  second page of Exhibit No. 1, specifically paragraph
22  number six.  We asked you to identify all physicians
23  and/or healthcare professionals that you've
24  consulted?

Page 32

1      A.  Mm-hmm, yes.
2      Q.  At any time?
3      A.  Yes.
4      Q.  As a consequence of Lowe's unlawful
5  conduct?
6      A.  Yes.
7      Q.  And you responded by identifying Lynn
8  Community Health Center and a Sonya, S O N Y A, Pena,
9  P E N A; correct?
10      A.  Yes.
11      Q.  Who is Sonya Pena?
12      A.  I guess she did the intake for me.
13  She's the one that led me to this gentleman here,
14  David Alpert.  She did the intake, took all the
15  information that led me to him.
16      Q.  When did you see Sonya Pena?
17      A.  About maybe two weeks ago.
18      Q.  Prior to seeing Sonya Pena and
19  ultimately David Joseph Alpert, did you consult with
20  any kind of physician or other healthcare
21  professional of any kind regarding any physical or
22  emotional consequences that you believe stem from
23  your treatment by Lowe's?
24      A.  Just for my asthma and my health I go

Page 33

1  to Lynn Community Health and just a walk-in clinic
2  there.  I guess they got tired of me walking in.
3  That's like -- I just got Mass Health.  They used to
4  give me free care.
5      Q.  Who at Lynn Community Health did you
6  see?
7      A.  Just the staff there at the walk-in.
8  I don't know these people's names.
9      Q.  Did you ever talk to any of the staff
10  at Lynn Community Health about anything having to do
11  with Lowe's?
12      A.  No, sir.
13      Q.  Did you ever talk to any of the staff
14  at Lynn Community Health regarding any emotional or
15  physical problems that you thought that you were
16  suffering as a result of what happened to you at
17  Lowe's?
18      A.  No.
19      Q.  Have you ever treated for any kind of
20  depression or mental health related issues or stress
21  or the like with anybody other than Sonya Pena and
22  David Joseph Alpert at any time in your life?
23      A.  No.
24      Q.  Other than your asthma are you in good

KACZYNSKI REPORTING

**Page 34**

```
 1   physical health?
 2        A.   I'm going through a mid-life thing,
 3   you know. I'm afraid of getting old and the body
 4   can't take what it's used to, you know. I find certain
 5   illnesses coming on now and I don't know what they
 6   are. My feet hurt, my legs hurt, everything hurt.
 7        Q.   Well, let's be specific. Other than
 8   asthma, you say that your feet hurt and your legs
 9   hurt?
10        A.   Well, you know, like --
11        Q.   Let's be specific now. What about
12   your feet hurt?
13        A.   Okay, you know, like, I guess they
14   getting bigger. I guess they're swelling up or
15   something. I don't know.
16        Q.   When did that start?
17        A.   It's been going on for many -- like,
18   also that comes with my asthma is the eczema. And
19   the eczema, like, it goes from certain parts. Like,
20   it used to be in my armpits and then it went to the
21   back of my knee and now it's on my foot.
22        Q.   In terms of your feet hurting, when
23   did that start?
24        A.   It's been going on for a, it's been
```

**Page 35**

```
 1   going on for years.
 2        Q.   How many years?
 3        A.   For the last ten years anyway.
 4        Q.   What's the problem with your legs?
 5        A.   The reason why I'm not playing ball
 6   now in the gentlemen's league is I've been getting
 7   these hamstrings, I've been getting these real tight
 8   knots in the back of my legs.
 9        Q.   Other than keeping you from playing
10   basketball, are there any other problems --
11        A.   No.
12        Q.   -- with your legs?
13        A.   That's it.
14        Q.   And other than your leg and feet
15   problems and the eczema you've just described, do you
16   have any other health issues?
17        A.   No, but my girlfriend do because she's
18   just been diagnosed with high blood pressure and
19   diabetes. For some reason I'm compassionate to her
20   health too. When she sick, it seem like I'm sick
21   too. That's how close we are.
22        Q.   Who is Barry Rowell, R O W E L L?
23        A.   Now, this gentleman, I believe he was,
24   like, a regional director or he was a, he was a
```

**Page 36**

```
 1   person from Lowe's and I spoke with him at a
 2   mediation before.
 3        Q.   A regional manager of some kind?
 4        A.   A higher level manager than the people
 5   From out of Connecticut.
 6        Q.   with whom you worked at the store in Danvers?
 7        A.   Yes, sir.
 8        Q.   You saw him at the MCAD?
 9        A.   No, he was on the phone, he was on an
10   intercom.
11        Q.   I see. And the first time you spoke
12   with him and I take it the only time you spoke with
13   him was at the MCAD?
14        A.   Yes, sir.
15        Q.   As it is related to the --
16        A.   The incident.
17        Q.   -- the incident and some conciliation
18   or investigative conference?
19        A.   Yeah.
20        Q.   Okay. What did Mr. Rowell say at that
21   time?
22        A.   Well, he was listening to what the
23   complaint was and what happened and he just -- he was
24   trying to be compassionate and he said, What can we
```

**Page 37**

```
 1   do to make all this go away? And that's what he said
 2   to me.
 3        Q.   Did he say anything else?
 4        A.   That was it.
 5        Q.   What did you say in response?
 6        A.   I said, I don't know. I've never been
 7   in this situation before, and I just don't know. I
 8   need to go talk to my family and friends. I don't
 9   know.
10        Q.   Did he seem like a decent man?
11        A.   Oh, yes.
12        Q.   Did he treat you well?
13        A.   Well, he spoke good, I mean, you know.
14        Q.   Was there anything that he did or said
15   that upset you?
16        A.   No, he was compassionate, he was cool.
17        Q.   And to your knowledge he did not
18   witness or did not in any way participate in
19   investigating or dealing with the incident between
20   you and Danny Puccio?
21        A.   I don't know that. I don't know what
22   he did. I don't know.
23        Q.   All you know is that he participated
24   by telephone in an MCAD related fact finding or
```

**Page 38**

1  conciliation hearing; correct?
2  A. Yes.
3  Q. What about Sherri Smith, who is she?
4  A. She was sitting in on the mediation.
5  She came out of Springfield branch, out of the
6  Springfield office there, out of Lowe's headquarters
7  in Springfield.
8  Q. Springfield, Mass.?
9  A. Yes, sir.
10  Q. Do you know what her position was?
11  A. I think she might have been a human
12  resource representative or something. I don't know.
13  Q. In fact, she was a regional human
14  resource manager; correct?
15  A. What was that again?
16  Q. She was a regional human resource
17  manager; correct?
18  A. Out of Springfield, Mass., yes.
19  Q. And, in fact, you had called her after
20  the incident, at some point after the incident with
21  Danny Puccio; right?
22  A. I kind of remember that, yes.
23  Q. You left a message with her; correct?
24  A. Yes, to let her know that they hired

**Page 39**

1  this guy back.
2  Q. And she called you back; correct?
3  A. I think she did, yeah.
4  Q. When she called you back, you thanked
5  her for calling you back?
6  A. Yes.
7  Q. She seemed responsive and decent?
8  A. Yes.
9  Q. Was a nice woman?
10  A. Yes.
11  Q. And, in fact, you made a point of
12  speaking to her nicely and saying hello to her --
13  A. Oh, always.
14  Q. -- when you saw her at the MCAD
15  hearing; right?
16  A. Yes.
17  Q. You thanked her again for her having
18  called you?
19  A. Yes.
20  Q. How long after Danny Puccio tied a
21  hangman's noose at the work place did you call her?
22  A. That might have been maybe, maybe six
23  or eight months afterward.
24  Q. And why did you call her?

**Page 40**

1  A. Because I needed to speak to somebody
2  about how they hired this person back, and I couldn't
3  talk to nobody right there in my work place, so I
4  thought I could speak to somebody who is pretty much
5  neutral, you know, I don't know.
6  Q. When first did you consult a lawyer
7  about anything having to do with this matter or this
8  case?
9  A. Right after the MCAD mediation.
10  Q. When was that?
11  A. I'd say maybe 2002.
12  Q. When in 2002?
13  A. I can't quite exactly remember the
14  month, but I'm going to have to say it was in 2002.
15  I don't know.
16  Q. You were still employed by Lowe's?
17  A. I think I was. I think I was, yes.
18  Q. And what counsel did you first
19  consult?
20  A. Barron & Stadfeld, I guess.
21  Q. Was there any particular lawyer there?
22  A. Yes.
23  Q. The name?
24  A. Ms. Denise Page.

**Page 41**

1  Q. How did you come to find Denise Page?
2  A. I don't know. I don't know.
3  Q. When first did you consult with
4  Mr. Federico?
5  A. Last year, I guess.
6  Q. When?
7  A. When, when someone from Barron &
8  Stadfeld told me that the MCAD thing wasn't going to
9  find something, I guess, and they said that my
10  statute of limitations was running out. In order for
11  me to go into a court, I had to find somebody else.
12  That's when I went to Rainer and Rainer.
13  Q. Okay. So Denise Page was representing
14  you through part of the MCAD process?
15  A. Through all of that, yes.
16  Q. Okay. Did Denise Page help you write
17  the MCAD complaint?
18  A. I guess they did all that. I didn't
19  write nothing.
20  MR. CASEY: Let's have marked as
21  Exhibit No. 2 a copy of Mr. Dean's MCAD complaint
22  which is three pages in length.
23  (Marked Exhibit 2; MCAD complaint)
24  Q. Do you recognize the document that's

**Page 42**

1   been marked as Exhibit No. 2, Mr. Dean?
2   A.   Yeah.
3   Q.   Is that your signature on the second
4   page?
5   A.   Yes.
6   Q.   Did you prepare this document or did
7   someone prepare it for you?
8   A.   Somebody prepared this for me.
9   Q.   Who?
10  A.   Okay, I might have told them what
11  this is saying, I might have said this, but they
12  prepared it. I don't know who prepared it.
13  Q.   Somebody at Barron & Stadfeld or
14  somebody at the MCAD?
15  A.   Oh, no, that's a good one. I don't
16  know between who did what. I think maybe somebody
17  from MCAD.
18  Q.   On the second page below your
19  signature there is the notary signature of a Jessica
20  it looks like Thrall or Trall, I can't tell which.
21  Do you know who that person is?
22  A.   No, sir.
23  Q.   You signed this document under oath;
24  correct?

**Page 43**

1   A.   Yes, sir.
2   Q.   And you reviewed it carefully before
3   you signed it for accuracy?
4   A.   I guess at that time, yes.
5   Q.   Okay. And in Exhibit No. 2 you were
6   doing your very best to tell the entire story of what
7   you felt Lowe's did that was wrong to you?
8   A.   I guess right here, yeah, I was trying
9   to explain, you know, to the best of my ability what
10  happened.
11  Q.   You weren't rushed when you wrote
12  this, were you, or when you provided this
13  information?
14  A.   No.
15  Q.   No one forced you to sign it, did
16  they?
17  A.   No.
18  Q.   No one rushed you in terms of your
19  ability to read it carefully and reflect on it before
20  you signed it; correct?
21  A.   No.
22  Q.   Is that correct?
23  A.   Nobody forced me to rush or do
24  anything.

**Page 44**

1   *Q.   So you thought carefully about Exhibit
2   No. 2 before you signed it; correct?
3   A.   Yes, sir.
4   Q.   And you signed it with the intent that
5   this told the story of what you thought Lowe's had
6   done --
7   A.   Pretty much.
8   Q.   -- wrong to you?
9   A.   Yes.
10  Q.   Is there anything left out?
11  A.   I don't know.
12  Q.   Why don't you read it and find out?
13  A.   That's correct, sir.
14  *(Whereupon, the record was read)
15  A.   Yes.
16  Q.   And you intended to tell the entire
17  story of what you thought Lowe's had done that was
18  wrong toward you; correct?
19  A.   Yes.
20  Q.   And you didn't leave anything out, did
21  you?
22  A.   No, that's pretty much it.
23  Q.   Now, when you called Sherri Smith, you
24  called her because she was a regional human resource

**Page 45**

1   person who worked outside of the particular store in
2   Danvers where you were working; correct?
3   A.   Yes.
4   Q.   And you knew by virtue of company
5   policy, and by virtue of your own common sense, that
6   you wanted to talk to somebody higher up in the
7   company and at a distance from where you were
8   working?
9   A.   Right.
10  Q.   So you could be sure you were treated
11  fairly; right?
12  A.   Yes.
13  Q.   And you felt that she treated you
14  fairly?
15  A.   She showed up at the mediation, you
16  know, and that was it.
17  Q.   Before that when you called her she
18  immediately called you back; right?
19  A.   Well, yeah, yeah, we kept, you know,
20  like, you know, we kept in touch like that, you know,
21  I was how we always wanted to always keep, you know,
22  doing. How things doing, Dave; things all right?
23  Oh, everything is lovely, Sherri; everything is nice.
24  Q.   She never did or said anything that

**Page 46**

1  gave you have the impression that she was an unfair
2  person?
3  A.  No, no.
4  Q.  Or was treating you poorly; correct?
5  A.  Correct.
6  Q.  You thought she was treating you fine?
7  A.  I think she was okay.
8  Q.  You thought she was genuinely
9  concerned how you were doing?
10  A.  Yes.
11  Q.  You called her several times?
12  A.  No, no.
13  Q.  How many times did you call her?
14  A.  Maybe once, maybe twice, the most.
15  Q.  Okay.  And you never told her about
16  any problems you were having at work; correct?
17  A.  Never.
18  Q.  Am I correct?
19  A.  Yes, correct.
20  Q.  You felt as though you could have --
21  you felt as though you could be honest?
22  A.  Well, you know, we never went into
23  that area, you know, never.
24  Q.  But you knew you could call her?

**Page 47**

1  A.  I knew, like, the people out there in
2  Springfield at that store; they seemed to be the kind
3  people.
4  Q.  She didn't call you, you initiated
5  calling her; correct?
6  A.  I may have called her once or twice,
7  yes.
8  Q.  How did you get her number?
9  A.  Oh, that's what my job is.  I had all
10  the store numbers.  I could call anybody.  We did
11  things where I would have to call another store from
12  somewhere and we were just had -- all those numbers were
13  available for me, you know.
14  Q.  Did anybody outside of the Lowe's
15  Danvers office ever treat you poorly?
16  A.  Did anybody --
17  Q.  Affiliated with Lowe's outside of the
18  Danvers office ever treat you poorly in any way?
19  A.  No.
20  Q.  Did anybody affiliated with Lowe's
21  outside of the Danvers office ever give you the
22  impression that they were not decent, fair-minded
23  people?
24  A.  No.

**Page 48**

1  Q.  Did anyone outside of the Lowe's
2  Danvers office ever give you the impression that they
3  were not willing to help you?
4  A.  No.
5  Q.  Did anyone affiliated with the Lowe's
6  Danvers office ever tell you or communicate to you in
7  any fashion that you could not speak with people from
8  Lowe's outside of that store?
9  A.  No.
10  Q.  Or that you should not do so?
11  A.  No.
12  Q.  So you knew you were free to talk to
13  people outside of the Danvers office affiliated with
14  Lowe's whenever you wanted; correct?
15  A.  Well, I mean, like, as far as my job
16  relations went, I mean, that was my duties.  I mean,
17  I had to speak to other people outside of the Danvers
18  place because that was business, you know.  Like, I
19  used to check up on the guys that I used to train.
20  There was guys that I used to train.  When they were
21  opening the store in Brockton, I had to train their
22  RTM clerks, their return to manufacturers.  I was
23  training people and sometimes I would call all the
24  Brockton store and say, hey, hey, Jim, how are you doing.

**Page 49**

1  Q.  I understand that.  But my question is
2  during the time you were employed at Lowe's you knew,
3  didn't you, if you ever had a problem, that you
4  needed to talk to someone outside of the Danvers
5  office with -- strike that, strike the question.
6  You knew when you were employed at
7  Lowe's that if you had a problem that you needed to
8  address with higher level management, higher level
9  HR, you could always do that?
10  A.  No, no.  Believe me, I used to have
11  problems.  We could take care of it in-house.  This
12  was my duty, responsibility, just my job description.
13  If I had a problem with making numbers match or
14  finding what kind of manufacturer this product here
15  belongs to, I could go to my store managers in-house
16  to take care of that.  That was pretty much the only
17  problems I ever had until this incident happened.
18  Q.  Okay.  But you knew by virtue of your
19  training at Lowe's --
20  A.  Mm-hmm.
21  Q.  -- and by virtue of Lowe's policy that
22  if you felt as though a manager was treating you
23  unfairly that you could go to somebody like Sherri
24  Smith and tell her about that?  You knew that; right?

KACZYNSKI REPORTING

**Page 50**

```
 1  A.  Oh, yes.
 2  Q.  And no one ever prevented you from
 3      doing that; correct?
 4  A.  No.
 5  Q.  I'm correct; right?
 6  A.  Yes.
 7  Q.  Who's Terry Johnson?
 8  A.  Now, he was one of the big regional
 9      managers that would come to the store frequently,
10      maybe twice a month, just to check on whatever he
11      did, you know, make sure everything was running
12      smooth.
13  Q.  Was he a decent guy?
14  A.  I thought so.
15  Q.  Did you ever speak with him?
16  A.  A few times.
17  Q.  Was he approachable?
18  A.  Oh, yes.
19  Q.  Did you ever tell him that you were
20      being mistreated in any way?
21  A.  Maybe once I complained to him about
22      all the stuff that kept being left in front of my
23      door.  I might have went to him one time about that.
24      I said, Terry, man, you got to be able to do
```

**Page 51**

```
 1      something about this.
 2  Q.  What did you tell him that the problem was?
 3  A.  Well, you know, like, when I come back
 4      off of the weekend, all that stuff would be piled in
 5      front of my door.  I said maybe they can put it on
 6      that side or something, but no, just continued to put
 7      the stuff in front of the door.
 8  Q.  Well, did you tell Mr. Johnson
 9      anything other than the fact that things were being
10      piled in front of your door?
11  A.  That was pretty much it.
12  Q.  You didn't tell him that you thought
13      that people were mistreating you by piling that stuff
14      in front of your door; correct?
15  A.  No, I didn't say that to him.
16  Q.  You didn't give him any sense that you
17      thought that people were retaliating against you by
18      piling stuff in front of your door; correct?
19  A.  No, I didn't say that.
20  Q.  Why not?
21  A.  Well, because, like, he was the
22      manager, I mean he was the regional manager, and I
23      was just, you know, maybe asking him to talk to his
24      managers, you know, the store managers -- like Bob
```

**Page 52**

```
 1      Estes, who was my warehouse manager who hired me --
 2      tell them to stop putting the stuff in front of my
 3      door.
 4  Q.  And these were returns that were being
 5      placed in front of your door?
 6  A.  Yes.
 7  Q.  And it's not that you cared about the
 8      returns being placed in that area, you just wanted
 9      them slightly to the side of the door; is that
10      correct?
11  A.  Correct.
12  Q.  Who's Kris Lovett?
13  A.  She was the dispatcher who worked in
14      the office right beside me.  We came in together.  We
15      was hired together.  We bonded because, like, she was
16      a real nice lady.
17  Q.  Was she a friend?
18  A.  We became kind of friends, you know.
19      We never went out or anything or went to dinner or
20      breakfast or nothing; but she would bring me coffee,
21      I would bring her coffee, you know.
22  Q.  Was she someone you felt free to speak
23      with?
24  A.  Oh, definitely, most definitely.
```

**Page 53**

```
 1  Q.  You never told her that you felt as
 2      though you were being mistreated?
 3  A.  She seen it.  I didn't have to tell
 4      her.  She used to come and tell me.
 5  Q.  What did she say?
 6  A.  Oh, I'm sorry, David.  Whatever, Kris,
 7      don't worry about it.
 8  Q.  Well, what was she commenting on, if
 9      you know?
10  A.  She would see the way they would leave
11      the stuff in front of my door.  She said, Dave,
12      uh-huh, you need to talk to somebody about that.  And
13      I said, Well, Kris, it doesn't matter.  I can get
14      blue in the face talking, ain't nobody listening.
15  Q.  Did she remark about anything other
16      than returns, and by that I mean return items, being
17      left in front of your door?
18  A.  That was pretty much it.
19  Q.  Do you know who was leaving the
20      returns in front of your door?
21  A.  Just associates from up in front.  The
22      kids would be bringing all the stuff back.  When it
23      gets too bulky up in the front, it gets so congested,
24      they start moving it down to the back of the store
```

**Page 54**

```
 1   where I was.
 2   Q.   Give me the the names of the people who
 3   were doing it?
 4   A.   I don't know these people.  I don't
 5   know who these kids are.
 6   Q.   Did they know who you were?
 7   A.   They knew I was the RTM, yeah, they
 8   knew that, but I don't know who they were.
 9   Q.   Did they know anything else about you?
10   A.   No.  Like what do you mean, know what?
11   I'm trying to understand from you
12   whether or not the people who were leaving things in
13   front of your door had any reason to do it?
14   A.   I guess they just thought it was a big
15   joke or something; Let's see how he climbs over
16   this.  I don't know.  That's what they did.  They
17   just left stuff in front of there.
18   Q.   And you don't know their names?
19   A.   I do not know who these people are,
20   no.
21   Q.   Would you be able to recognize them if
22   you saw them?
23   A.   I guess so.  I haven't been there in a
24   few years now.  I guess if I see somebody I would
```

**Page 55**

```
 1   know who they were.
 2   Q.   How many people were involved in
 3   leaving things in front of your door?
 4   A.   They have different shift changes;
 5   different people come, different people go.  Their
 6   job and responsibility is to move the stuff from the
 7   back of the store and bring it to the warehouse.
 8   When they bring it to the warehouse, somebody told
 9   them to do that.
10   Q.   Do you know who told them to do that?
11   A.   I think he was one of the managers.  I
12   think it might have been Glen Delcrean or the other
13   man -- or my manager, Bob Estes, might have been on
14   that too; I think he might have told them.
15   Q.   Do you have any idea why any of the
16   managers might have told those people to leave things
17   in front of your door?
18   A.   No.
19   Q.   You have no idea what their thought
20   process was?
21   A.   No.
22   Q.   Or what their motivation was?
23   A.   No.
24   Q.   Can I use the restroom, please?
```

**Page 56**

```
 1   MR. CASEY:  Yes.
 2        (Whereupon, a recess was taken)
 3        BY MR. CASEY:
 4   Q.   Now, Mr. Dean, just before the break I
 5   was asking you about who the people were who left
 6   return items in front of the door to your work area,
 7   and you said you didn't know who they were; correct?
 8   A.   Yes, sir.
 9   Q.   Was that your testimony?
10   A.   Yes, sir.
11   Q.   You did not know who they were?
12   A.   Yes.
13   Q.   And I also asked you about why they
14   did it, and you said that some of the managers may
15   have told them to do it; is that your testimony?
16   A.   I said that, yes.
17   Q.   And I asked you if you had any idea as
18   to why the manager might have told them that, you
19   said you didn't; correct?
20   A.   Yes.
21   Q.   Is that correct?
22   A.   Correct.
23   Q.   Now, did anyone ever tell you who was
24   leaving things in front of your work area?
```

**Page 57**

```
 1   A.   Well.
 2   Q.   Just answer that question.  Did anyone
 3   ever tell you who was leaving those things there?
 4   A.   No.
 5   Q.   Did anyone ever tell you why people
 6   were leaving things in front of your work area?
 7   A.   No.
 8   Q.   Did anyone ever tell you whether or
 9   not the people who were leaving those things in front
10   of your work area were instructed to do so by someone
11   in management?
12   A.   Yes.
13   Q.   Who told you what in that respect?
14   A.   I would go back out --
15   Q.   First, who told you what; give me a
16   name?
17   A.   I don't remember the names too much,
18   different departments.  You know, like the rug
19   department, they would come and leave, like,
20   remnants.  Different departments.  Different
21   different things there.  Like the plumbing department
22   would leave all kinds of fixtures and stuff.  The
23   appliance department was good for leaving big
24   appliances; refrigerators, wash machines, dryers --
```

**Page 58**

1  you name it, it was there, you know. And like, it
2  would get sent to me for me to put the price on it as
3  a mark down and put it back out on the floor and sell
4  it as a, you know, might have a little ding on it or
5  a little bent knob or something. It would come to me
6  and I would say, Listen, we can't get a store credit
7  on this. The manufacturer will not take it back. We
8  can put a mark down price on it and put it back on
9  the floor.
10  Q.  Things were brought by various people
11  within the store to your area for a determination as
12  to whether or not those items would be sent back to
13  the manufacturer for this sort of --
14  A.  Store credit.
15  Q.  -- store credit on the one hand and
16  whether they would be put back out on the store floor
17  for sale and a reduction on the other?
18  A.  Right.
19  Q.  That was your job and that's why these
20  things were brought to your work area; correct?
21  A.  Yes.
22  Q.  Throughout your entire tenure at
23  Lowe's these things were brought to your attention
24  and into your area for those purposes; correct?

**Page 59**

1  A.  Correct.
2  Q.  And that didn't change?
3  A.  It didn't --
4  Q.  Is that correct?
5  A.  Yes, in a sense it is correct because
6  when I first started working there, I would be able
7  to go and open my door freely and be able to go in;
8  but then as the time went on, they were just piling
9  it right in front of the door. How am I supposed to
10  get in and answer the phone? How am I supposed to
11  get in, do what I'm supposed to do?
12  Q.  Did you ever complain to anyone about
13  appliances --
14  A.  All the time.
15  Q.  -- or things being left in front of
16  your door?
17  A.  All the time.
18  Q.  To whom did you complain?
19  A.  To my department manager, Bob Estes.
20  I told Ken Godin. Those were managers. I went
21  straight to them about that. I didn't talk to the
22  fellow associates or employees. I went straight to
23  the management.
24  Q.  When did you complain to Bob Estes or

**Page 60**

1  Ken Godin about things being left in front of your
2  door?
3  A.  Say at the time of this incident right
4  now. I remember that day. There was a lot of stuff
5  in front of my door then.
6  Q.  The day that the noose incident
7  happened things were in front of your door?
8  A.  Right then and there too.
9  Q.  Were they left at your door before you
10  saw the noose or after you saw the noose?
11  A.  Before, before.
12  Q.  Before there was any problem with the
13  noose, things were being left in front of your door;
14  correct?
15  A.  Yeah.
16  Q.  Before you had any problem with the
17  noose, you complained to Estes and Godin about things
18  being left in front of your door; correct?
19  A.  Yes, yes.
20  Q.  What did they say?
21  A.  Yeah, that's your job, Dave; clean it
22  up.
23  Q.  Did you say anything in response?
24  A.  No, I just went and did what I was

**Page 61**

1  told to do.
2  Q.  Did both Estes and Godin say the same
3  thing?
4  A.  Pretty much.
5  Q.  Did you think that that was
6  inappropriate on their part?
7  A.  Yes, I did.
8  Q.  In what respect?
9  A.  I mean, like, at least tell the
10  people, your associates, to stop putting it in front
11  of the door, at least do that.
12  Q.  Do you have any idea why Estes did not
13  tell people from within the store not to leave things
14  in front of your door?
15  A.  No, I don't know why.
16  Q.  Do you have any idea why Ken Godin
17  didn't tell people in the store not to leave things
18  in front of your door?
19  A.  No, I don't know why.
20  Q.  Now, when the noose incident occurred,
21  that was after you had been working with Danny Puccio
22  for almost a year; right?
23  A.  I would say that, yes.
24  Q.  And you and he were friendly before

Page 62

1  that time; correct?
2  A.  We were hi, how are you doing; good,
3  you know.
4  Q.  Prior to that noose incident you had
5  had no difficulty with Danny Puccio; correct?
6  A.  NO.
7  Q.  Is that correct
8  A.  Correct.
9  Q.  He seemed to be a decent guy?
10  A.  He seem to be.
11  Q.  When that happened you were surprised?
12  A.  Oh, man, where did that come from?
13  Q.  And at first when it happened you told
14  Bob Estes and Ken Godin and other managers that you
15  didn't want to see Puccio get into any trouble for
16  it?
17  A.  From what I understand now, people
18  say, oh, Dave, you had every right to call Danvers
19  police and have him arrested. I'm trying to keep my
20  job here. I got a family to support. I'm not trying
21  to make waves.
22  Q.  You simply said you didn't want to see
23  him get into any trouble; right?
24  A.  Yes.

Page 63

1  Q.  You told Godin that?
2  A.  Yes.
3  Q.  You told Estes that?
4  A.  Yes, and they went along with it too.
5  Q.  They accepted his resignation;
6  correct?
7  A.  I mean.
8  Q.  Did they accept his resignation?
9  A.  Two weeks later.
10  Q.  They accepted it immediately and then
11  he actually left two weeks later?
12  A.  Yeah.
13  Q.  During that two-week period they
14  separated him from you and reassigned him outside;
15  correct?
16  A.  Yeah, kind of.
17  Q.  Well, they assigned him into the lawn
18  and garden area which was literally outside; correct?
19  A.  Oh, yeah, okay, yeah.
20  Q.  Between the time of his resignation
21  and the time he actually left, in that two-week
22  period you didn't have any further problems with
23  Danny Puccio, did you?
24  A.  NO.

Page 64

1  Q.  So management as soon as you told them
2  about this immediately investigated, immediately
3  separated you and Puccio, and you had no further
4  problems with Puccio; correct?
5  A.  Correct.
6  Q.  And you thought that they handled it
7  properly, didn't you?
8  A.  Kind of, yeah.
9  Q.  Well, you told them you thought --
10  A.  Yes.
11  Q.  -- they handled it properly, didn't
12  you?
13  A.  Okay, yeah.
14  Q.  And a number of them asked you if
15  there was something else they might do?
16  A.  They asked me like this: Dave, are
17  you all right? Are you okay, Dave?
18  Q.  And you told them you were?
19  A.  Yes, yeah, I good.
20  Q.  And they asked you, is there anything
21  else, anything more that you'd like for us to do to
22  make you feel okay, didn't they?
23  A.  No.
24  Q.  Didn't Ken Godin say that to you?

Page 65

1  A.  No.
2  Q.  You sure about that?
3  A.  Yes, I am.
4  MR. CASEY:  Let's have marked as
5  Exhibit No. 3 a two-page document which is dated
6  November 9, '01; it appears to be a document prepared
7  by a Kenneth Godin.
8  (Marked Exhibit 3; Lowe's Incident
9  Report dated 11/9/01)
10  Q.  Have you seen Exhibit No. 3 before
11  today, Mr. Dean?
12  A.  I've never seen this before.
13  Q.  Okay. And does that look like Ken
14  Godin's signature at the bottom lower left-hand area
15  on page two?
16  MR. FEDERICO:  I'll object to the
17  form. If you have any idea what his signature looks
18  like. If you don't, you don't have to answer the
19  question.
20  A.  I don't know what his signature look
21  like, sir.
22  Q.  Mr. Godin writes on the first page in
23  the third full paragraph, and I quote, "After the
24  conversation with Danny I called David Dean to the

Page 66

1  ASM office. Besides myself (Ken Godin) I had Mark
2  Guillotti ASM and Stephen Sexton ASM present to talk
3  to David." Close quote. Is that true; did you speak
4  with Godin, Guillotti, and Sexton on that day?
5  A.  I kind of remember that, yes.
6  Q.  And Godin goes on to write, quote, "I
7  immediately told him" -- meaning you -- "exactly what
8  Dan had told me. I also told him Dan had given
9  me his two-week notice to end his employment with
10  Lowe's. David then said he did not want to see Dan
11  leave over this." Close quote. Is that the way the
12  conversation happened?
13  A.  I guess it kind of went that way. I'm
14  not sure.
15  Q.  At the end of this document, at least
16  on the first page Godin writes, and I quote, "I
17  completely agreed with him" -- meaning you?
18  A.  No, no.
19  Q.  Hold on. Let me rephrase the
20  question.
21  Godin writes at the end of the first
22  page, quote, "I then asked him" -- meaning you?
23  A.  Mm-hmm.
24  Q.  "...if he felt that I was handling

Page 67

1  this the way he wanted it to be handled and if he
2  felt that I needed to do more to tell me immediately.
3  He said no, he felt that I reacted very rapidly and
4  fairly." Close quote.
5  Is that a fair characterization of the
6  conversation between you and Godin in the presence of
7  Guillotti and Sexton?
8  A.  No, sir.
9  Q.  It's not?
10  A.  No.
11  Q.  What about that is not accurate?
12  A.  This part here where he says I
13  completely agreed with him. I then asked him if he
14  felt that I was handling this the way he wanted it.
15  It's not the way I wanted it to be handled. Handle
16  it the way it's supposed to be handled, not the way I
17  want it to be. I just want, like, this to be
18  resolved, that's all.
19  Q.  You're not understanding my question
20  correctly. I'm asking you whether or not Godin said
21  to you --
22  A.  No, he did not, sir.
23  Q.  -- do you feel as though I'm handling
24  this the way you wanted it to be handled?

Page 68

1  A.  I don't remember him saying that.
2  Q.  Do you deny that he said it or do you
3  just not remember it?
4  A.  I don't remember him saying that.
5  Q.  Okay. Do you remember him asking you
6  if you wanted him to do anything more?
7  A.  No, I don't remember him saying that.
8  Q.  You don't deny it; you just don't
9  remember it?
10  A.  I don't remember it.
11  Q.  Okay. Do you remember saying to him
12  that you felt that he had reacted rapidly and fairly?
13  A.  No, I did not. I did not say that.
14  Q.  You deny that?
15  A.  Yes.
16  Q.  So if Godin and Guillotti and Sexton
17  all remember you saying that, it's your testimony
18  that they're incorrect?
19  A.  Yes, sir.
20  Q.  Okay. Who is Wesley Anderson?
21  A.  Wesley Anderson was an associate that
22  worked in the shipping and receiving area inside the
23  warehouse.
24  Q.  Was he a decent guy?

Page 69

1  A.  Wes was cool, he was all right.
2  Q.  Did he ever do or say anything that
3  gave you any reason to believe that he was dishonest?
4  A.  No.
5  Q.  Did he ever do or say anything that
6  gave you any reason to believe that he didn't like
7  you?
8  A.  No, sir.
9  Q.  Was he friendly to you?
10  A.  Yeah, he was; hi, how are you, you
11  know.
12  Q.  Did he ever do or say anything to
13  indicate to you that you couldn't trust him?
14  A.  No.
15  Q.  Who is Mark Guillotti?
16  A.  One of the ASMs, one of the managers.
17  Q.  Was he a decent guy?
18  A.  I didn't care for him too much.
19  Q.  Did he ever mistreat you in any way?
20  A.  No.
21  Q.  Did he ever give you any reason to
22  believe that you couldn't trust him?
23  A.  Just like I said, I didn't care for
24  him too much.

**Page 70**

1   Q.   I'm asking you a different question.
2   Q.   I understand what you're saying. I'm asking you did
3        he ever give you any reason to believe that you
4        couldn't trust him?
5   A.   No.
6   Q.   Did he ever give you any reason to
7        believe that he was dishonest?
8   A.   No.
9   Q.   Did he tell you on the day of the
10       incident that he was available to talk to if you ever
11       needed to talk to him?
12  A.   No.
13  Q.   Who is Steve Sexton?
14  A.   Now, I believe Steve was the assistant
15       manager under Bob Estes in the warehouse, I believe.
16       I'm not quite sure about the last name Sexton, but
17       there was a Steve and I believe maybe that was him.
18  Q.   Was he a decent guy?
19  A.   He was all right.
20  Q.   Did he ever do or say anything that
21       gave you any reason to think that he was dishonest?
22  A.   No.
23  Q.   Did he ever do or say anything that
24       gave you any reason to believe that you couldn't

**Page 71**

1        trust him?
2   A.   You know, like, for a long time I
3        thought that maybe he had a little something to do
4        with why all the stuff was being piled up in front of
5        my door, I really felt that.
6   Q.   You didn't have any reason to know one
7        way or the other; you just thought it might be the
8        case?
9   A.   He'd usually be the first person there
10       in the mornings and he had to see whoever was
11       bringing this stuff. And by me talking to him about
12       the stuff being left in front of my door, I would
13       just think that he would have told them, no, don't
14       bring that right there, put that over there, but I
15       guess -- you know, I think he knew a little something
16       about the stuff being put in front of my door.
17  Q.   But you're not sure, you're guessing?
18  A.   Yeah.
19  Q.   Did he ever give you any reason to
20       believe that you couldn't trust him?
21  A.   He had a different behavior than
22       everybody else. Certain people act different ways.
23  Q.   He was -- I don't know, I don't know.
24  Q.   What about Kat Richard, who was she?

**Page 72**

1   A.   Now, she was our human resource person
2        at the Danvers store.
3   Q.   What was she like, describe her for
4        me?
5   A.   I thought she was a pleasant lady, she
6        was all right.
7   Q.   Decent person?
8   A.   I would think so, yes.
9   Q.   Approachable?
10  A.   Yes.
11  Q.   Someone you could talk to?
12  A.   Yes.
13  Q.   And she sat in on a discussion between
14       you and Frank Romano regarding the incident with
15       Danny Puccio, right?
16  A.   Okay.
17  Q.   Do you remember that?
18  A.   I kind of, yes.
19  Q.   In that discussion Romano told you
20       that the matter was being addressed, and that Lowe's
21       was going to take steps to rectify the situation,
22       didn't he?
23  A.   Correct.
24  Q.   And he told you that he had confronted

**Page 73**

1        Danny and that Danny had given his two weeks' notice?
2   A.   Correct.
3   Q.   He told you that he had moved Danny to
4        the lawn and garden area to finish out his notice
5        period and you would not have any more contact with
6        him?
7   A.   Correct.
8   Q.   And he asked you how you felt about
9        how the situation was addressed and you told him that
10       all the managers had acted quickly and
11       professionally?
12  A.   Okay.
13  Q.   Is that correct?
14  A.   Correct.
15  Q.   And you also told him that you had and
16       Danny had been friends and that you had worked well
17       together, correct?
18  A.   Mm-hmm, that's what I thought, yeah,
19       correct.
20  Q.   You also told Mr. Romano that you did
21       not want anyone to get into trouble or lose their job
22       over this?
23  A.   Correct.
24  Q.   And Kat Richard told you that if there

Page 74

```
 1   was anything that you needed to talk with her about
 2   going forward that you should feel free to come see
 3   her?
 4        A.   Correct.
 5        Q.   And you never did go to complain to
 6   her about anything, did you?
 7        A.   No.
 8        Q.   Danny Puccio apologized to you after
 9   this incident, didn't he?
10        A.   Yeah.
11             MR. CASEY:  I want to have marked as
12   Exhibit No. 4 a document dated November 8, 2001, two
13   pages in length, which appears to be Mr. Dean's
14   statement regarding the Puccio incident.
15             (Marked Exhibit 4; Lowe's Incident
16             Report dated 11/8/01)
17        Q.   Mr. Dean, do you recognize the
18   document that's been marked Exhibit No. 4?
19        A.   Yes, sir.
20        Q.   That's your handwriting?
21        A.   Yes, sir.
22        Q.   And that's your signature on the
23   second page?
24        A.   Yes, sir.
```

Page 75

```
 1        Q.   No one forced you to write that;
 2   correct?
 3        A.   Correct.
 4        Q.   You were given all the time you needed
 5   to write that; correct?
 6        A.   Yes, sir.
 7        Q.   What you wrote there was true; right?
 8        A.   Yes, sir.
 9        Q.   You didn't leave anything out, did
10   you?
11        A.   Let me just go over and see.
12        Q.   Sure.  Why don't you read into the
13   record what you wrote and that will serve two
14   purposes:  I'll be sure I know what your handwriting
15   says, and you have a chance to review what you wrote.
16   Read into the record exactly what this document says.
17        A.   To whom this may concern:  Today,
18   11/8, around 10:30 a.m. I was with two
19   representatives doing buy backs for one and just
20   basic RTMs with the other when a fellow associate,
21   Danny, says to me, Dave, I left something for you on
22   your desk.  I responded, Yeah, Danny, I'll get to it
23   when I am through with these two reps.  When I made
24   it, when I made it back to my desk, one of the reps
```

Page 76

```
 1   and myself could not believe what was on my desk.  It
 2   was a black hangman's noose which was very
 3   distasteful and rather embarrassing.  So I says to
 4   Danny, What's all this about?  And he just started
 5   laughing.  But there was nothing funny and that's
 6   when I brought this --
 7        Q.   Infraction?
 8        A.   -- infraction to manager on duty, or
 9   MOD, in the warehouse.  Soon afterward I was called
10   to the office to hear my side of the story and to
11   make sure I was okay about what had just happened.
12   I'm all right, but no one needs to be hurt or
13   humiliated this way with distasteful, childish
14   behavior.  Basically my fellow associates are nice
15   people.  We all try to get along with each other and
16   when one crosses the line, such as this, this creates
17   matters, especially from someone who you trust to be
18   a friend.  I am sorry for the situation that came
19   about.  I just want to work in a safe, friendly
20   environment without the ugly side of racism -- I
21   can't read it.
22        Q.   Rearing?
23        A.   Rearing its ugly head.  We're all
24   about, we're all adults here and what might be
```

Page 77

```
 1   humorous to others can be very insulting to most.
 2   I'm all right, but we as associated, as associated
 3   and people don't need this kind of behavior.  Thank
 4   you for your time.  David Dean.
 5        Q.   You were asked by the manager on duty
 6   to write a statement reflecting your side of the
 7   story; correct?
 8        A.   Correct.
 9        Q.   And this is what you wrote?
10        A.   Yes.
11        Q.   And you didn't leave anything out?
12        A.   No, I didn't leave anything out.
13        Q.   And what you wrote was truthful?
14        A.   Very truthful.
15        Q.   This is how you felt at the time;
16   correct?
17        A.   Yes, sir.
18        Q.   Kat Richard was in the store every
19   day, wasn't she?
20        A.   Yeah.
21        Q.   And you would frequently see her in
22   the store; correct?
23        A.   Yes.
24        Q.   She was in the store after you were
```

Page 78

1  transferred into the lawn and garden center; correct?
2      A.  Yes.
3      Q.  And you continued to see her?
4      A.  Yes.
5      Q.  You never complained to her about
6  being transferred into the lawn and garden center,
7  did you?
8      A.  No.
9      Q.  You never told her you were having any
10  problems with management or otherwise in the lawn and
11  garden center, did you?
12      A.  No.
13      Q.  At the time you agreed to the transfer
14  into the lawn and garden center, didn't you?
15      A.  Yes.
16      Q.  And you thought it would give you a
17  fresh start; correct?
18      A.  Yeah.
19      Q.  And you said that to Mr. Estes;
20  correct?
21      A.  Yeah.
22      Q.  After you were transferred into the
23  lawn and garden center, did you experience any
24  problems on the job at Lowe's?

Page 79

1      A.  Well, things just seemed different
2  after that, you know, because people would keep
3  coming out to me, why are you in lawn and garden, how
4  come you ain't in your office, and I had to explain
5  this over and over and over again.
6      Q.  Other than people asking you why are
7  you in lawn and garden, did you experience any kind
8  of problems at work for Lowe's after you were
9  transferred into the lawn and garden center?
10      A.  Until that one time there was one
11  incident when I came out the lawn and garden, I came
12  into the employee cafeteria to get something cold,
13  and I had seen that they had rehired Danny Puccio,
14  and that's when I couldn't believe my eyes.
15      Q.  Okay.  So just so I understand your
16  testimony, you agreed to be transferred into the lawn
17  and garden center?
18      A.  Mm-hmm.
19      Q.  You went over there to work, you
20  didn't have any problems whatsoever with Lowe's or
21  Lowe's management or having in any respect to do with
22  your job after you were transferred into the lawn and
23  garden center other than the fact that you learned on
24  one occasion that the company had rehired Danny

Page 80

1  Puccio; is that correct?
2      A.  Right, right.
3      Q.  How did you learn that he had been
4  rehired?
5      A.  I went into the cafeteria to get my
6  soft drink, and the next room right beside there
7  where we did our orientation where they were bringing
8  their new associates in, I seen Danny come out of
9  there with an apron on and I'm like, oh, my God.
10      Q.  He wasn't, you later found out,
11  working in the Danvers store; correct?
12      A.  I don't know.  That was the first time
13  I seen him after that incident.  When he resigned or
14  whatever, that was the, that was the last time I seen
15  him because I didn't see him no more after that.  I
16  knew that he was rehired somewhere.
17      Q.  When was that that you saw him with
18  the apron on?
19      A.  I really can't tell you, I can't tell
20  you.  It had to be during the, maybe the end of the
21  summer or maybe the beginning of the fall because it
22  was still kind of warm out.
23      Q.  You think it was the end of the
24  summer?

Page 81

1      A.  Maybe.
2      Q.  And you then worked for another three
3  or four months after that; correct?
4      A.  About right.
5      Q.  And you didn't have any other problems
6  after you saw him with Danny Puccio; correct?
7      A.  Well, well, there was one problem.
8  Like, when I was in the RTM in my office there, I had
9  a set schedule.  I would come in every morning at
10  7:30 and I would leave every afternoon at 3:30.  When
11  they put me out in lawn and garden, man, my hours
12  went from six o'clock in the morning one day until
13  two in the afternoon; the next day they wanted me to
14  come in at midnight to work until six o'clock in the
15  morning.  Just the fluctuation of the schedule, it
16  was really bizarre.  One minute I'd be working three
17  to eleven and -- oh, they just kept playing with my,
18  you know what I mean.
19      Q.  Were there legitimate business reasons
20  for that scheduling?
21      A.  No, they just wanted to, I guess,
22  bother me.
23      Q.  That's what you think, they wanted to
24  bother you?

Page 82

1   A.   I really believe that.
2   Q.   Who was it that was doing that?
3   A.   Whoever was making up the schedule.
4   Q.   You don't know?
5   A.   I'm going to say Glen DeLorean.
6   Q.   Do you know or are you guessing?
7   A.   I'm going to say Glen DeLorean, he did
8   it.
9   Q.   That's your testimony under oath, you
10  know that he was doing it?
11  A.   I believe he was, yes.
12  Q.   How do you spell his last name?
13  A.   D E capital L O R E A N, DeLorean.
14  Q.   What was his supervisory relationship
15  to you; was he your direct manager?
16  A.   Yes.
17  Q.   When did you start working for him, as
18  soon as you were transferred into lawn and garden?
19  A.   Yes.
20  Q.   And why do you think that he was
21  trying to give you a hard time?
22  A.   I don't know, sir. I really don't
23  know.
24  Q.   Do you have any idea what his

Page 83

1   motivation was?
2   A.   No, I really don't. I just know all
3   of a sudden by me coming in at one set schedule and
4   now all of a sudden I'm coming in on Saturdays,
5   Sundays, I might have Monday off, and it was just --
6   it was hard.
7   Q.   Do you know whether or not that
8   fluctuating schedule was typical of people working in
9   the lawn and garden center, and if you don't know
10  tell me?
11  A.   I don't know, sir.
12  Q.   You don't know one way or the other?
13  A.   I don't know.
14  Q.   Did you ever speak with Mr. DeLorean
15  about this matter as to why your schedule was
16  fluctuating?
17  A.   I think I might have brought it to his
18  attention one time and he said, Hey, that's the way
19  it is.
20  Q.   Did you say anything further to him?
21  A.   No.
22  Q.   And you never complained to anybody
23  about the schedule?
24  A.   No, I just went, did my work.

Page 84

1   Q.   You never complained to anybody at
2   Lowe's about how Mr. DeLorean was treating you, did
3   you?
4   A.   No.
5   Q.   Why did you leave Lowe's?
6   A.   Glen DeLorean again at the end of my
7   shift, I did my shift, and I think it was five
8   o'clock that evening, and he says, Hey, we need you
9   to stay late. I said, I'm sorry, I can't. I have a
10  prior commitment. I have a part-time job that I have
11  to go get to. And he says, Well, Dave, you're not
12  going to leave me no choice. I said, Glen, do
13  whatever you want to, man. I've had it up to here
14  anyway. I went to my other job. He said, Hey, if
15  you leave, I'm going to have to write you up and
16  that's grounds for termination. I said, Whatever.
17       The next day, that was my day off and
18  I didn't go back to work, and I think he gave me a
19  phone call telling me that when I come in to come
20  straight -- don't punch in, just come straight to see
21  him, Glen DeLorean. And I knew what that meant. I
22  didn't even go back. I just didn't even go back.
23  Q.   Did you call to tell Mr. DeLorean or
24  to tell anyone else at Lowe's that you would not be

Page 85

1   returning to work?
2   A.   No, I didn't.
3   Q.   So you don't know if you were going to
4   be terminated; you were just guessing that might
5   happen?
6   A.   Yeah.
7   Q.   But it could have been short of
8   termination; it could have been a warning?
9   A.   I don't think so. I don't think so.
10  Q.   It could have been?
11  A.   It could have been. I guess it could
12  have been.
13  Q.   You didn't know?
14  A.   I didn't know, but what I did know is
15  that I was tired of being, you know, kicked around
16  like that.
17  Q.   Well, you say kicked around, but you
18  said under oath a few minutes ago you didn't know
19  what other people's schedules had been in lawn and
20  garden?
21  A.   I didn't.
22  Q.   They may have had fluctuating
23  schedules; correct?
24  A.   They could have. I don't know.

Page 86

1    Q.   Just like yours?
2    A.   It wasn't -- I didn't see too many
3  people in there at midnight but me. I was the only
4  one in there.
5    Q.   How many times did you go in at
6  midnight?
7       MR. FEDERICO: Object to the form,
8  argumentative.
9    A.   A couple times, few times.
10   Q.   Why were you asked to work late at
11  night on those occasions?
12   A.   To water the plants.
13   Q.   When did that happen?
14   A.   To put, to, to water the plants and to
15  put certain stock away.
16   Q.   When did that happen?
17   A.   Right after when they put me in lawn
18  and garden.
19   Q.   That was in April of 2002?
20   A.   I believe so, yes, sir.
21   Q.   So on a couple of occasions in your
22  first week or so working in lawn and gardens, they
23  had asked you either to stay or come in late to water
24  plants and put stock away?

Page 87

1    A.   Yes.
2    Q.   And that never happened again after
3  that?
4    A.   It happened a few times. That
5  happened for months. It happened for a few months.
6    Q.   It happened a few times over the
7  course of months?
8    A.   Yes.
9    Q.   Did you ever ask why they wanted you
10  to water the plants late at night?
11   A.   They said that's your job description.
12  No problem.
13   Q.   Was anyone else in the store when you
14  were there watering the plants?
15   A.   There might have been a few other
16  people in other departments, you know, putting stuff
17  up over there in them departments.
18      MR. CASEY: I need to break for lunch
19  now. I have a meeting that I have to attend for
20  roughly an hour. Why don't we break for an hour,
21  come back at one o'clock, and we shouldn't be
22  terribly long after that before we finish up, okay?
23      MR. FEDERICO: Well, sure.
24      (Whereupon, a lunch recess was taken)

Page 88

1       AFTERNOON SESSION
2       CONTINUED DIRECT EXAMINATION
3  BY MR. CASEY:
4    Q.   Back on the record after the lunch
5  break. Mr. Dean, I want to have several documents
6  marked as exhibits to the deposition.
7       I'd like to have marked Exhibit No. 5
8  a one-page document that is entitled Lowe's Employee
9  Orientation Training Record.
10      (Marked Exhibit 5; Lowe's Employee
11      Orientation Training Record)
12   Q.   Do you recognize this document,
13  Mr. Dean, Exhibit No. 5?
14   A.   Yes, sir.
15   Q.   Is that your signature near the bottom
16  of the page?
17   A.   Yes, sir.
18   Q.   And by signing is it fair to say that
19  it indicates that you received training regarding the
20  subject matters that are checked in the columns above
21  your signature?
22   A.   Yes, mm-hmm.
23   Q.   So that, among other things, you
24  received training regarding the company's open door

Page 89

1  policy?
2    A.   Yes.
3    Q.   And you understood what the company's
4  open door policy was?
5    A.   No, I kind of forgot.
6    Q.   But you knew it at the time; correct?
7    A.   I guess so, yes.
8    Q.   And that is that if you have a problem
9  at any time with your direct supervisor or with
10  co-workers, you can always go to people in the
11  company above your manager in the corporate hierarchy
12  or outside of the particular store in which you work
13  to make sure that you're getting objective people
14  from Lowe's to look at the situation?
15   A.   Yes.
16   Q.   You're aware of that?
17   A.   Yes.
18      MR. CASEY: I want to have marked as
19  Exhibit No. 6 a one-page document that relates to
20  Mr. Dean's employment with Lowe.
21      (Marked Exhibit 6; Acknowledgement
22      dated 1/6/01)
23   Q.   Mr. Dean, do you recognize this
24  document?

Page 90

1    A.   Yes.
2    Q.   And is that your signature toward the
3  bottom of the page?
4    A.   Yes, sir.
5    Q.   This is also something that you signed
6  as part of your orientation and training before you
7  actively commenced work with Lowe's; is that correct?
8    A.   Yes, sir.
9    Q.   And did you read this document before
10  you signed it?
11    A.   Yes.
12    Q.   So you knew that in Section I, where
13  it says "Notice of Lowe's policies," you were
14  instructed that, and I quote, "If you are subjected
15  to discrimination, including sexual harassment, or if
16  you are aware of a violation of any of the policies
17  above, report it immediately to your store/location
18  manager...If immediate satisfactory action is not
19  taken, call or write Lowe's Internal Audit
20  Department..." and then it provides both an address
21  and a telephone number, close quote.  Do you see
22  that?
23    A.   Yes, I see that.
24    Q.   And you retained a copy of this

Page 91

1  document during the course of your employment at
2  Lowe's; correct?
3    A.   I believe so, yes.
4    Q.   So that you knew that if you had a
5  problem with what your managers were doing or how you
6  were being treated in any fashion by anyone while you
7  were employed at Lowe's that you could always go to
8  your department head, and indeed you could go above
9  the head of your department head, and call or write
10  Lowe's Internal Audit Department to address any
11  complaints you might have?
12    A.   Correct.
13    Q.   You understood not only you could do
14  that but that you were supposed to do that?
15        MR. FEDERICO:  Object to the form.
16  You can answer.
17    A.   Yes, correct.
18    Q.   Who is Janie Jordan?
19    A.   That was a friend of mine.
20    Q.   Is that a girlfriend?
21    A.   She was, yes.
22    Q.   A woman you lived with?
23    A.   In the past.
24    Q.   Okay.  Are you still friends with her?

Page 92

1    A.   Yes.
2        MR. CASEY:  I'd like to have marked as
3  Exhibit No. 7 your application for employment at
4  Lowe's dated January 2, 2001 which is in two pages.
5        (Marked Exhibit 7; Application for
6        Employment dated January 2, 2001)
7    Q.   Do you recognize Exhibit No. 7?
8    A.   Yes.
9    Q.   Is that your signature at the bottom
10  of the first page?
11    A.   Yes, sir.
12    Q.   And in the lower left-hand column on
13  the second page is that your --
14    A.   Yes, it is, sir.
15    Q.   -- signature?
16    A.   Yes.
17    Q.   Okay.  Now, you knew when you were
18  filling out this employment application that you were
19  to be truthful in doing so; correct?
20    A.   Correct.
21    Q.   And you were, in fact, answering these
22  questions fully and truthfully; correct?
23    A.   Yes.
24    Q.   You see in the section entitled "Work

Page 93

1  History" on page one of Exhibit 7 near the bottom --
2    A.   Work history, yes.
3    Q.   -- you were asked to identify your
4  last three or four employers immediately preceding
5  this application for employment at Lowe's; correct?
6    A.   Yes, sir.
7    Q.   And you identified your then current
8  employer as New Boston?
9    A.   Yes.
10    Q.   Is that correct?
11    A.   Yes, sir.
12    Q.   And you were, in fact, working for New
13  Boston in January of 2001; is that correct?
14    A.   I guess, yes.
15    Q.   And you had been working there for a
16  couple months?
17    A.   Yes, sir.
18    Q.   What were you doing for New Boston?
19    A.   It was a temp agency, and they would
20  send us out on assignments to different places.  I
21  did work at McDonald's warehouse where we would store
22  the products in the truck to be sent to the local
23  McDonald's throughout the state.
24    Q.   And prior to that you had been working

Page 94

1  at Home Depot?
2      A.  Yes, sir.
3      Q.  And I take it from your job
4  application that you worked at Home Depot between
5  March of 2000 and November of 2000, approximately
6  eight months?
7      A.  Yes, sir.
8      Q.  Is that correct?
9      A.  Yes, sir.
10     Q.  What did you do for Home Depot?
11     A.  That's where I learned to do my RTM
12  work for Lowe's. I was a RTV which there is return
13  to vendor.
14     Q.  Okay. And did you work for Home Depot
15  at any time other than that eight-month period
16  between March of the year 2000 and November of the
17  year 2000?
18     A.  No, sir, just what's there.
19     Q.  Just that eight-month period?
20     A.  Yes.
21     Q.  All right, and you're sure of that?
22     A.  Yes.
23     Q.  Why did you leave Lowe's -- I'm
24  sorry -- why did you leave Home Depot?

Page 95

1      A.  Because it was, it was a little bit
2  difficult for me to get there because at this
3  particular store, it was in Salem, and by me living
4  in Lynn it was, like they just started a bus schedule
5  there, and I used to have to depend on friends to
6  pick me up and bring me to work.
7      Q.  Was there any reason -- did you leave
8  voluntarily?
9      A.  Yes.
10     Q.  You were not terminated?
11     A.  Yes.
12     Q.  Yes, what?
13     A.  I was terminated.
14     Q.  You were terminated?
15     A.  Yes.
16     Q.  So you left involuntarily?
17     A.  Okay, yes.
18     Q.  Why were you terminated?
19     A.  There was an accident where a fork, a
20  forklift, a fork jack rolled over my foot; and when
21  it rolled over my foot, their policy was to send me
22  straight to the hospital. When I went to the
23  hospital, they did some tests and stuff; and they
24  found something, some marijuana, in my system.

Page 96

1      Q.  So they terminated you for testing
2  positive for marijuana?
3      A.  Yes, sir.
4      Q.  And they told you that?
5      A.  Yes, sir.
6      Q.  And you knew that on or about the day
7  that you were terminated in November --
8      A.  Yes, sir.
9      Q.  -- of 2000?
10     A.  Yes, sir.
11     Q.  You knew that before you filled out
12  this work application?
13     A.  I filled out -- no, no, I -- like when
14  I filled -- they gave me a drug test when I filled
15  out this work application.
16     Q.  No, no, listen to me for a second.
17  When you prepared the information that's contained on
18  the document that's been marked as Exhibit 7 --
19     A.  Yes.
20     Q.  -- you did that work in January of the
21  year 2001; correct?
22     A.  Yes.
23     Q.  As of January 2d, 2001 you knew that
24  you had been terminated by Home Depot for testing

Page 97

1  positive for marijuana; correct?
2      A.  Yes.
3      Q.  So when you prepared this work history
4  portion of the job application for Lowe's, you were
5  not entirely truthful, were you?
6      A.  Oh, I was truthful because they tested
7  me there too.
8      Q.  Well, but when you were asked for the
9  reason for leaving Home Depot you answered, not
10  enough hours?
11     A.  Oh, right.
12     Q.  Correct, and that was not entirely
13  truthful, was it?
14     A.  Not entirely.
15     Q.  Because, in fact, you had been
16  terminated for testing positive for marijuana;
17  correct?
18     A.  Correct.
19     Q.  You didn't tell anybody at Lowe's that
20  you had been terminated by Home Depot for testing
21  positive for marijuana?
22     A.  No, I didn't, sir.
23     Q.  And when you filled out the date at
24  the bottom of page one of Exhibit 7, you made an

25 (Pages 94 to 97)

1 error and filled it out as 1/2/00 when, in fact, you
2 prepared this document on 1/2/01 as is reflected
3 correctly on the second page of Exhibit 7; correct?
4     A. Correct.
5     Q. Now, in your complaint to the MCAD --
6 and I'll show you again the document that was marked
7 as Exhibit No. 2 -- you stated under oath to the MCAD
8 that you had worked at Home Depot for two years, and
9 that's in the second sentence of the second paragraph
10 under the section entitled, "The particulars are."
11 Do you see that? I quote, "I was hired as a Return
12 to Manufacturer, a position in which I had two years
13 of experience at Home Depot." Close quote. Have I
14 read it accurately?
15     A. Yes, sir.
16     Q. And when you wrote that to the MCAD,
17 you were not being entirely truthful, were you?
18     A. Well, I didn't have all my, my dates
19 correct, you know. I was just saying this off the
20 top of my head.
21     Q. So in your complaint to the MCAD, you
22 said that you had two years' experience at Home Depot
23 when, in fact, you only had eight months' experience
24 there; correct?

1     A. I think I had more than eight months
2 at Home Depot.
3     Q. Look again at the first page of
4 Exhibit 7 where it indicates you worked at Home Depot
5 from March of 2000 to November of 2000; do you see
6 that?
7     A. Yes, sir.
8     Q. Is that accurate?
9     A. I guess it is, yes. I'm not real
10 sure, but I guess it is.
11     Q. Prior to that you had worked at Arrow
12 Electronics?
13     A. Yes.
14     Q. For approximately four years?
15     A. Yes, sir.
16     Q. Did you leave there voluntarily or
17 involuntarily?
18     A. I left there voluntarily.
19     Q. Under what circumstances?
20     A. The assignment, what it says here, it
21 had ended. Arrow Electronics used to, it was, used
22 to be Ritchie Electronics, but Ritchie was sold to
23 Arrow, and then once they were sold and they were
24 going through their transition or switching the

1 companies, they let a lot of people go, and I was one
2 of them.
3     MR. CASEY: I want to have marked as
4 Exhibit No. 8 a copy of the Complaint and Jury Claim
5 that you filed in superior court in this matter.
6     (Marked Exhibit 8; Complaint and Jury
7     Claim)
8     Q. Do you recognize the document that has
9 been marked as Exhibit No. 8, Mr. Dean?
10     A. I guess this is the first time I ever
11 seen this.
12     Q. Is that right, you haven't seen it
13 before?
14     A. I believe this might be the first time
15 I ever seen this.
16     Q. Do you know who Chris O'Connor is?
17     A. No.
18     Q. Just yes or no, did you speak with
19 anyone affiliated with Mr. Federico's law firm to
20 prepare a document for filing suit in this case, just
21 yes or no?
22     A. No.
23     MR. CASEY: I want to have marked as
24 Exhibit No. 9 a performance review related document

1 dated at least with respect to your signature
2 August 31, '01; it's one page.
3     (Marked Exhibit 9; Lowe's Strategic
4     Training & Achievement Review/Career
5     Development Review dated August 31,
6     2001)
7     Q. Do you recognize Exhibit No. 9?
8     A. Yes, sir.
9     Q. This is the first performance related
10 review that you received in writing from Lowe's after
11 you commenced work there in January of '01; correct?
12     A. Yes, sir.
13     Q. And it's signed by Robert Estes, your
14 supervisor, and by yourself at the lower left-hand
15 corner at the bottom of the page?
16     A. Yes, sir.
17     Q. You had a chance to review this
18 document before you signed it; correct?
19     A. Yes, sir.
20     Q. And you thought that it fairly and
21 accurately reviewed your work for the first eight
22 months of your tenure at Lowe's; correct?
23     A. Yes, sir.
24     Q. And you knew that you had an

1 obligation to provide comments in a section entitled
2 "Employee Comments" if you wanted to disagree with or
3 add to anything that was contained in your review;
4 correct?
5     A.    That's correct.
6     Q.    And you knew that you could not only
7 write on the front page but you could go on and write
8 on the back of the page if you needed more space to
9 state your comments; correct?
10     A.    Yes, sir.
11     Q.    Mr. Estes noted in the supervisor
12 comments section that you needed, quote, "some
13 improvement on his" -- meaning your -- "attendance
14 and on the organization...his paperwork, like OFR and
15 cleared RTM reports." Close quote. Do you see that?
16     A.    Yes, sir.
17     Q.    Did I read it accurately?
18     A.    Yes, sir.
19     Q.    And you did not disagree with that
20 assessment; correct?
21     A.    Correct.
22     Q.    You thought that was a fair
23 assessment?
24     A.    Yes.

1     Q.    You had missed some time from work?
2     A.    I had time to use, you know.
3     Q.    And you missed time because both you
4 had some car problems with an old van that you were
5 driving and because you had asthma; correct?
6     A.    Yes, sir.
7     Q.    And, in fact, Mr. Estes was fairly
8 understanding about that, wasn't he?
9     A.    Sure, he was fair.
10     Q.    And you generally found him to be fair
11 in the way he dealt with you, didn't you?
12     A.    Yes, he hired me.
13     Q.    And he was a pretty -- well, to use a
14 common term, he was a pretty laid back, easy-going
15 guy, wasn't he?
16     A.    Real big guy.
17     Q.    And laid back?
18     A.    Yes.
19     Q.    People liked him?
20     A.    I guess so, yes.
21     Q.    Nice guy?
22     A.    Yeah.
23     Q.    And after you transferred from the
24 return area to the lawn and garden area, he continued

1 to be at least your second level supervisor; correct?
2     A.    Yes.
3     Q.    And you never registered any
4 complaints with him regarding how you were being
5 treated in the lawn and garden center, did you?
6     A.    No, sir.
7     Q.    I'm correct; right?
8     A.    Yes, you are.
9     Q.    And he was an approachable guy; if you
10 needed to speak with him, he was around and always
11 willing to listen, wasn't he?
12     A.    Yes.
13     MR. CASEY: I want to mark as Exhibit
14 No. 10 a one-page document that appears to be your
15 review effective January 6, '02 which you signed on
16 January 30, '02.
17     (Marked Exhibit 10; Lowe's Strategic
18     Training & Achievement Review/Career
19     Development Review dated January 30,
20     2002)
21     Q.    Do you recognize Exhibit No. 10?
22     A.    Yes, sir.
23     Q.    And is that your signature at the
24 lower left-hand portion of that document?

1     A.    Yes, it is sir.
2     Q.    Now, as of January '02, according to
3 your earlier testimony in this deposition today,
4 people had been for some time, for several months at
5 that point, leaving return merchandise and appliances
6 and the like in front of your door to your work area,
7 which was called the cage; is that correct?
8     A.    Yes.
9     Q.    You did not make note of that in your
10 employee comment section of this document, did you?
11     A.    What training -- oh, employee
12 comments. Major concerns are appliances, tools, and
13 other items needs to be marked with what's wrong with
14 it, plus receipts of purchases, that helps the return
15 process turnover.
16     Q.    My question is, in the employee
17 comment section of this review, you did not make any
18 note or comment regarding --
19     A.    No, I did not, sir.
20     Q.    -- return items being placed in front
21 of the door leading to the cage area; correct?
22     A.    All I wrote here --
23     Q.    Is that correct?
24     A.    Correct.

Page 106

1    Q.   You did talk about the return process
2  and your major concern being that appliances, tools,
3  and other items be properly marked with what's wrong
4  with them?
5      A.   Right.
6      Q.   That was the only concern that you
7  expressed?
8      A.   Exactly.
9      Q.   In this review, as opposed to the
10 review that you received some five months earlier,
11 you received four "does not meet standard"
12 indications out of the twelve performance criteria,
13 whereas in the first review you received all "meets
14 standard" scores; is that correct?
15     A.   Correct, sir.
16     Q.   And you did not complain about that;
17 you thought it was fair that Bob Estes registered a
18 score of "does not meet standard" on four out of the
19 twelve criteria; correct?
20     A.   Correct.
21         MR. FEDERICO: I'll object to the
22 form.
23     Q.   Your answer was correct?
24     A.   Correct, sir, but that's like when

Page 107

1  this -- if I can, if I can speak.
2      Q.   You can when your lawyer asks you
3  questions, if he'd like to.
4      A.   Okay.
5      Q.   At this time, in January of '02,
6  Mr. Estes wrote, "David has the knowledge and can
7  certainly perform this job. I think that his
8  constant time away from work is directly affecting
9  the productivity. He also needs to be more organized
10 especially with all the reports and OFR log." Do you
11 see that he writes that, have I accurately read it?
12     A.   Yes, sir.
13     Q.   And you did not indicate on this
14 document or otherwise that you disagreed with that,
15 did you?
16     A.   No, I didn't write that on this
17 document.
18     Q.   In fact, you did agree with that
19 assessment, didn't you?
20     A.   Kind of.
21     Q.   You had missed a fair amount of work
22 time in December of 2001; correct?
23     A.   I can't quite remember how much I
24 missed, but I think I said my asthma was acting up at

Page 108

1  that time.
2      Q.   That was the reason you were missing
3  work, because of your asthma?
4      A.   Yes.
5      Q.   And that was the only reason; correct?
6      A.   Yes.
7          MR. CASEY: I want to now have marked
8  as Exhibit No. 11 a one-page employee performance
9  report dated January 20, 2002.
10         (Marked Exhibit 11; Lowe's Employee
11         Performance Report dated January 20,
12         2002)
13     Q.   Do you recognize Exhibit No. 11?
14     A.   Yes, sir.
15     Q.   And is it, in fact, true that on or
16 about January 20th of 2002, some two weeks after you
17 received your performance review which has been
18 marked as Exhibit No. 10, Mr. Estes and Mr. Vaughn
19 sat down with you to talk about the condition of the
20 RTM cage and to tell you that you needed to do a
21 better job with it?
22     A.   Yes, sir.
23         MR. FEDERICO: Excuse me, if I can
24 object to the form that Exhibit 10 is dated after

Page 109

1  Exhibit 11. You indicated the opposite. Exhibit 11
2  is dated before Exhibit 10.
3          MR. CASEY: Well, I guess it is in
4  terms of its signature. That's a fair statement.
5          MR. FEDERICO: Well, it is in terms of
6  the signature of the supervisor.
7          MR. CASEY: Fair statement. My
8  apologies, I was wrong about that. I was looking at
9  the date in the upper right-hand corner of
10 Exhibit 10, which is January 6 of '02.
11         MR. FEDERICO: Right.
12     Q.   And you did not disagree with this
13 performance initial warning, did you?
14     A.   I did not, no, I didn't.
15         MR. CASEY: I want to have marked as
16 Exhibit No. 12 a document dated April 1, 2002
17 concerning Mr. Dean's performance.
18         (Marked Exhibit 12; Lowe's Employee
19         Performance Report dated April 1,
20         2002)
21     Q.   Do you recognize Exhibit No. 12,
22 Mr. Dean?
23     A.   Yes, sir.
24     Q.   This was a second written warning for

Page 110

1 poor job performance that Mr. Vaughn and Mr. Estes
2 provided to you and discussed with you on or about
3 April 1 of 2002; correct?
4     A.  Correct.
5     Q.  And you signed acknowledging receipt
6 of this in the lower right-hand corner; correct?
7     A.  Yes, sir.
8     Q.  And you had an opportunity to write in
9 employee comments and you did not; correct?
10     A.  I was told to read this here, which I
11 did, and sign it.
12     Q.  Well, you also saw that there was a
13 section provided for employee comments; correct?
14     A.  Correct.
15     Q.  And that section is provided in all
16 the performance review templates that Lowe's uses or
17 at least that you saw; correct?
18     A.  Yes.
19     Q.  And you knew because you had provided
20 employee comments with respect to prior performance
21 documents that you had the right to insert comments
22 if you wished to do so; correct?
23     A.  Correct.
24     Q.  And you did not make any comments on

Page 111

1 this document?
2     A.  No, I didn't.
3     Q.  Nor did you ever complain to anybody
4 at Lowe's about this second written warning, did you?
5     A.  No, sir.
6     Q.  Do you know who Andy Ramos was?
7     A.  No.
8     Q.  You do not challenge the fact that
9 Andy Ramos was in the Danvers Lowe's facility
10 conducting a review of operations in or about --
11     A.  Inventory.
12     Q.  -- March of 2002, do you?
13     MR. FEDERICO: I'll object; if he
14 doesn't know who he is, how can he observe that he
15 was there.
16     Q.  Do you know from time to time that
17 people from outside the particular Danvers store came
18 to that store on behalf of Lowe's and performed
19 various inventory reviews?
20     A.  Yes, sir.
21     Q.  Do you have any reason to believe that
22 Andy Ramos was not truthful in telling Mr. Vaughn and
23 Mr. Estes that he found your work area to be poorly
24 managed?

Page 112

1     MR. FEDERICO: I'll object; same
2 objection, he can't fairly be asked to speculate
3 about Mr. Ramos.
4     Q.  Do you have any reason to believe that
5 anybody affiliated with Lowe's reported falsely
6 regarding the status of your work site and/or
7 regarding the quality of your work as they reviewed
8 it in an inventory in March of '02?
9     MR. FEDERICO: Same objection; it just
10 simply calls for speculation which wouldn't be useful
11 testimony.
12     MR. CASEY: I don't know. You may
13 answer.
14     A.  All I know is on this one particular
15 time when we did this inventory, all the stuff that
16 was outside of my door, when I came in that morning I
17 couldn't even get in the office because they took all
18 the stuff from outside and put it inside my office.
19     Q.  You didn't write that down in the
20 employee comment section in this document, did you?
21     A.  No, I didn't.
22     Q.  The document reads, "Just recently we
23 had inventory, and Andy Ramos was conducting some
24 reviews for operations. When Andy went to view the

Page 113

1 RTM cleared report to see it was work[ed] properly,
2 he found that it was not worked at all. Dave had
3 been instructed and shown how to print this on
4 several occasions, both by myself and Steve Vaughn.
5 To this day the report is still not printed or
6 worked." Close quote. Have I read that accurately?
7     A.  Yes, sir.
8     Q.  And you read that on April 1 of 2002
9 before you signed this document; correct?
10     A.  Correct.
11     Q.  And you did not take issue with or
12 challenge the accuracy of that statement, did you?
13     A.  No, sir.
14     Q.  And you agree with it as you sit here
15 today, don't you?
16     A.  Yes, but they were informed, Bob Estes
17 and Steve Vaughn was informed. That's why when you
18 said something about another name, Steve, I thought
19 that was his name, but this now is real clear to me.
20 Steve Vaughn had it -- where I was, my job
21 responsibility, became too overwhelming; I had too
22 much stuff to do. Between sorting out all the stuff
23 that was there and printing out the reports, that
24 took a long time. What was more important to them

KACZYNSKI REPORTING

Page 114

1  was clean this up, get this straightened up. That
2  took a majority of my time.
3      Q.  And you didn't print the reports?
4      A.  As to their satisfaction.
5      Q.  Or at all; correct?
6      A.  I did print them. That's what they
7  wrote down. That's why I gave them no arguments
8  because I knew my time was going to be short there
9  because of the way they kept coming with these
10 reports.
11     Q.  You knew that you were supposed to
12 print RTM cleared reports and you were not doing it
13 to their satisfaction; correct?
14     A.  Correct.
15         MR. CASEY: I'd like to have marked as
16 Exhibit No. 13 a one-page employee performance report
17 concerning Mr. Dean also dated April 1 of 2002.
18         (Marked Exhibit 13; Lowe's Employee
19         Performance Report dated April 1,
20         2002)
21     Q.  Do you recognize Exhibit 13?
22     A.  Yes, sir.
23     Q.  Is that your signature toward the
24 bottom of the page?

Page 115

1      A.  Yes, it is.
2      Q.  And this was the third written warning
3  that you had received in the course of four months
4  and it also followed a performance review in which
5  four out of twelve criteria were identified as your
6  not meeting standard; correct?
7      A.  Correct.
8      Q.  This was a final written warning,
9  meaning that you could be terminated if there was any
10 further problem with your work; correct?
11     A.  Correct.
12     Q.  And you did not challenge the accuracy
13 or the fairness of this final written notice, did
14 you?
15     A.  Never.
16     Q.  In fact, when you were given a final
17 written warning regarding the RTM area being in an
18 "atrocious" state, you agree that it would be better
19 for you to move to the lawn and garden center so that
20 you could have an opportunity still to succeed with
21 Lowe's; correct?
22     A.  Correct.
23     Q.  Did Mr. Estes ever say or do anything
24 to you or in your presence that in any way reflected

Page 116

1  that he was a racist?
2      A.  I guess I might have seen something.
3  I don't know.
4      Q.  I'm not asking you to speculate. This
5  is a serious question.
6      A.  I don't know. I can't answer that. I
7  don't know. I don't know.
8      Q.  Did anybody affiliated with Lowe's
9  ever do or say anything to you or in your presence
10 that you thought reflected they were a racist?
11         MR. FEDERICO: I'll just object to the
12 term "racist." I don't think it would elicit
13 favorable or unfavorable testimony since the claim is
14 racial discrimination. We're not claiming the people
15 were racists. I think that term -- just requesting
16 that the question be reformed.
17     Q.  You can answer the question. Did
18 anyone affiliated with Lowe's ever do or say anything
19 to you that reflected that they had any animosity
20 toward you because you were a black man?
21     A.  I felt that.
22     Q.  Who did what that made you feel that
23 way? Be precise, who? First give me the name.
24     A.  Oh, see, that's where -- they were

Page 117

1  unfair to me; Steve Vaughn was unfair to me and Bob
2  Estes was unfair to me.
3      Q.  When?
4      A.  Through my whole ordeal there. After
5  I was hired and after they see me doing a good job
6  and they see how I behave myself, other people, I
7  notice a change in their attitude toward me, and I
8  knew it was a matter of time before they were in
9  cahoots to get me moved out of that warehouse.
10     Q.  You're saying that Bob Estes and the
11 people who work with you --
12     A.  Bob Estes hired me.
13     Q.  Here's a guy who hires you; after he
14 sees you're doing a good job, he wants to get rid of
15 you?
16     A.  Mm-hmm, because I also heard the lady
17 who replaced me as the RTM clerk, it was told to me
18 by Kris Lovett that she told Bob, I want his job, and
19 that was when I was moved out.
20     Q.  Well, what, if anything, did Mr. Estes
21 ever do or say that suggested that he moved you out
22 of that job or treated you improperly in any fashion
23 because of your race?
24     A.  Nothing.

Page 118

1    Q.   What, if anything, did Mr. Vaughn ever
2  say or do that led you to suspect that he mistreated
3  you in any respect because of your race?
4         A.   Nothing.
5         Q.   So do I understand your testimony to
6  be you thought these guys didn't like you and they
7  liked somebody else more?
8         A.   (Witness nods head).
9         Q.   Is that correct?
10        A.   Yes.
11        Q.   And it had nothing to do with your
12  race; is that correct?
13             MR. FEDERICO:  I'll object to the
14  form.
15        A.   Correct.
16             MR. CASEY:  That's all I have.
17             MR. FEDERICO:  I have no questions.
18             MR. CASEY:  Thank you, Mr. Dean.
19             THE WITNESS:  Thank you, sir.
20             (Whereupon, the deposition was
21  concluded at 1:51 p.m.)
22
23
24

Page 119

1         I have read the foregoing transcript and the
2  same contains a true and accurate recording of my
3  answers given to the questions therein set forth.
4
5
6  _____
7         DAVID H. DEAN
8
9  On this____day of_____, 2005, before me, the
10  undersigned notary public, personally appeared David
11  H. Dean, proved to me through satisfactory evidence
12  of identification, which were _____,
13  to be the person whose name is signed on the
14  preceding or attached document, and who swore or
15  affirmed to me that the contents of the document are
16  truthful and accurate to the best of his knowledge.
17
18
19  _____
20         NOTARY PUBLIC
21
22
23
24

Page 120

1  COMMONWEALTH OF MASSACHUSETTS)
                                )
2  SUFFOLK, SS.                 )
3
4         I, Cynthia A. Powers, Shorthand Reporter and
   Notary Public in and for the Commonwealth of
5  Massachusetts, do hereby certify that there came
   before me on the 10th day of March 2005, at 10:10
6  a.m., the person hereinbefore named, who was by me
   duly sworn to testify to the truth and nothing but
7  the truth of his knowledge touching and concerning
   the matters in controversy in this cause; that he was
8  thereupon examined upon his oath, and his examination
   reduced to typewriting under my direction; and that
9  the deposition is a true record of the testimony
   given by the witness.
10
        I further certify that I am neither attorney
11  or counsel for, nor related to or employed by, any of
   the parties to the action in which this deposition is
12  taken, and further that I am not a relative or
   employee of any attorney or counsel employed by the
13  parties hereto or financially interested in the
   action.
14
        IN WITNESS WHEREOF, I have hereunto set my
15  hand and affixed my notarial seal this 16th day of
   March 2005.
16
17
18
                       CYNTHIA A. POWERS
19                     NOTARY PUBLIC
                       MY COMMISSION EXPIRES
20                     JULY 2, 2010
21
22
23
24

31 (Pages 118 to 120)

KACZYNSKI REPORTING

# LOWE'S

## LOWE'S INCIDENT REPORT
### (Please Print)



_Dean_
EXHIBIT NO. 3
3/10/05         C

| SUBJECT OR INCIDENT NAME | STORE | DATE | CASE # IF APPLICABLE |
|---|---|---|---|
| DAVID DEAN vs. DANNY PUCCIO | 1094 | 11-9-01 | |

On Thursday Nov. 11 I (Kenneth Godin) was called to Rec. to look into an incident that transpired a few minutes earlier. Upon my arrival I asked David Dean what happened he then brought me into the RTM office where he showed a noose made of rope laying on his desk. I immediately asked everyone on the Rec. dock who was responsible for this. Dan Puccio immediately told me that he did it. I then asked Dan to come with me. I took him off the dock to talk to him about what he had done. Dan then stated to me that they were playing with the rope when he was asked if he knew how to make a noose. He stated that he did. He stated that David also asked if he could make one (a noose) Dan replied yes, he then proceeded to make one. Dan stated that he then left it for David on his desk, because of his curiosity of the noose. Dan thought nothing more of the situation then horse play. He said that he told Dave he (Dan) left the noose on his desk and I quote "I left you a present."

After completing the conversation with Dan, he then gave me his 2 week notice. He stated that he could not believe that his friend David is doing this to him.

After the conversation with Danny I called David Dean to the ASM office. Besides myself (Kenneth Godin) I had Mark Gullotti ASM and Stephen Sexton ASM present to talk to David. I immediately told him exactly what Dan had told me. I also told him that Dan had given me his 2 week notice to end his employment with Lowe's. David then said he did not want to see Dan leave over this. He just wanted to make sure that it was addressed because it hurt him. He then told me that he was very hurt because he considered Dan to be his friend. He then stated that this made him feel very uncomfortable and did not want things of this nature to happen at work. I completely agreed with him. I then asked him if he felt that I was handling this the way he wanted it to be handled.

| PREPARED BY: Ken Godin | DATE: | REVIEWED BY: | DATE: |
|---|---|---|---|

L 0034

# LOWE'S

## LOWE'S INCIDENT REPORT
### (Please Print)

| SUBJECT OR INCIDENT NAME | STORE | DATE | CASE # IF APPLICABLE |
|---|---|---|---|
| | | | |

and if he felt that if I needed to do more to tell me immediately. He said no he felt that I reacted very rapidly and fairly. I then asked David to fill out an incident report to document what had happened. He agreed and filled out the report.

To back up a little I also sent Danny home for the day so that the situation could not be further aggravated. I felt that under the circumstances this was the best way to avoid any more incidents since both parties were very emotional.

PREPARED BY: _____   DATE: 11/9/01   REVIEWED BY: _____   DATE: _____

L 0035

# LOWE'S

## LOWE'S INCIDENT REPORT
### (Please Print)

Dear
EXHIBIT NO. 4
3/10/05     C

| SUBJECT OR INCIDENT NAME | STORE | DATE | CASE # IF APPLICABLE |
|---|---|---|---|
| DAVID DEAN | 1094 | 11/8/01 | |

To whom this may concern:

Today 11/8 around 10:30 AM I was with two "Reps" doing "buy backs" for one and just basic "RTM's" with the other when a fellow associate "Danny" says to me — "Dave, I left something for you on your desk." I responded "Yeah Danny, I'll get to it, when I'm through here with these two reps."

When I made it back to my desk, one of the reps, and myself could not believe what was on my desk. It was a "black hang mans noose" which was very distasteful and rather embarrassing, so I says to "Danny" whats all this about. And he just started laughing, but there was nothing funny, after that when I bought this infraction to a "MOD" in the warehouse. Soon afterwards I was called to the office to hear my side of the story and to make sure I was o.k about what had just happened. I'm alright but no one needs to be hurt or humiliated —ed

| PREPARED BY: | DATE: | REVIEWED BY: | DATE: |
|---|---|---|---|

(1)

# LOWE'S

## LOWE'S INCIDENT REPORT
(Please Print)

| SUBJECT OR INCIDENT NAME | STORE | DATE | CASE # IF APPLICABLE |
|---|---|---|---|
| | | | |

this way with distasteful, childish, behavior
Basically my fellow associates, are nice
people. we all try to get along with
each other and when one crosses
the line such as this, this created
matters, especially from some one who
you trust to be a friend. I'm sorry
for the situation thats come about.
I just want to work in a safe
friendly environment with out the
ugly side of racism, rearing its ugly
head. where all adults here, and
what might be humorous humorous to
others can be very insulting to most.
I'm alright, but us as associates
and people don't need this kind of behavior

Thank You for time

Daniel H. Dean RTM

| PREPARED BY: Daniel H. Dean | DATE: 11/8/01 | REVIEWED BY: | DATE: 11/8/01 |
|---|---|---|---|

ITEM # 90071          PAGE 1 OF ____          Revised: 10/26/94

# WORK HISTORY

| LIST WORK HISTORY BEGINNING WITH THE CURRENT OR MOST RECENT EMPLOYERS AND MILITARY SERVICE | | EMPLOYMENT DATES | |
|---|---|---|---|
| Company Name *New Boston*  Tel # 978·774·1800 | What type of work do you do? *Temp* | From Month *11* Year *00* | |
| Address *85 Constitution Lane* | Name and title of your supervisor? *Jim* | To Month Year *Present* | |
| City *Danvers* State *MA* Zip | Reason for leaving? *Present* | Pay Rate *10·hr* | |
| Company Name *Home Depot* Tel # 978 - 741 - 9299 | What type of work did you do? *RTV Clerk* | From Month *3* Year *00* | |
| Address *5 Traders Way* | Name and title of your supervisor? *Sherri* | To Month *11* Year *00* | |
| City *Salem* State *MA* Zip *01970* | Reason for leaving? *Not enough hours* | Pay Rate *12·hr* | |
| Company Name *Arrow Electronics* Tel # 978·974·4? | What type of work do you do? | From Month *3* Year *96* | |
| Address *85 Concord St* | Name and title of your supervisor? | To Month *3* Year *00* | |
| City *N. Reading* State *MA* Zip *01985* | Reason for leaving? | Pay Rate | |
| Company Name *American Staffing* Tel # *Yellow Page* | What type of work do you do? *Temp* | From Month Year | |
| Address *Union St* | Name and title of your supervisor? *Paul* | To Month Year | |
| City *Lynn* State *MA* Zip *01902* | Reason for leaving? *Assignment Ended* | Pay Rate | |

State reason and length of any inactivity between employers.

May we contact your present employer for a work reference?  Yes ☑  No ☐
If yes, when?

To assist us in verifying your prior employment, have you ever worked under another name?
☐ Yes  ☑ No    If yes, list name

# Availability

What type of employment are you seeking?
(Check each classification you are willing to work.)
☑ Full-Time  ☐ Part-Time  ☐ Seasonal

Length of employment desired:
✓ Over a year _____ Less than a year
_____ Summer/Seasonal – From _____ to _____

How soon can you start working for Lowe's? *ASAP*

Number of hours you would prefer to work each week *48*

Maximum number of hours you can work each week *?*

We hire people to work during hours we're open to the public as well as times we are open for business. To help us consider you for a job that matches your availability, please tell us the earliest time and the latest time you can work each day by completing the chart on the right.

| Day | Earliest Time | Latest Time |
|---|---|---|
| Sun. | *Afternoons* | *Closing* |
| Mon. | *All Day* | |
| Tue. | '' | |
| Wed. | '' | • |
| Thu. | '' | |
| Fri. | '' | |
| Sat. | '' | |

If hired, the hours you have listed will be taken into consideration in our scheduling process. If you have any conflicts, please list them: _____

*Dear*

EXHIBIT NO. 7

*3/10/05*    c

# Important

## APPLICANT'S AGREEMENT AND CERTIFICATION.  READ BEFORE SIGNING.

I hereby certify that the facts set forth in the above employment application are true and complete to the best of my knowledge.  I understand that, if employed, falsified statements on this application may result in disciplinary action up to and including termination.

I hereby authorize all of my present and former employers, school authorities and persons listed as personal references to furnish Lowe's, or any agent acting on its behalf, information concerning my personal character, work habits and employment record (such as a statement of the reasons for the termination or separation of my employment), work performance, abilities, and other qualities pertinent to my qualifications for employment.  I hereby release all such persons and Lowe's and their respective officers, directors, employees, or agents, in both their individual and representative capacities, from any and all liability for damages of whatever nature arising from furnishing or receiving the requested information.

Lowe's is hereby authorized to make any investigation of my personal history and financial and credit record through any investigative or credit agencies or bureaus of Lowe's choice, at anytime during the course of my employment with Lowe's. I also understand that, upon written request, I will be informed if a consumer credit report was requested, and if such a report was requested, I will be told the name and address of the agency furnishing the report.

I understand that I may be required to undergo screenings for substance abuse (drugs) as a condition of my employment.

I also understand that all employment with Lowe's Companies, Inc. and its Subsidiaries, Lowe's Home Centers, Inc. and the Contractor Yard, Inc. or any affiliate thereof is 'at will' and may be terminated by Lowe's or by me at any time and for any reason or no reason at all with or without notice.

Lowe's is an equal opportunity employer.  Our policy is to consider all applicants for employment based on their qualifications and our current job vacancies.  Applicants are considered without regard to race, color, religion, sex, national origin, age, disability, or marital status or any other category that may be protected under applicable law.

MY SIGNATURE IS EVIDENCE THAT I HAVE READ AND AGREE WITH THE ABOVE STATEMENTS.

*1/2/00*

L 0010

**NOTE:** An objection does not necessarily disqualify an applicant from consideration.

Would you be willing to:

| | |
|---|---|
| Work overtime when needed? | (YES)  NO |
| Work holidays (not including Thanksgiving and Christmas)? | (YES)  NO |
| Work a schedule that changes from week to week? | YES  (NO) |
| Interrupt your break to help a customer? | (YES)  NO |
| Be at work on time every time? | (YES)  NO |
| Report to work and remain free from being under the influence of drugs or alcohol? | (YES)  NO |
| Wear safety equipment required for your job? | (YES)  NO |
| Work in an environment that may sometimes be hot or cold, dusty and noisy? | (YES)  NO |

**RATE YOURSELF**
Circle the number that best describes you.
One is average, five is excellent.

| | | | | |
|---|---|---|---|---|
| FRIENDLINESS: 1 | 2 | 3 | 4 | (5) |
| HELPFULNESS: 1 | 2 | 3 | 4 | (5) |
| WORK ETHIC: 1 | 2 | 3 | 4 | (5) |
| HONESTY: 1 | 2 | 3 | 4 | (5) |
| TEAM PLAYER: 1 | 2 | 3 | 4 | (5) |

Please explain objections you may have to any of the conditions noted above, such as the desire for a part-time schedule.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

---

**HIRING PROCESS**
Thank you for your interest in Lowes. Our commitment to excellence begins with hiring the most qualified candidate. We want to provide you with information about Lowe's to help you make an informed decision to apply. Before you begin the formal application process, please read this statement of basic standards and requirements. If you feel that you can comply, we welcome your application. Please acknowledge your understanding by signing your name on the line provided below.

**SUBSTANCE ABUSE** — Lowe's provides a substance-free workplace. All candidates will undergo urinalysis and/or hair testing to determine any level of controlled substance. A confirmed positive drug test will result in disqualification or termination.

**BACKGROUND CHECKS** — Lowe's will conduct an extensive background check which may include verification with the Social Security Administration, Department of Motor Vehicles, criminal Courts, state and county repositories of criminal records, credit bureaus, and employer mutual associations. Falsification of information or failure to provide information can result in disqualification, or termination if discovered after hire.

**EMPLOYMENT INTERVIEWS** — Several interviews may be conducted with you in order to determine if you are the best candidate and to provide more detailed information regarding your work history and qualifications.

**SURVEYS** — Various surveys may be administered to determine your attitude and aptitude in job-related areas. Some positions in the company require a physical examination.

**PHYSICAL EXAMINATION** — All of Lowe's

**CUSTOMER SATISFACTION** — All of Lowe's Employee Owners commit to provide our customers knowledgeable and friendly assistance whenever needed, regardless of where each job is performed.

I have read and understand the employee selection process utilized by Lowe's.

_Darrell H. Dean_
**Applicant's SIGNATURE**

**DATE** _1-2-01_

NOTE: We intend to fully verify all information on your application. Be complete and accurate in your responses. Falsification or omission of information will lead to termination.

L 0011

# Lowe's Strategic Tra___g & Achievement Review/___er Development Review
## (STAR/CDR)

| Last Name Dean | First David | Middle | STAR Effective Date |
|---|---|---|---|

| Job Title RTM Clerk | Reason for Review ☐ Merit   ☐ Promotion   ☑ Other 90 da. |
|---|---|

| STAR Standards (see back) | Exceeds Standard | Meets Standard | Does Not Meet Standard |
|---|---|---|---|
| 01 Customer Service | ☐ | ☑ | ☐ |
| 02 Merchandising | ☐ | ☑ | ☐ |
| 03 Computer Operation | ☐ | ☑ | ☐ |
| 04 Product Knowledge | ☐ | ☑ | ☐ |
| 05 Loss Prevention & Safety | ☐ | ☑ | ☐ |
| 06 Attendance/Punctuality | ☐ | ☑ | ☐ |
| 07 Organization | ☐ | ☑ | ☐ |
| 08 Report/Record Keeping | ☐ | ☑ | ☐ |
| 09 Initiative, Teamwork & Reliability | ☐ | ☑ | ☐ |
| 10 Job Knowledge | ☐ | ☑ | ☐ |
| 11 Training | ☐ | ☑ | ☐ |
| 12 Job Performance | ☐ | ☑ | ☐ |

**Supervisor Comments\*** (please include explanation for failure to meet standard(s) if applicable):
Dave has recently found himself really grasping the different aspects of the RTM position. The area's coming together. Dave needs some improvement on his attendance and on the organization his paper work, like OFR and Cleared RTM report.

**Training Completed Since Last Review:** Description and Date\*      Last Review Date_____

**Training Goals For Next Review:** Description & Date for Completion\*
I would like for Dave to Complete the SOS test on WKLN an all the Receiving test as well.

❖This section should be completed by employee only when employee meets or exceeds all standards.❖

**Career Development Review**     Do you know how to apply for other jobs at Lowe's? ☐ Yes   ☐ No

Please check the box that best matches how you feel about your work at Lowe's
☐ I am very satisfied with the job I have at Lowe's and have little interest in a job change.
☐ I am satisfied with the job I have, but would like another job at my current level even more.
☐ I am very interested in exploring the training required for a promotion.
☐ I am not satisfied with my job and want to talk about other opportunities.

**What are your career goals?\*  Have they changed since you started at Lowe's?\*  How?\*  Why?\***

_____

**What training do you need to be more successful in your current job?\*  A job you want in the future?\***
SOS - training so I can be more understanding to this procedure.

**Employee Comments:\***
Being treated fairly is alright, being appreciated is good. Being compensated for a job such at RTM - is hopefully approaching. I like what I do, with time I can do it better.

| Store Manager Signature | Date | Store Manager Name (Printed) | |
|---|---|---|---|
| Supervisor Signature | Date 8/04/01 | Supervisor Name (Printed) Robert Estes | Dean |
| Employee Signature David A. Dean | Date 8/31/01 | Month/Year of Next Planned Review | EXHIBIT NO. 9   3/10/05 |

90099 (Rev. 4/00)      **\*Please check if additional comments on back ☐**

# Lowe's Strategic Training & Achievement Review/Career Development Review (STAR/CDR)

| Last Name | First | Middle | STAR Effective Date |
|---|---|---|---|
| Dean | David | | 1-6-02 |

Job Title: RTM Clerk

Reason for Review: ☐ Merit  ☐ Promotion  ☒ Other Annual

| STAR Standards (see back) | Exceeds Standard | Meets Standard | Does Not Meet Standard |
|---|---|---|---|
| 01 Customer Service | ☐ | ☒ | ☐ |
| 02 Merchandising | ☐ | ☒ | ☐ |
| 03 Computer Operation | ☐ | ☒ | ☐ |
| 04 Product Knowledge | ☐ | ☒ | ☐ |
| 05 Loss Prevention & Safety | ☐ | ☒ | ☐ |
| 06 Attendance/Punctuality | ☐ | ☐ | ☒ |
| 07 Organization | ☐ | ☐ | ☒ |
| 08 Report/Record Keeping | ☐ | ☐ | ☒ |
| 09 Initiative, Teamwork & Reliability | ☐ | ☒ | ☐ |
| 10 Job Knowledge | ☐ | ☒ | ☐ |
| 11 Training | ☐ | ☒ | ☐ |
| 12 Job Performance | ☐ | ☐ | ☒ |

Supervisor Comments* (please include explanation for failure to meet standard(s) if applicable):
David has the knowledge and can certainly perform this job. I think that his constant time away from work is directly affecting the productivity - He also needs to be more organized especially w/ all the reports and OFR log.

Training Completed Since Last Review: Description and Date*    Last Review Date _____
N/A

Training Goals For Next Review: Description & Date for Completion*
Dave needs to Cross-Train w/ price changes.    1-6-03

❖This section should be completed by employee only when employee meets or exceeds all standards.❖

**Career Development Review**

Please check the box that best matches how you feel about your work at Lowe's

Do you know how to apply for other jobs at Lowe's? ☐ Yes  ☐ No
☐ I am very satisfied with the job I have at Lowe's and have little interest in a job change.
☐ I am satisfied with the job I have, but would like another job at my current level even more.
☐ I am very interested in exploring the training required for a promotion.
☐ I am not satisfied with my job and want to talk about other opportunities.

What are your career goals?*  Have they changed since you started at Lowe's?*  How?*  Why?*

What training do you need to be more successful in your current job?*  A job you want in the future?*
1 yr - has help me familiarize with my duties and more time will be an ally in RTM functions.

Employee Comments:*
Major concerns are appliances tools, and other items needs to be marked with what's wrong with it plus receipts of purchases, that helps's the return process turnover.

| Store Manager Signature | Date | Store Manager Name (Printed) | |
|---|---|---|---|
| Supervisor Signature | Date 1-31-02 | Supervisor Name (Printed) Robert Estes | Dean |
| Employee Signature David Dean | Date 1/30/02 | Month/Year of Next Planned Review | EXHIBIT NO. 10  3/10/05  c |

90099 (Rev. 4/00)    *Please check if additional comments on back ☐    L 0012

# LOWE'S
## EMPLOYEE PERFORMANCE REPORT

*Dean*
EXHIBIT NO. *11*
*3/10/05*    c

| Print Employee's Name | Location # | Department | Date |
|---|---|---|---|
| Dave Dean | 1094 | RTM | 1-20-02 |

**Check Type of Notice:**
- ☒ INITIAL
- ☐ WRITTEN
- ☐ FINAL NOTICE
- ☐ TERMINATION

**Check Reason for Employee Performance Report:**
- ☐ COMMENDATION FOR GOOD JOB PERFORMANCE
- ☐ VIOLATION OF COMPANY POLICIES
- ☒ POOR JOB PERFORMANCE
- ☐ OTHER _____

**Describe the conduct/performance (who, what, when, why, where and how).**

Today I had to sit down and have a discussion with Dave on the Condition of the RTM Cage. On Several occasions I've had to personally work overnight to help clean up his area. I told him I don't mind helping out, but he needs to maintain it. Dave has agreed and says that his efforts will increase to ensure that the area is well kept.

**What is expected in the future? Include follow-up dates.**

Follow up is ongoing —

**List previous performance reports within the last 12 months:**

Date _____ ☐ INITIAL ☐ WRITTEN ☐ FINAL NOTICE Reason _____

Date _____ ☐ INITIAL ☐ WRITTEN ☐ FINAL NOTICE Reason _____

Date _____ ☐ INITIAL ☐ WRITTEN ☐ FINAL NOTICE Reason _____

**Employee Comments:**

| Employee Signature does not mean the employee agrees with the content of this report, it only verifies that discussion about this report occurred. | Employee's Signature | Date |
|---|---|---|
| Print Supervisor's Name  Steve A Vaughn Jr | Supervisor's Signature | Date 1/20/02 |
| Print Manager's Name  Robert Estes | Manager's Signature | Date 1-20-02 |

This report does not modify the Contract of Employment, which is terminable at the will of either party, with or without cause, at any time, and for any reason.

Retain a copy in the employee's personnel file. Provide the employee a copy of the initial, written or final notice report.

90776 POD

# LOWE'S
## EMPLOYEE PERFORMANCE REPORT

*Dear*

EXHIBIT NO. *12*

*3/18/05*

| Print Employee's Name | Location # | Department | Date |
|---|---|---|---|
| Dave Dean | 1094 | RTM | 4-01-02 |

**Check Type of Notice:**

- ☐ INITIAL
- ☒ WRITTEN
- ☐ FINAL NOTICE
- ☐ TERMINATION

**Check Reason for Employee Performance Report:**

- ☐ COMMENDATION FOR GOOD JOB PERFORMANCE
- ☐ VIOLATION OF COMPANY POLICIES
- ☒ POOR JOB PERFORMANCE
- ☐ OTHER _____

**Describe the conduct/performance (who, what, when, why, where and how)**

Just recently we had inventory, and Andy Ramos was conducting some reviews for Operations. When Andy went to view the RTM Cleared report to see it was worked properly, he found that is was not worked at all. Dave had been instructed and shown how to print this on several occasions, both by myself and Steve Vaughan. To this day the report is still not printed or worked.

**What is expected in the future? Include follow-up dates.**

Dave is expected to print the reports pertinent to his functions follow-up is ongoing and any other violation of this or any other kind will be delt with by diciplinary action up to and including termination

**List previous performance reports within the last 12 months:**

Date 1-20-02 ☒ INITIAL ☐ WRITTEN ☐ FINAL NOTICE Reason _____

Date_____ ☐ INITIAL ☐ WRITTEN ☐ FINAL NOTICE Reason _____

Date_____ ☐ INITIAL ☐ WRITTEN ☐ FINAL NOTICE Reason _____

**Employee Comments:**

_____

_____

_____

| Employee Signature does not mean the employee agrees with the content of this report, it only verifies that discussion about this report occurred. | Employee's Signature David Dean | Date 4/1/02 |
|---|---|---|
| Print Supervisor's Name Steve A Vaughn Jr | Supervisor's Signature | Date 4/1/02 |
| Print Manager's Name Robert Estes | Manager's Signature | Date 4/1/02 |

This report does not modify the Contract of Employment, which is terminable at the will of either party, with or without cause, at any time, and for any reason.

Retain a copy in the employee's personnel file. Provide the employee a copy of the initial, written or final notice report.

Dean
EXHIBIT NO. 13
3/10/05     c

# LOWE'S
## EMPLOYEE PERFORMANCE REPORT

| Print Employee's Name | | Location # | Department | Date |
|---|---|---|---|---|
| Dave Dean | | 1094 | RTM | 4-01-02 |

Check Type of Notice:
- ☐ INITIAL
- ☐ WRITTEN
- ☒ FINAL NOTICE
- ☐ TERMINATION

Check Reason for Employee Performance Report:
- ☐ COMMENDATION FOR GOOD JOB PERFORMANCE
- ☐ VIOLATION OF COMPANY POLICIES
- ☒ POOR JOB PERFORMANCE
- ☐ OTHER _____

Describe the conduct/performance (who, what, when, why, where and how).

Today April 1, 2002 I came in to a what seems to be become a familiar sight. The RTM area was atrocious the items that we received credit for were still on the dock, not shipped out. The appliances that have not received credit have no disposition on them as discussed in prior meetings with Dave. The inside of the cage is also extremely unorganized as well as the dock and work area. In my professional opinion I don't believe the RTM

What is expected in the future? Include follow-up dates. position is the best fit for Dave. Dave will be moved out of RTM's and placed in a different position that will allow him to succeed in this Company instead. decline - Follow-up is ongoing and violation of this or any other kind will be dealt with by diciplinary action up to and including termination.

List previous performance reports within the last 12 months:

| Date | | | | Reason |
|---|---|---|---|---|
| Date _____ | ☐ INITIAL | ☐ WRITTEN | ☐ FINAL NOTICE | _____ |
| Date 4-01-02 | ☐ INITIAL | ☒ WRITTEN | ☐ FINAL NOTICE | Poor Job Performance. |
| Date _____ | ☐ INITIAL | ☐ WRITTEN | ☐ FINAL NOTICE | _____ |

Employee Comments:

_____

_____

_____

_____

| Employee Signature does not mean the employee agrees with the content of this report, It only verifies that discussion about this report occurred. | Employee's Signature David Dean | Date 4/1/02 |
|---|---|---|
| Print Supervisor's Name Steve A Vaughn Jr | Supervisor's Signature | Date 4/1/02 |
| Print Manager's Name Robert Estes | Manager's Signature | Date 4-1-02 |

**This report does not modify the Contract of Employment, which is terminable at the will of either party, with or without cause, at any time, and for any reason.**

Retain a copy in the employee's personnel file. Provide the employee a copy of the initial, written or final notice report.

00776 POD