## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

### CIVIL ACTION NO: 04-1265-mel

|  |  |
|---|---|
| **DAVID DEAN,** | ) |
| **Plaintiff,** | ) |
|  | ) |
| **v.** | ) |
|  | ) |
| **LOWE'S HOME CENTERS, INC.** | ) |
| **Defendant.** | ) |

## THE PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I STATEMENT OF MATERIAL FACTS

On January 6, 2001 David Dean was hired as a RTM or return to manufacture clerk at the Danvers Lowe's location. (Exhibit 1, Deposition of David Dean P. 103) Between January 6, 2001 and November 8, 2001 Mr. Dean received one positive performance evaluation from his supervisor Robert Estes, which indicated two areas for improvement. From January 6, 2001 through August 2, 2001 David Dean met all performance standards on his review according to his manager. (Exhibit 2, Deposition of Robert Estes, P. 52-53; 91) During the same time period, Mr. Dean successfully passed several Lowe's work related examinations receiving "certificates of accomplishment", including an RTM quiz. (Deposition of Robert Estes, Exhibit 5) David Dean was the only African American employee on the day shift at Lowe's. (Deposition of Robert Estes , P. 119)

On November 8, 2001, Mr. Dean was meeting with two customers, one of whom was Robert

Davis, a Sinco nail representative.(Exhibit 3, David Dean's Answers to Interrogatories) When

returning to Mr. Dean's office they saw that a large, black hangman's noose had been placed on his

desk. (Exhibit 4, MCAD Charge) Mr. Dean and the customers were embarrassed.(MCAD Charge)

When confronted by a Lowe's manager in a group of white employees, Daniel Puccio, a Lowe's

employee, admitted to placing the noose on Mr. Dean's desk. Mr. Puccio resigned, continuing to work

at Lowes for two to three weeks. (MCAD Charge)

Mr. Dean states that after the noose incident the atmosphere at work changed dramatically.

(MCAD Charge) When he came to work in the morning he found that all of the returns had been

placed in from of his office door. (Deposition dean P. 67, 83, MCAD Charge; Exhibit 5- Superior

Court Complaint). Although his office should have been locked overnight, Mr. Dean would find that it

had been used overnight. Trash was found on the floor and on the desk. In order to get into his office,

it would take 45 minutes to climb over sinks, refrigerators, furnaces, bathtubs, boxes of tile and marble,

just to enter the office. Mr. Dean's testimony is that the piling of returned merchandise became

significantly worse after the noose incident. (Deposition of David Dean, P. 51-52; David Dean's

Answers to Interrogatories)

Unable to perform as the RTM clerk, Mr. Dean was given a final warning of impeding

termination, and transferred by management to the lawn and garden department on or about

April 1, 2002.(Deposition of David Dean P. 79-80) Mr. Dean had no experience in this department,

and his work scheduled changed from 9-5 to unpredictable hours. (Deposition of David Dean P. 83)

2

Mr. Dean was required to work overtime in the evening and overnight shifts. Mr. Dean was effectively discharged by his supervisor Mr. DesLauriers on or about April 6, 2002, when he was told by Mr. DesLauriers if you do not work tonight 'If you leave I will have to write you up and that's grounds for termination." Since he had received his final warning already, Mr. Dean understood this language to mean that he was terminated. (Deposition of David Dean, P. 84)

Lowes did not hold racial sensitivity training after the noose incident, nor did Lowe's offer employee assistance programs to Mr. Dean. (Deposition of Robert Estes P. 68; 71) Several weeks after the incident, Mr. Dean saw Mr. Puccio at work, at Lowe's in Danvers. (Dean Deposition P. 79). Mr. Puccio and Mr. Dean were co-workers and were never friends. (Deposition of David Dean P. 77 )

## II.   **THE LEGAL STANDARD FOR SUMMARY JUDGMENT**:

The proper standard for the court to apply in considering a motion for summary judgment under Mass.R.Civ.P. 56, is delineated in Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991): "A party moving for summary judgment in a case where the opposing party has the burden of proof at trial is entitled to summary judgment if he demonstrates, by reference to material described in Mass.R.Civ.P. 56(c), unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case."

"In order to be entitled for Summary Judgment a party must show, based upon the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law." Mass. R. Civ. P. 56;

3

Community Nat'l Bank v. Dawes, 369 Mass. 550, 553-56 (1976). The burden is on the moving party to demonstrate with admissible evidence that there are no genuine issues as to any material fact. Godbout v. Cousens, 396 Mass. 254, 261, 495 N.E.2d 940 (1985).

In a motion for summary judgment under Rule 56, "the movant is held to a stringent standard ... any doubt as to the existence of a genuine issue of material fact will be resolved against [him]. Because the burden is on the movant, the evidence presented ... always is construed in favor of the party opposing the motion and he is given the benefit of all favorable inferences that can be drawn from it." Foley v. Matulewicz, 17 Mass.App.Ct. 1004, 1004, 459 N.E.2d 1262, 1262 (1984).

Once the moving party meets its burden, the burden shifts to the non-moving party "to show with admissible evidence the existence of a dispute as to material facts." Godbout v. Cousens, 396 Mass. 254, 261, 495 N.E.2d 940 (1985). The opposing party must show that a genuine issue of fact does exist, by showing that there is more than a "metaphysical doubt as to the material facts." Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 106 S.Ct. 1348, 1356 (1986).

When considering a motion for summary judgment, the court should not consider the credibility of witnesses. Junkins v. Slender Woman, Inc., 7 Mass.App.Ct. 878, 386 N.E.2d 789, 794 (1974). When considering a motion for summary judgment, the court should not consider the weight of the evidence and the court should not make any findings of fact. Riley v. Presnell, 409 Mass. 239 (1991). Any inference to be drawn from the materials before the court must be viewed in the light most favorable to the party opposing the motion. United States v. Diebold, 369 U.S. 654, 655 (1962).

Finally, the court should not grant the motion for summary judgment merely because the facts, offered by the movant, appear to be more plausible than those tendered by the opposition, or because

4

it appears that the opposition is unlikely to prevail at trial. Id.; Atty Gen. v. Bailey, 386 Mass. 367,

370, 436 N.E.2d 139, 143, cert. denied, 459 U.S. 970 (1982).

## ARGUMENT

## III THE PLAINTIFF ASSERTS THAT THE REMEDIAL ACTION ALLEGEDLY TAKEN BY THE DEFENDANT WAS INEFFECTIVE IN ADDRESSING THE RACIAL DISCRIMINATION EXPERIENCED BY THE PLAINTIFF

Lowes argues that it is not liable for Puccio's conduct because the Company immediately and

effectively responded to the plaintiff's complaints of racial discrimination citing Cerqueira v. Corning

Net Optix, 2004 U.S. Dist. LEXIS 17308 (D. Mass. 2004).

Even though the defendant immediately warned the offender, Mr. Puccio, about his

behavior of placing a noose on the desk of the Plaintiff where it was seen by two vendors, the finder of

fact should determine whether a warning was effective under the circumstances. Further, Mr. Puccio

was not terminated by the defendant, but rather he tendered his two week notice and resignation.

Upon information and belief, the Plaintiff asserts that Mr. Puccio was subsequently hired at a different

Lowe's retail store. The Plaintiff has served Mr. Puccio with a deposition subpoena to be taken on

June 24, 2005. (Exhibit 6)

Under the standard set by the court in Cerqueira the defendant failed to take effective

remedial measures. This raises a legitimate question of material fact best left for the fact finder at trial.

In Cerqueira, the employer developed a remedial program that was reasonably calculated to end the

5

harassment. In this case, on the contrary, the defendant merely issued the offender a written warning. Furthermore, unlike the employer in Cerqueira , Lowe's, neither before nor after the racial discrimination,  implement a racial sensitivity training program.  (Deposition of Robert Estes P. 68; 71)

The manager responsible for Mr. Puccio and Mr. Dean took no action at all concerning the incident in question.  Mr. Estes never spoke to Puccio about the incident and spoke only once to Mr. Dean at Mr. Dean's request. (Deposition of Robert Estes P. 68; 71)

## IV THE DEFENDANT CANNOT SHOW THAT THERE IS NO GENUINE ISSUE OF FACT AS TO WHETHER IT ACTED FEASIBLELY AND REASONABLY TO COMBAT THE RACE DISCRIMINATION

The defendant took the most convenient and minimal measurers possible to combat the racial discrimination incurred by the plaintiff.  Lowe's action to remedy the plaintiff's complaints of racial discrimination were not effective, because following the initial racist act of placing a noose on the desk of Mr. Dean by Puccio, harassment continued. Dean's office was used at night when it was supposed to be locked, all of the returns from the night before were placed in front of his office forcing him to climb over things, and he was demoted to another department with a completely different schedule, and he was not allowed to clear out his office. Therefore, the employees and managers apparently felt free to harass Mr. Dean after seeing the lenient treatment of Mr. Puccio by Lowes.

Whether or not Mr. Dean was harassed should be determined by an assessment of all the facts

6

and circumstances by the finder of fact at trial. DeGrace v. Rumsfeld, 614 F.2d 796, 805 (1ˢᵗ Cir. 1980) which was cited by Lowe's does not answer the question of what measures would be considered feasible and reasonable to combat race discrimination in the work place. This is a facts-and-circumstances test which should be resolved by a jury.. However, the DeGrace case suggests that sporadic pep talks would not be enough, and at the least, an intra-departmental investigation would be required. No such investigation was done by Lowes. Mr. Dean's manager at the time, Robert Estes was indifferent to the racial discrimination and harassment. Lowes inaction, as exemplified by Mr. Estes indifference to the racial discrimination created a hostile work environment. Satterwhite v. Faurecia Exhaust Systems, Inc. WL 1279253 (2005)(A vehicle in the plant parking lot that had a noose hanging from the rear view mirror can be viewed as contributing to a hostile work environment).

## V. THE TIMING AND INTENSITY OF THE HARASSMENT, OCCURRING AFTER THE NOOSE INCIDENT IN NOVEMBER OF 2001, INCREASES THE PROBABILITY THAT THE PLAINTIFF WAS DEMOTED AND FORCED OUT IN RETALIATION FOR HIS COMPLAINTS OF RACIAL DISCRIMINATION.

The defendant argues that the "Plaintiff has not demonstrated a *prima facie* claim for retaliation without acknowledge that evidence of retaliation exists. Through further depositions and other discovery, as well as discovery done to date, the plaintiff can show that there is a genuine issue of material fact as to whether he was retaliated against by Lowe's.

Prior to the racial discrimination the plaintiff had met all objective standards on the Lowes 90 day performance evaluation. (Dep. of Estes P. 52-53; 91) After approximately 200 days on the job

7

Mr. Dean had a mostly positive employment evaluation, with no warnings. In September and October of 2001, Mr. Estes admits that Mr. Dean did not receive warnings or critical evaluations concerning his job performance. (Estes dep P. 98 L. 14-20) Then after the noose incident, and Mr. Dean's complaint's, in January and April of 2002, written warnings, and a final termination warning was handed out.

Lowe's argues that Dean's job was processing returns, therefore, these returns were not placed in front his door because he engaged in protected conduct. Before the incident, his office was never used, however, after the incident, he went to work and found trash on the floor and desk of his office. (Exhibit 5) Further, the piling of returns impeding his Monday morning entrance into his office became worse after November of 2001. (Deposition of David Dean P. 51-52)

## VI THE PLAINTIFF CAN SHOW THAT THE WORKPLACE HARASSMENT , THE LACK OF EFFECTIVE RESPONSE FROM LOWE'S, AND HIS DEMOTION WERE IN RETALIATION FOR HIS PROTECTED ACTIVITY.

In August of 2001, during Mr. Dean's 90 day evaluation, his manager, Mr. Estes, noted that Mr. Dean needed to "improve his organization and attendance." These were benign comments, that any manager may make to any employee. Mostly, his review was positive in August, 2001. (Deposition of Robert Estes P. 54) After his complaint, Mr. Dean's performance evaluations were sharply more negative following the incident, due to the duress inflicted on him by the incident and Lowe's ineffective response. Recall that his manager, Mr. Estes, never spoke to Mr. Puccio about the placing of the noose on Mr. Dean's desk. Further, Mr. Estes only spoke to Mr. Dean about the

8

incident one time, when Mr. Dean approached Mr. Estes. The weak response by Lowe's, created a hostile work environment and duress within Mr. Dean.

Mr. Dean sets forth a reasonable basis for his retaliation complaint: (i) He engaged in protected conduct (reported racist incident); (ii) he was demoted to lawn and garden because of this, and then constructively discharged (adverse employment action); and Lowe's ineffective response to his claim perpetuated the hostile work environment impairing his ability to work (iii) there was a causal connection between the protected activity, hostile work environment and the demotion to lawn and garden.

The Dziamba v. Warner & Stackpole LLP, 56 Mass. App. Ct. 397 (2002) case cited by Lowe's can be distinguished, because in that case, the plaintiff requested reasonable accommodations for a physical disability, and the court held that his later discharge was not retaliatory, but in good faith, because he had unsatisfactory performance ratings before and after his disability request.

However, in Dean's case his performance did not falter until January of 2002, after the noose incident. At the same time the harassment in the form of overnight misuse of his office and the piling of returns increased. In addition, Dean realized the offender was never actually terminated, after seeing him at work. (Dean Deposition P. 79 ) In retaliation to his complaints, Lowe's failed to address the issues raised by Mr. Dean, which led to a hostile work environment, his demotion and constructive discharge in April of 2002.

9

Glen DesLauriers, the lawn and garden manager, harassed Dean into quitting by imposing an

unpredictable work schedule, repeatedly asking him to stay or come in late, and requesting that he stay

late on a day when Dean had to work at a second job.(Deposition of David Dean P. 84)

## VII CONCLUSION

For the reasons stated herein the Defendant's motion for Summary Judgment must be

denied.

By Plaintiff's Attorney,

RAINER & O'CONNOR, LLP
Daniel C. Federico
B.B.O. #645717
60 V.F.W. Parkway
Revere, Massachusetts 02151
(781) 289-7900

10

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

### CIVIL ACTION NO: 04-1265-mel

|                                          |   |
|------------------------------------------|---|
| **DAVID DEAN,**                          | ) |
| **Plaintiff,**                           | ) |
|                                          | ) |
| **v.**                                   | ) |
|                                          | ) |
| **LOWE'S HOME CENTERS, INC.)**           |   |
| **Defendant.**                           | ) |

## THE PLAINTIFF'S STATEMENT IN OPPOSITION TO THE DEFENDANT'S
## STATEMENT OF UNDISPUTED FACTS

1. Agree.

2. Disagree – Mr. Dean and Mr. Puccio were not friends but were "fellow associates.". (Exhibit 1-Deposition of David Dean 75 L. 12- 77 L. 4)

3. Agree.

4. Disagree – Mr. Puccio remained employed with Lowes in Danvers for two or three weeks after November 8, 2001. (Ex. 2- Deposition of Robert Estes P. 77)

5. Agree.

6. Disagree – Mr. Dean was not in a managerial position and was not charged with making policy or decisions around race discrimination, Mr. Dean was the victim of racial discrimination. Mr. Dean was not satisfied withe how Lowe's handled the situation. ( Deposition of David Dean P. 67)

7. Disagree – Mr. Puccio was seen by Mr. Dean at Lowes, working, several months after November 8, 2001. (Deposition of David Dean P. 79-80)

8. Disagree – Mr. Dean alleged that the piling of returns, leaving trash in his office or "cage area" , and the demotion to lawn and garden with a significant change in his work hours was harassment due to his race and/or due to his complaint about race discrimination. (Ex. 5- Complaint, Ex. 4- MCAD

complaint, deposition of David dean pp. 67, 83 )

9. Agreed.

10. Disagree.

11. Disagree.

12. Disagree. It is speculation to state why returns were placed in front of the cage door.

13. Agree.

14. Disagree – the piling of returned merchandise in front of Mr. Dean's door grew much worse after November 8, 2001. (Deposition of David Dean P. 51 and 52; see also MCAD Charge, Complaint and Ex. - 3 Answers to Interrogatories)

15. Disagree. The employees routinely left merchandise at the RTM cage were Lowe's employees who worked at the front of the store, stockers, customer service associates, and department managers. (Deposition of Robert Estes P. 20, 21

16. Agree.

17. Disagree. Robert Estes states in Mr. Dean's performance review on August 8, 2001 that: " Dave has recently found himself really grasping he different aspects of the R.T.M. position. The area is coming together. He needs some improvement on his attendance and on the organization of paperwork like the O.F.R. and the cleared R.T.M. reports. (Deposition of Robert Estes P. 54 L4-9)

18. Agree

19. Agree

20. Agree

21. Disagree – Plaintiff complained to Mr. Estes about piling of returns . (Estes dep P. 78)

22. Disagree – the Plaintiff in January of 2002 acknowledged his need as stated in his performance review to increase organization, but this was not classified as poor performance. The purpose of an employee performance report is to : "Coach and counsel an employee to help them identify the areas of opportunities and make them better." (Deposition of Robert Estes p. 95 L. 22-P. 96 L. 2)

23. Agreed.

24. Agreed.

25. Agree.

26. Disagree – the plaintiff did not have an option to decline the transfer. Deposition of David Dean, P. 79-80)

27. Disagree – the plaintiff in general stated that Mr. Estes was a "fair" person. (Deposition of David Dean P. 103 L. 10)

28. Disagree – the plaintiff in addition to feeling overwhelmed, had complained on several occasions to Mr. Estes about he excessive piling of returns in front of his door. (deposition of David Dean P.59 L. 1-23)

29. Disagree –the plaintiff was forced to work a varying schedule, overtime and weekends, which were a significant change from the terms of the RTM position which was 9-5 Monday through Friday. (Deposition of David Dean P. 83 L. 2-6; P. 81)

30. Disagree – The plaintiff complained that the Lowes management did not handle his complaint to his satisfaction. (Deposition of David Dean P. 67 L. 12-18)

31. Disagree – Discovery is not complete and there is no evidence that the Lawn and Garden manager did not know about the noose incident, since the incident was public knowledge among all Lowe's employees. (Deposition of Robert Estes P. 74; MCAD Charge )

32. The plaintiff cannot agree or disagree with this statement of fact because he has insufficient knowledge as to the allegation by the defendant.

33. The plaintiff cannot agree or disagree with this statement of fact because he has insufficient knowledge as to the allegation by the defendant.

34. The plaintiff cannot agree or disagree with this statement of fact because he has insufficient knowledge as to the allegation by the defendant.

35. Disagree – on Mr. Dean's last day, his manager in Lawn and Garden, Mr.DesLauriers required Mr. Dean to work overtime. (Deposition of David Dean, P. 84 L. 5-22)

36. Disagree.

37. Disagree. Mr. Dean was constructively discharged by Mr. DesLauriers, after Mr. Dean had been given a "final warning of termination" by Mr. Estes. (Deposition of David Dean, P. 84 L. 5-22)

38. Agreed.

39. Disagree. Mr. Dean did report the piling of returns, and the trash in his office to his supervisor on

several occasions. (Deposition of David Dean P. 59 )

40. Disagree. Mr. Dean did not consider several Lowe's employees including manager Glen DesLauriers, Steve Stexton, and Daniel Puccio, "fair minded" and decent. (Deposition of David Dean, P. 70-71, P. 84)

By Plaintiff's Attorney,

RAINER & O'CONNOR, LLP
Daniel C. Federico
B.B.O. #645717
60 V.F.W. Parkway
Revere, Massachusetts 02151
(781) 289-7900

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

**CIVIL ACTION NO: 04-1265-mel**

|  |  |
|---|---|
| | ) |
| **DAVID DEAN,** | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **LOWE'S HOME CENTERS, INC.** | ) |
| **Defendant.** | ) |
| | ) |

AFFIDAVIT OF DANIEL C. FEDERICO ESQ.

1.  I, Daniel C. Federico, am an attorney at the law firm of Rainer & O'Connor, LLP, 60 VFW Parkway, Revere, MA. 02151 who states as follows:

2.  Attached hereto as Exhibit 1 is a true and accurate copy of the deposition transcript of David Dean.

3.  Attached hereto as Exhibit 2 is a true and accurate copy of the deposition of Robert Estes.

4.  Attached as Exhibit 3 is the Answers to Interrogatories by David Dean.

5.  Attached as Exhibit 4 is the MCAD Charge filed by David Dean.

6.  Attached as Exhibit 5 is the Suffolk County Superior Court Complaint.

7.  Attached as exhibit 6 is the Deposition Subpoena of Daniel Puccio.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY ON THIS 17 DAY OF JUNE 2005

Daniel C. Federico

1                                  Volume:    I
                                   Pages:     1 to 120
2                                  Exhibits:  1 to 13

3

4            UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF MASSACHUSETTS
5
     * * * * * * * * * * * * * * * *
6    DAVID H. DEAN,
                        Plaintiff,
7
         vs.                        Civil Action
8                                   No. 04-12605-MEL
     LOWE'S HOME CENTERS, INC.,
9                        Defendant.
     * * * * * * * * * * * * * * * *
10

11

12

13            DEPOSITION OF DAVID H. DEAN, a witness
     called on behalf of the Defendant, taken pursuant to
14   the applicable provisions of the Federal Rules of
     Civil Procedure before Cynthia A. Powers, Shorthand
15   Reporter and Notary Public in and for the
     Commonwealth of Massachusetts, at the law offices of
16   Littler Mendelson, P.C., One International Place,
     Suite 2700, Boston, Massachusetts, on Thursday,
17   March 10, 2005, commencing at 10:10 a.m.

18

19

20                    * * * * *

21

22
                    KACZYNSKI REPORTING
23              72 Chandler Street, Suite 3
                Boston, Massachusetts 02116
24                    (617) 426-6060

Page 2

APPEARANCES:

ROBERT K. RAINER, P.C.
Daniel C. Federico, Esquire
60 VFW Parkway
Revere, Massachusetts 02151
(781) 289-7900
Representing the Plaintiff

LITTLER MENDELSON, P.C.
David C. Casey, Esquire
Amy L. Nash, Esquire
One International Place, Suite 2700
Boston, Massachusetts 02110
(617) 378-6000
Representing the Defendant

Page 3

INDEX

Examination by:  Direct  Cross  Redirect  Recross
Mr. Casey         4
Afternoon Session 88

EXHIBITS

| Exhibit | | Page |
|---|---|---|
| 1 | Plaintiff's Answers to First Set of Interrogatories Propounded by the Defendant | 30 |
| 2 | MCAD Complaint | 41 |
| 3 | Lowe's Incident Report dated November 9, 2001 | 65 |
| 4 | Lowe's Incident Report dated November 8, 2001 | 74 |
| 5 | Lowe's Employee Orientation Training Record | 88 |
| 6 | Acknowledgement dated January 6, 2001 | 89 |
| 7 | Application for Employment dated January 2, 2001 | 92 |
| 8 | Complaint and Jury Claim | 100 |
| 9 | Lowe's Strategic Training & Achievement Review/Career Development Review dated August 31, 2001 | 101 |
| 10 | Lowe's Strategic Training & Achievement Review/Career Development Review dated January 30, 2002 | 104 |
| 11 | Lowe's Employee Performance Report dated January 20, 2002 | 108 |
| 12 | Lowe's Employee Performance Report dated April 1, 2002 | 109 |
| 13 | Lowe's Employee Performance Report dated April 1, 2002 | 114 |

Page 4

PROCEEDINGS

MR. CASEY:  Dan, in terms of stipulations, I suggest that we reserve all objections to the time of trial and motions to strike and that the only exception be with respect to objections as to the form of the question.  I further suggest that the witness have an opportunity for thirty days after your receipt of a copy of the transcript to review and make any changes he thinks necessary and then to sign under the penalties of perjury only, which will obviate the need for his signing before a notary public, and that if he doesn't make any corrections in thirty days after your receipt his opportunity will be deemed waived. Is that acceptable?

MR. FEDERICO:  That is acceptable.

DAVID H. DEAN,

having been satisfactorily identified
and duly sworn by the Notary Public,
was examined and testified as follows:

DIRECT EXAMINATION

BY MR. CASEY:

Q.    Good morning, Mr. Dean.

Page 5

A.    Good morning, sir.

Q.    My name is David Casey.  I am with the law firm Littler Mendelson.  I represent Lowe's.

A.    Yes.

Q.    And I'm going to be asking you a series of questions today about the lawsuit that you've brought against my client.  As I do that, I'd like you to keep a few things very much in the front of your mind throughout.

First, if at any time you don't understand a question or any phrase or word in a question that I put to you, please tell me that you don't understand my question, and I will rephrase it until it's clear to you what I'm getting at.  Is that agreeable?

A.    Yes, sir.

Q.    Second, and similarly, if at any time you don't hear a question in its entirety, because there's noise outside the room or I garble my words or the like, tell me --

A.    Yes, sir.

Q.    -- and I will have Cindy, the stenographer, read it back for you.

A.    Okay.

Page 6

1    Q.   Is that agreeable?
2    A.   Yes.
3    Q.   Along the same lines I want to
4  emphasize, and I cannot emphasize too strongly, that
5  this is a process about trying to understand your
6  thoughtful, considered, careful testimony. This is
7  not about trying to trick or intimidate or harass or
8  confuse you. I want you to understand that and the
9  following comments:  If you get tired, if you lose
10 your concentration, if you get upset, if you get
11 confused, if you need to take a break or clear your
12 mind or for any reason are having difficulty
13 answering any -- I underscore "any" -- of my
14 questions, I want to you tell me and we'll take a
15 break.
16   A.   All right.
17   Q.   Okay?
18   A.   Yep.
19   Q.   Finally, before -- and you're doing a
20 good job on this point -- before you even begin to
21 say anything in response to any of my questions,
22 please wait until you're absolutely certain that I've
23 finished my question, okay? And there are several
24 reasons for that. First, the last word in a question

Page 7

1  can fundamentally alter its meaning, and I don't want
2  you to think you know what I'm asking you before I've
3  completed my question, understand?
4    A.   Yes.
5    Q.   Second, if you try to answer my
6  question before I've got it out, you may not be
7  reflecting and carefully considering your answers,
8  and I want your very carefully considered testimony
9  and only your very carefully considered testimony
10 today; agreed?
11   A.   Yes, sir.
12   Q.   Finally, as terrific as Cindy is, it's
13 hard for her to take down two people who are speaking
14 at the same time.
15   A.   Okay.
16   Q.   So again, I'm going to be asking you a
17 bunch of questions; I want you to take your time with
18 every one of them; I want you to wait until you're
19 certain I've finished the question before you even
20 begin to answer; and if at any time you don't
21 understand or hear a question or you're losing your
22 concentration or focus for any reason, I want you to
23 tell me immediately so that you can take a break,
24 clear your head, regain your composure, whatever the

Page 8

1  case may be, so that at the end of the day you will
2  have heard and understood each of my questions and
3  you will have been certain to reflect carefully on
4  them and provide me with your very best answer. Is
5  that agreeable?
6    A.   Yes, sir.
7    Q.   Great. Now, are you under any
8  medication today?
9    A.   No, I just have my inhaler with me.
10   Q.   I understand you have asthma. When
11 you make reference to your inhaler, is that what you
12 are referring to?
13   A.   My Albuterol, that's all the only
14 medication I'm under right how.
15   Q.   Can you spell that medication for the
16 record?
17   A.   Spell "medication"?
18   Q.   Albuterol.
19   A.   Oh, A L B U T E R O L, I guess.
20   Q.   And have you had any -- and I
21 apologize in advance for asking this question, but I
22 really need to -- have you had any alcohol this
23 morning or are you under the influence of any illegal
24 drugs?

Page 9

1    A.   No.
2    Q.   As far as you know, there's nothing
3  whatsoever that would adversely affect your ability
4  to hear and understand and respond carefully and
5  thoughtfully to my questions today?
6    A.   No, sir.
7    Q.   Is that correct?
8    A.   Oh, that's correct.
9    Q.   Have you ever been deposed before?
10   A.   I don't understand that question.
11   Q.   Have you ever been in a process like
12 this where a lawyer asked you questions under oath?
13   A.   Oh, no, sir.
14   Q.   Have you ever been involved in
15 litigation of any kind before?
16   A.   I guess, yeah.
17   Q.   What litigation have you been involved
18 in?
19   A.   I was in a car accident and my
20 insurance company went after the person that was
21 involved in the accident. I had to sit down and talk
22 to their people, I guess, and that was pretty much
23 it.
24   Q.   Were you a party to that lawsuit, or

Page 10

1  was there a lawsuit?
2      A.   I was the victim. I was hit. I was
3  in an automobile accident.
4      Q.   When did that happen?
5      A.   I'd say '96 maybe.
6      Q.   Did you receive any money as a result
7  of that accident and the litigation associated with
8  it?
9      A.   Yes.
10     Q.   How much?
11     A.   There was a settlement for, I guess,
12 maybe ten thousand dollars or something.
13     Q.   What lawyer, if any, represented you
14 in that matter?
15     A.   Rosencranz.
16     Q.   Is that the last name?
17     A.   Rosencranz, that's the only name I can
18 remember.
19     Q.   And what city or town did that lawyer
20 work out of?
21     A.   Boston, here.
22     Q.   Do you recall what county the lawsuit
23 was filed in, whether it was Middlesex or Suffolk or
24 the like?

Page 11

1      A.   What is this county here, Suffolk
2  County, I guess.
3      Q.   Where did you live at the time of this
4  car accident?
5      A.   In Lynn.
6      Q.   Okay. Did you ever actually go into a
7  courtroom?
8      A.   No.
9      Q.   Other than the litigation associated
10 with the car accident, have you had any other
11 involvement with courts or the law; and by that I
12 mean have you been divorced, have you been involved
13 in restraining orders, have you been involved in any
14 criminal matters or the like?
15     A.   I don't understand that question. You
16 know, I've had, you know, I've had a restraining
17 order where I've taken out on a young lady, you know,
18 because she was harassing me.
19     Q.   In what court?
20     A.   That would be in Lynn court, Essex
21 County, I guess.
22     Q.   Lynn district court or superior court?
23     A.   Lynn district.
24     Q.   What was the name of the woman against

Page 12

1  whom you received this restraining order?
2      A.   Her name is Tabitha Murkison.
3      Q.   Spell the last name as best you can?
4      A.   M U R K I S O N.
5      Q.   When did you obtain that restraining
6  order?
7      A.   I'd say it was around between
8  2000-2001, I guess.
9      Q.   Have any restraining orders ever been
10 taken out as against you?
11     A.   No.
12     Q.   Have you been involved in any other
13 kind of criminal or civil matter involving a court?
14     A.   Are you asking me if I have a record?
15     Q.   Have you ever been arrested?
16     A.   Yes.
17     Q.   Have you ever been convicted or pled
18 guilty or no contest of any kind to any --
19     A.   No.
20     Q.   -- criminal charge?
21     A.   No.
22     Q.   For what have you been arrested?
23     A.   Shoplifting.
24     Q.   On how many occasions have you been

Page 13

1  arrested for any crime or alleged crime?
2      A.   You know, um, in my past, coming from
3  the area where I come from, there was a lot of
4  incidents, there was numerous incidents.
5      Q.   And for what alleged crimes were you
6  arrested, other than shoplifting?
7      A.   Assault and battery, possession of a
8  Class B substance, that's it pretty much.
9      Q.   Do you remember what the Class B
10 substance was?
11     A.   Marijuana.
12     Q.   And it's your testimony that you were
13 never convicted of any of these crimes?
14     A.   No.
15     Q.   And you never pled guilty or no
16 contest or agreed to a continuance without a finding;
17 is that correct or not correct?
18     A.   Yes, correct.
19     Q.   What's your date of birth?
20     A.   July 17, 1954.
21     Q.   And what's your Social Security
22 number?
23     A.   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.
24     Q.   Have you ever gone by any name other

4 (Pages 10 to 13)

Page 14

1 than David Dean?
2     A.    I did use an alias one time, and I
3 think it was David Brown, I think.
4     Q.    When was that?
5     A.    Somewhere back in the eighties. I
6 can't quite remember.
7     Q.    For what reason?
8     A.    Possession of a Class B substance.
9     Q.    Was any kind of guilty finding or no
10 contest plea or continuance without a finding entered
11 as against David Brown relative to that charge of
12 possession of a Class B substance?
13     A.    There was no -- there was a continuing
14 without a finding.
15     Q.    In what state?
16     A.    Massachusetts.
17     Q.    County?
18     A.    Suffolk.
19     Q.    Do you recall what Social Security
20 number, if any, you provided at that time?
21     A.    Same one.
22     Q.    Did you review any documents or papers
23 or any material or evidence before coming to testify
24 today?

Page 15

1     A.    No.
2     Q.    Other than with counsel, did you speak
3 with anybody --
4     A.    No.
5     Q.    -- about this matter in preparation
6 for your deposition today?
7     A.    No.
8     Q.    What is your full name?
9     A.    David Harden, H A R D E N, Dean.
10     Q.    What's your address?
11     A.    36 Sagamore Street, Apartment 1, Lynn,
12 Mass.
13     Q.    How long have you lived there?
14     A.    Just over a year now.
15     Q.    With whom, if anyone, do you live?
16     A.    My girlfriend.
17     Q.    Her name?
18     A.    Marilyn Cox, C O X.
19     Q.    Are you married?
20     A.    Yes.
21     Q.    Are you separated from your wife?
22     A.    Yes.
23     Q.    Her name?
24     A.    Tanya.

Page 16

1     Q.    Last name?
2     A.    Dean.
3     Q.    When were you and she married?
4     A.    I'd say in 1980.
5     Q.    When did you first separate?
6     A.    Let's see, I'd say around '85, '86.
7     Q.    Did you reconcile at any point since
8 then, or have you been separated since 1985 or '6?
9     A.    We've been separated since then.
10     Q.    Do you have any children?
11     A.    One son. I have two children. By
12 her, one son.
13     Q.    Two children total, one by Tanya Dean?
14     A.    Yes, that's my son, David Jr.
15     Q.    How old is he?
16     A.    He's 26.
17     Q.    Where does he live?
18     A.    In Boston.
19     Q.    And your other child?
20     A.    Her name is Dara.
21     Q.    Dara?
22     A.    Dara, D A R A.
23     Q.    How old is she?
24     A.    I believe 31.

Page 17

1     Q.    Where does she live?
2     A.    In Boston.
3     Q.    Do you see David Jr.?
4     A.    All the time.
5     Q.    Do you see Dara?
6     A.    All the time.
7     Q.    Where does David Jr. live, what
8 street?
9     A.    I don't know their streets.
10     Q.    What's his telephone number?
11     A.    His home number is (617) 427-2372 and
12 his cell number is 480, no, (617) 480-4504.
13     Q.    Where does Dara live?
14     A.    I don't -- I mean, I know, but I don't
15 know the street.
16     Q.    In what section of the city?
17     A.    Between Andrew Station and Jackson
18 Station.
19     Q.    What section of the city does David
20 live in?
21     A.    In the Delhi Street area.
22     Q.    What is Dara's telephone number?
23     A.    That I don't know, I mean, because she
24 has a different number; like every time I see her she

5 (Pages 14 to 17)

Page 18

1    has a different phone number or different cell
2    number.
3        Q.    When did you last see Dara?
4        A.    About two weeks ago.
5        Q.    Do you use a cell?
6        A.    No.
7        Q.    You use your home number?
8        A.    Yes.
9        Q.    What's your home telephone number?
10       A.    (781) 592-6563.
11       Q.    Six-five-six --
12       A.    Three.
13       Q.    Is that phone in your name?
14       A.    Yes.
15       Q.    How long have you had that telephone
16   number?
17       A.    Maybe twelve years.
18       Q.    What's your educational background?
19   Did you graduate from high school?
20       A.    Yes, sir.
21       Q.    When?
22       A.    In 1971, '72.
23       Q.    What high school?
24       A.    It used to be a high school here in

Page 19

1    downtown Boston called Don Bosco Tech.
2        Q.    Have you taken any courses in college
3    or post high school?
4        A.    I went to University of Massachusetts
5    in Amherst right after my graduation from Don Bosco
6    on an academic and sports scholarship there.
7        Q.    What sport?
8        A.    Basketball.
9        Q.    Did you graduate from UMass?
10       A.    I had to withdraw in my sophomore
11   year.
12       Q.    Why?
13       A.    My parents were elderly at the time,
14   and my dad got kind of sick, and I needed to be home
15   with my mom.
16       Q.    Did you withdraw for any other reason?
17       A.    No.
18            Excuse me. Can I get some more water?
19       Q.    Sure.
20            Are you currently employed?
21       A.    No.
22       Q.    When last were you employed?
23       A.    Last year.
24       Q.    When last year?

Page 20

1        A.    I'd say around September.
2        Q.    Of 2004?
3        A.    Yes.
4        Q.    By whom were you employed at that
5    time?
6        A.    W&W Construction.
7        Q.    In what capacity were you employed by
8    W&W Construction?
9        A.    A laborer.
10       Q.    What were you making on an hourly
11   basis?
12       A.    I'd say about fourteen dollars an
13   hour.
14       Q.    How long did you work with W&W
15   Construction?
16       A.    I'd say for about three years.
17       Q.    So sometime in, roughly speaking, the
18   fall of 2001 through the 2004; is that correct?
19       A.    Yes.
20       Q.    Did you work full-time for W&W
21   Construction during that three-year period?
22       A.    As needed. I mean, as needed. I
23   mean, like, when work was available for me I was
24   there, and then there was a lot of time, you know,

Page 21

1    there was no work for me.
2        Q.    Why did you leave in September 2004?
3        A.    Well, my asthma condition is seasonal
4    and, you know, I usually get congested by just a
5    change of the weather and, like, when it goes from
6    the fall to the winter my condition gets bad.
7        Q.    So do I understand your testimony to
8    be that you left work with W&W Construction in or
9    about September of 2004 because your asthma was
10   making it impossible for you to continue to work?
11       A.    Yes.
12       Q.    And does asthma frequently adversely
13   affect you and your ability to work in the fall of
14   the year?
15       A.    Well, it's seasonal like.
16       Q.    And I understand and does it typically
17   adversely affect you in the fall?
18       A.    Yes. Just like right now, going from
19   the winter to the spring, I get that same, you know,
20   problem.
21       Q.    Are you receiving any kind of
22   disability benefits either from a private insurance
23   source or from the government?
24       A.    No, sir.

Page 22

1    Q.   How do you support yourself?
2    A.   My landlord, I do a lot of odd jobs
3    around his property for him.
4    Q.   What's your landlord's name?
5    A.   Peter Mazereas.
6    Q.   Spell it.
7    A.   M A Z E R E A S, I think. I'm not
8    sure.
9    Q.   For how long have you been doing odd
10   jobs for Peter Mazereas?
11   A.   I've known Peter for I'd say over
12   seven years now.
13   Q.   Have you been doing work for him for
14   around seven years?
15   A.   Off and on.
16   Q.   For how long have you been living in
17   one of his units?
18   A.   One year, a little over one year.
19   Q.   And prior to your current address
20   where were you living?
21   A.   I lived at 26 Broad Street in Lynn.
22   Q.   For how long?
23   A.   I lived there for I'd say maybe close
24   to seven, eight years.

Page 23

1    Q.   How long have you lived with Marilyn
2    Cox?
3    A.   I've been living with Marilyn for now
4    I'd say the last three years.
5    Q.   Do you have a good relationship with
6    her?
7    A.   Very good.
8    Q.   Has it been bad at all in the last two
9    years?
10   A.   I don't understand.
11   Q.   Has your relationship been adversely
12   affected with her in the last two years?
13   A.   Oh, no, no, no. I thank God for her.
14   Q.   Are you currently treating with any
15   physicians or mental health clinicians or any other
16   kind of healthcare provider?
17   A.   Yes, I am. His name is David Joseph.
18   He's my clinician. He's helping me with my stress
19   and my conditions.
20   Q.   David Joseph Alpert?
21   A.   Yes.
22   Q.   When first did you see David Joseph
23   Alpert?
24   A.   Yesterday.

Page 24

1    Q.   First time you ever saw him?
2    A.   Yesterday.
3    Q.   Why did you go to see him yesterday?
4    A.   That's when he was able to see me.
5    Q.   When first did you contact him to see
6    him?
7    A.   About maybe -- oh, God -- maybe two
8    weeks ago.
9    Q.   Why did you contact him at that time?
10   A.   Because I had just received my Mass
11   Health because I -- I didn't have no insurance, and
12   in order for me to be seen by him, I imagine I needed
13   to have Mass Health, and I finally got activated.
14   Q.   How did you get activated on Mass
15   Health?
16   A.   I do not know. I've been going over
17   to the Lynn Community Health Center into their
18   walk-ins for so long and then I guess one of the
19   doctors, you know, said, you know, you need to go see
20   somebody, you know, because your asthma is getting
21   worse, you're falling apart. I guess he took it upon
22   himself to file the information that he had in to
23   Mass Health.
24   Q.   And who helped you with that, what

Page 25

1    doctor?
2    A.   I don't remember the doctor's name. I
3    really don't know his name.
4    Q.   But he's affiliated with Lynn
5    Community Health Center?
6    A.   Yes, sir.
7    Q.   Is Mass Health some sort of government
8    sponsored health insurance program?
9    A.   I might think it's state funded. I'm
10   not sure. I know they help people who are dire
11   straits, who don't have insurance, or you know. This
12   doctor here, Dr. Alpert, he also gave me directions
13   on how I can go and get, you know, like a lot of
14   benefits that fits people like me who don't have
15   anything. He says you can go get fuel assistance and
16   food stamps. And I said, cool, I could use it.
17   Q.   What was the reason why you decided to
18   see David Joseph Alpert?
19   A.   Because -- you know, there's a lot of
20   different reasons -- I just needed somebody to talk
21   to, you know, somebody who I didn't know, somebody
22   who would maybe -- I don't know. I just needed
23   somebody to talk to.
24   Q.   About what?

7 (Pages 22 to 25)

Page 26

```
 1      A.   About a lot of things.
 2      Q.   Tell me.
 3      A.   Well, you know, it's hard, you know,
 4  it's just, you know, you know, just a lot of things.
 5  Like, you know, I wanted to stop smoking cigarettes
 6  because the doctors are telling me it's killing me.
 7  He says, this is insane; you have asthma, you can't
 8  breathe and here you are, reaching for a cigarette.
 9  You need to talk to somebody about that.  And I said,
10  yeah.  And I've been doing this all my life, you
11  know.  And I am glad he took the time to talk to me
12  because I'm sure I'm going to be all right with him.
13      Q.   Are there any other things that you
14  wanted to see Alpert or someone like him to talk
15  about other than trying to stop smoking cigarettes?
16      A.   You know, like I've always been the
17  type to keep a lot of stuff bottled up inside of me.
18  And I don't talk a lot, but people have been telling
19  me for a long time, you know, you need help, you need
20  to talk to somebody, man -- because I'm not suicidal
21  or homicidal or nothing like that -- but, you know,
22  David, you're depressed, man, come up out of it, man,
23  snap out of it.  I don't want to be out, I don't want
24  to be bothered, leave me alone.
```

Page 27

```
 1      Q.   People have been telling you that for
 2  a long time?
 3      A.   Ever since a few years now.
 4      Q.   Who's been telling you that?
 5      A.   My closest friend, you know, he's,
 6  he's a real buddy.
 7      Q.   His name?
 8      A.   His name is Levi Downing Jr., D O W N
 9  I N G, junior.
10      Q.   Where does he live?
11      A.   In Brockton.
12      Q.   The stenographic record is not going
13  to reflect this, but it's obvious that you're
14  emotionally affected by talking about Levi Downing.
15      A.   No, because like when I get emotional
16  like this is because like he's, he's been a childhood
17  friend, we've been friends for over thirty years, and
18  he's like a spiritual brother to me.  I don't have no
19  mother, no father, no sisters, no brothers, you know.
20  That's when I get like this, because I don't have
21  nobody to talk to.
22      Q.   Other than wanting to talk about
23  stopping smoking cigarettes and about being depressed
24  I think you said, was there any other reason why you
```

Page 28

```
 1  wanted to see David Joseph Alpert?
 2      A.   Yeah, to talk about, you know, like
 3  letting go of things that I've been holding onto and
 4  like, and like every time I think about my family,
 5  you know, I get like this, you know, and I need to
 6  let that go.
 7      Q.   What kinds of things have you been
 8  holding onto; what are the major reasons, the major
 9  reasons why you wanted to see David Alpert?
10      A.   You know, the cigarettes, leave the
11  cigarettes alone, my girlfriend says.  Like now she
12  says, when your kids come over, no one smokes
13  cigarettes, you're the only one smoking, you have to
14  go outside to smoke, and then where is this drinking
15  pattern coming from, why do you drink like this all
16  of a sudden.  I said, I don't know.
17      Q.   So you've been trying to stop drinking
18  and trying to stop smoking cigarettes?
19      A.   I'm willing to and try the patch,
20  do the pills, whatever they got, you know, let's stop
21  it.
22      Q.   Other than trying to stop drinking and
23  trying to stop smoking cigarettes, are there any
24  other reasons why you have gone to see David Joseph
```

Page 29

```
 1  Alpert?
 2      A.   No, sir.
 3      Q.   Do you have any idea as to why you've
 4  been drinking or drinking too much?
 5      A.   Yes.
 6      Q.   Why do you think you have?
 7      A.   Just to keep the, to keep the, to
 8  block things out, you know.
 9      Q.   What kinds of things have you been
10  trying to block out?
11      A.   Like what happened, you know, why I'm
12  out of work; how come, you know, why my parents had
13  to go so quickly, you know what I mean.  Even though
14  they were elderly, even though they were in their
15  nineties, it just hurt, you know.  And then there was
16  another thing with one of my sister-in-laws.  She
17  stole my whole estate.  There was nothing I could do
18  about that.
19      Q.   When you say she stole your whole
20  estate, what do you mean by that?
21      A.   I don't know, it just -- I know like
22  when my -- she was my mom's beneficiary or something,
23  man, and one day a lot of stuff just came up missing;
24  I mean everything, all my mother's personal
```

Page 30

1  belongings and stuff, you know, and --
2      Q.  When did that happen?
3      A.  I'd say around, my mom passed in 2003,
4  I believe, yeah.
5      Q.  When did your dad die?
6      A.  I'd say in '99.
7      MR. CASEY:  I'd like to have marked as
8  Exhibit No. 1 to this deposition a six-page document
9  which appears to be Plaintiff's Answers to
10 Defendant's First Set of Interrogatories in this
11 matter.
12          (Marked Exhibit 1; Plaintiff's Answers
13          to First Set of Interrogatories
14          Propounded by the Defendant)
15     Q.  Mr. Dean, do you recognize the
16 document that's been marked as Exhibit No. 1?
17     A.  Do I recognize this?
18     Q.  Yes.
19     A.  Yes, sir.
20     Q.  Is that your signature on the
21 second-to-last page of Exhibit No. 1?
22     A.  Second to the last page, yes, sir.
23     Q.  You signed this document on March 4th
24 of this year?

Page 31

1      A.  I believe so, yes.
2      Q.  Just a few days ago; right?
3      A.  Yes, sir.
4      Q.  Did you review the document carefully
5  before you signed it?
6      A.  Yes, sir.
7      Q.  You knew you were signing it under the
8  penalties of perjury; correct?
9      A.  Yes, sir.
10     Q.  By that you knew if you did not tell
11 the truth completely that you literally could be
12 prosecuted criminally for lying?
13     A.  Okay, right.  Yes, sir.
14     Q.  So you reviewed the document carefully
15 to ensure that it was accurate and truthful before
16 you signed it; correct?
17     A.  Like, I spoke to my counsel, and
18 there's a lot of things I don't quite understand; and
19 what I did understand, that's what I --
20     Q.  Okay.  Now, if you'll turn to the
21 second page of Exhibit No. 1, specifically paragraph
22 number six.  We asked you to identify all physicians
23 and/or healthcare professionals that you've
24 consulted?

Page 32

1      A.  Mm-hmm, yes.
2      Q.  At any time?
3      A.  Yes.
4      Q.  As a consequence of Lowe's unlawful
5  conduct?
6      A.  Yes.
7      Q.  And you responded by identifying Lynn
8  Community Health Center and a Sonya, S O N Y A, Pena,
9  P E N A; correct?
10     A.  Yes.
11     Q.  Who is Sonya Pena?
12     A.  I guess she did the intake for me.
13 She's the one that led me to this gentleman here,
14 David Alpert.  She did the intake, took all the
15 information that led me to him.
16     Q.  When did you see Sonya Pena?
17     A.  About maybe two weeks ago.
18     Q.  Prior to seeing Sonya Pena and
19 ultimately David Joseph Alpert, did you consult with
20 any kind of physician or other healthcare
21 professional of any kind regarding any physical or
22 emotional consequences that you believe stem from
23 your treatment by Lowe's?
24     A.  Just for my asthma and my health I go

Page 33

1  to Lynn Community Health and just a walk-in clinic
2  there.  I guess they got tired of me walking in.
3  That's like -- I just got Mass Health.  They used to
4  give me free care.
5      Q.  Who at Lynn Community Health did you
6  see?
7      A.  Just the staff there at the walk-in.
8  I don't know these people's names.
9      Q.  Did you ever talk to any of the staff
10 at Lynn Community Health about anything having to do
11 with Lowe's?
12     A.  No, sir.
13     Q.  Did you ever talk to any of the staff
14 at Lynn Community Health regarding any emotional or
15 physical problems that you thought that you were
16 suffering as a result of what happened to you at
17 Lowe's?
18     A.  No.
19     Q.  Have you ever treated for any kind of
20 depression or mental health related issues or stress
21 or the like with anybody other than Sonya Pena and
22 David Joseph Alpert at any time in your life?
23     A.  No.
24     Q.  Other than your asthma are you in good

9 (Pages 30 to 33)

Page 34

1   physical health?
2       A.   I'm going through a mid-life thing,
3   you know. I'm afraid of getting old and the body
4   can't take what it used to, you know. I find certain
5   illnesses coming on now and I don't know what they
6   are. My feet hurt, my legs hurt, everything hurt.
7       Q.   Well, let's be specific. Other than
8   asthma, you say that your feet hurt and your legs
9   hurt?
10      A.   Well, you know, like --
11      Q.   Let's be specific now. What about
12  your feet hurts?
13      A.   Okay, you know, like, I guess they
14  getting bigger. I guess they're swelling up or
15  something. I don't know.
16      Q.   When did that start?
17      A.   It's been going on for many -- like,
18  also that comes with my asthma is the eczema. And
19  the eczema, like, it goes from certain parts. Like,
20  it used to be in my armpits and then it went to the
21  back of my knee and now it's on my foot.
22      Q.   In terms of your feet hurting, when
23  did that start?
24      A.   It's been going on for a, it's been

Page 35

1   going on for years.
2       Q.   How many years?
3       A.   For the last ten years anyway.
4       Q.   What's the problem with your legs?
5       A.   The reason why I'm not playing ball
6   now in the gentlemen's league is I've been getting
7   these hamstrings, I've been getting these real tight
8   knots in the back of my legs.
9       Q.   Other than keeping you from playing
10  basketball, are there any other problems --
11      A.   No.
12      Q.   -- with your legs?
13      A.   That's it.
14      Q.   And other than your leg and feet
15  problems and the eczema you've just described, do you
16  have any other health issues?
17      A.   No, but my girlfriend do because she's
18  just been diagnosed with high blood pressure and
19  diabetes. For some reason I'm compassionate to her
20  health too. When she sick, it seem like I'm sick
21  too. That's how close we are.
22      Q.   Who is Barry Rowell, R O W E L L?
23      A.   Now, this gentleman, I believe he was,
24  like, a regional director or he was a, he was a

Page 36

1   person from Lowe's and I spoke with him at a
2   mediation before.
3       Q.   A regional manager of some kind?
4       A.   From out of Connecticut.
5       Q.   A higher level manager than the people
6   with whom you worked at the store in Danvers?
7       A.   Yes, sir.
8       Q.   You saw him at the MCAD?
9       A.   No, he was on the phone, he was on an
10  intercom.
11      Q.   I see. And the first time you spoke
12  with him and I take it the only time you spoke with
13  him was at the MCAD?
14      A.   Yes, sir.
15      Q.   As it related to the --
16      A.   The incident.
17      Q.   -- the incident and some conciliation
18  or investigative conference?
19      A.   Yeah.
20      Q.   Okay. What did Mr. Rowell say at that
21  time?
22      A.   Well, he was listening to what the
23  complaint was and what happened and he just -- he was
24  trying to be compassionate and he said, What can we

Page 37

1   do to make all this go away? And that's what he said
2   to me.
3       Q.   Did he say anything else?
4       A.   That was it.
5       Q.   What did you say in response?
6       A.   I said, I don't know. I've never been
7   in this situation before, and I just don't know. I
8   need to go talk to my family and friends. I don't
9   know.
10      Q.   Did he seem like a decent man?
11      A.   Oh, yes.
12      Q.   Did he treat you well?
13      A.   Well, he spoke good, I mean, you know.
14      Q.   Was there anything that he did or said
15  that upset you?
16      A.   No, he was compassionate, he was cool.
17      Q.   And to your knowledge he did not
18  witness or did not in any way participate in
19  investigating or dealing with the incident between
20  you and Danny Puccio?
21      A.   I don't know that. I don't know what
22  he did. I don't know.
23      Q.   All you know is that he participated
24  by telephone in an MCAD related fact finding or

1  conciliation hearing; correct?
2      A.  Yes.
3      Q.  What about Sherri Smith, who is she?
4      A.  She was sitting in on the mediation.
5  She came out of Springfield branch, out of the
6  Springfield office there, out of Lowe's headquarters
7  in Springfield.
8      Q.  Springfield, Mass.?
9      A.  Yes, sir.
10     Q.  Do you know what her position was?
11     A.  I think she might have been a human
12  resource representative or something.  I don't know.
13     Q.  In fact, she was a regional human
14  resource manager; correct?
15     A.  What was that again?
16     Q.  She was a regional human resource
17  manager; correct?
18     A.  Out of Springfield, Mass., yes.
19     Q.  And, in fact, you had called her after
20  the incident, at some point after the incident with
21  Danny Puccio; right?
22     A.  I kind of remember that, yes.
23     Q.  You left a message with her; correct?
24     A.  Yes, to let her know that they hired

1  this guy back.
2      Q.  And she called you back; correct?
3      A.  I think she did, yeah.
4      Q.  When she called you back, you thanked
5  her for calling you back?
6      A.  Yes.
7      Q.  She seemed responsive and decent?
8      A.  Yes.
9      Q.  Was a nice woman?
10     A.  Yes.
11     Q.  And, in fact, you made a point of
12  speaking to her nicely and saying hello to her --
13     A.  Oh, always.
14     Q.  -- when you saw her at the MCAD
15  hearing; right?
16     A.  Yes.
17     Q.  You thanked her again for her having
18  called you?
19     A.  Yes.
20     Q.  How long after Danny Puccio tied a
21  hangman's noose at the work place did you call her?
22     A.  That might have been maybe, maybe six
23  or eight months afterward.
24     Q.  And why did you call her?

1      A.  Because I needed to speak to somebody
2  about how they hired this person back, and I couldn't
3  talk to nobody right there in my work place, so I
4  thought I could speak to somebody who is pretty much
5  neutral, you know.  I don't know.
6      Q.  When first did you consult a lawyer
7  about anything having to do with this matter or this
8  case?
9      A.  Right after the MCAD mediation.
10     Q.  When was that?
11     A.  I'd say maybe 2002.
12     Q.  When in 2002?
13     A.  I can't quite exactly remember the
14  month, but I'm going to have to say it was in 2002.
15  I don't know.
16     Q.  You were still employed by Lowe's?
17     A.  I think I was.  I think I was, yes.
18     Q.  And what counsel did you first
19  consult?
20     A.  The name?
21     Q.  Yes.
22     A.  Barron & Stadfeld, I guess.
23     Q.  Was there any particular lawyer there?
24     A.  Ms. Denise Page.

1      Q.  How did you come to find Denise Page?
2      A.  I don't know.  I don't know.
3      Q.  When first did you consult with
4  Mr. Federico?
5      A.  Last year, I guess.
6      Q.  When?
7      A.  When, when someone from Barron &
8  Stadfeld told me that the MCAD thing wasn't going to
9  find something, I guess, and they said that my
10  statute of limitations was running out.  In order for
11  me to go into a court, I had to find somebody else.
12  That's when I went to Rainer and Rainer.
13     Q.  Okay.  So Denise Page was representing
14  you through part of the MCAD process?
15     A.  Through all of that, yes.
16     Q.  Okay.  Did Denise Page help you write
17  the MCAD complaint?
18     A.  I guess they did all that.  I didn't
19  write nothing.
20         MR. CASEY:  Let's have marked as
21  Exhibit No. 2 a copy of Mr. Dean's MCAD complaint
22  which is three pages in length.
23         (Marked Exhibit 2; MCAD complaint)
24     Q.  Do you recognize the document that's

11 (Pages 38 to 41)

Page 42

1   been marked as Exhibit No. 2, Mr. Dean?
2       A.   Yeah.
3       Q.   Is that your signature on the second
4   page?
5       A.   Yes.
6       Q.   Did you prepare this document or did
7   someone prepare it for you?
8       A.   Somebody prepared this for me.
9       Q.   Who?
10      A.   Okay. I might have told them what
11  this is saying, I might have said this, but they
12  prepared it. I don't know who prepared it.
13      Q.   Was it someone at Barron & Stadfeld or
14  somebody at the MCAD?
15      A.   Oh, no, that's a good one. I don't
16  know between who did what. I think maybe somebody
17  from MCAD.
18      Q.   On the second page below your
19  signature there is the notary signature of a Jessica
20  it looks like Thrall or Trall, I can't tell which.
21  Do you know who that person is?
22      A.   No, sir.
23      Q.   You signed this document under oath;
24  correct?

Page 43

1       A.   Yes, sir.
2       Q.   And you reviewed it carefully before
3   you signed it for accuracy?
4       A.   I guess at that time, yes.
5       Q.   Okay. And in Exhibit No. 2 you were
6   doing your very best to tell the entire story of what
7   you felt Lowe's did that was wrong to you?
8       A.   I guess right here, yeah, I was trying
9   to explain, you know, to the best of my ability what
10  happened.
11      Q.   You weren't rushed when you wrote
12  this, were you, or when you provided this
13  information?
14      A.   No.
15      Q.   No one forced you to sign it, did
16  they?
17      A.   No.
18      Q.   No one rushed you in terms of your
19  ability to read it carefully and reflect on it before
20  you signed it; correct?
21      A.   No.
22      Q.   Is that correct?
23      A.   Nobody forced me to rush or do
24  anything.

Page 44

1       *Q.   So you thought carefully about Exhibit
2   No. 2 before you signed it; correct?
3       A.   Yes, sir.
4       Q.   And you signed it with the intent that
5   this told the story of what you thought Lowe's had
6   done --
7       A.   Pretty much.
8       Q.   -- wrong to you?
9       A.   Yes.
10      Q.   Is there anything left out?
11      A.   I don't know.
12      Q.   Why don't you read it and find out?
13      A.   That's correct, sir.
14      *(Whereupon, the record was read)
15      A.   Yes.
16      Q.   And you intended to tell the entire
17  story of what you thought Lowe's had done that was
18  wrong toward you; correct?
19      A.   Yes.
20      Q.   And you didn't leave anything out, did
21  you?
22      A.   No, that's pretty much it.
23      Q.   Now, when you called Sherri Smith, you
24  called her because she was a regional human resource

Page 45

1   person who worked outside of the particular store in
2   Danvers where you were working; correct?
3       A.   Yes.
4       Q.   And you knew by virtue of company
5   policy, and by virtue of your own common sense, that
6   you wanted to talk to somebody higher up in the
7   company and at a distance from where you were
8   working?
9       A.   Right.
10      Q.   So you could be sure you were treated
11  fairly; right?
12      A.   Yes.
13      Q.   And you felt that she treated you
14  fairly?
15      A.   She showed up at the mediation, you
16  know, and that was it.
17      Q.   Before that when you called her she
18  immediately called you back; right?
19      A.   Well, yeah, yeah, we kept, you know,
20  like, you know, we kept in touch like that, you know,
21  you know, because she wanted to always know how was I
22  doing. How things doing, Dave; things all right?
23  Oh, everything is lovely, Sherri; everything is nice.
24      Q.   She never did or said anything that

12 (Pages 42 to 45)

Page 46

1  gave you have the impression that she was an unfair
2  person?
3      A.  No, no.
4      Q.  Or was treating you poorly; correct?
5      A.  Correct.
6      Q.  You thought she was treating you fine?
7      A.  I think she was okay.
8      Q.  You thought she was genuinely
9  concerned how you were doing?
10     A.  Yes.
11     Q.  You called her several times?
12     A.  No, no, no.
13     Q.  How many times did you call her?
14     A.  Maybe once, maybe twice, the most.
15     Q.  Okay. And you never told her about
16  any problems you were having at work; correct?
17     A.  Never.
18     Q.  Am I correct?
19     A.  Yes, correct.
20     Q.  You felt as though you could have --
21  you felt as though you could be honest?
22     A.  Well, you know, we never went into
23  that area, you know, never.
24     Q.  But you knew you could call her?

Page 47

1     A.  I knew, like, the people out there in
2  Springfield at that store; they seemed to be kind
3  people.
4     Q.  She didn't call you, you initiated
5  calling her; correct?
6     A.  I may have called her once or twice,
7  yes.
8     Q.  How did you get her number?
9     A.  Oh, that's what my job is. I had all
10  the store numbers. I could call anybody. We did
11  things where I would have to call another store from
12  somewhere and we just had -- all those numbers were
13  available for me, you know.
14     Q.  Did anybody outside of the Lowe's
15  Danvers office ever treat you poorly?
16     A.  Did anybody --
17     Q.  Affiliated with Lowe's outside of the
18  Danvers office ever treat you poorly in any way?
19     A.  No.
20     Q.  Did anybody affiliated with Lowe's
21  outside of the Danvers office ever give you the
22  impression that they were not decent, fair-minded
23  people?
24     A.  No.

Page 48

1     Q.  Did anyone outside of the Lowe's
2  Danvers office ever give you the impression that they
3  were not willing to help you?
4     A.  No.
5     Q.  Did anyone affiliated with the Lowe's
6  Danvers office ever tell you or communicate to you in
7  any fashion that you could not speak with people from
8  Lowe's outside of that store?
9     A.  No.
10     Q.  Or that you should not do so?
11     A.  No.
12     Q.  So you knew you were free to talk to
13  people outside of the Danvers office affiliated with
14  Lowe's whenever you wanted; correct?
15     A.  Well, I mean, like, as far as my job
16  relations went, I mean, that was my duties. I mean,
17  I had to speak to other people outside of the Danvers
18  place because that was business, you know. Like, I
19  used to check up on the guys that I used to train.
20  There was guys that I used to train. When they were
21  opening the store in Brockton, I had to train their
22  RTM clerks, their return to manufacturers. I was
23  training people and sometimes I would call the
24  Brockton store and say, hey, Jim, how are you doing.

Page 49

1     Q.  I understand that. But my question is
2  during the time you were employed at Lowe's you knew,
3  didn't you, if you ever had a problem, that you
4  needed to talk with someone outside of the Danvers
5  office with -- strike that, strike the question.
6        You knew when you were employed at
7  Lowe's that if you had a problem that you needed to
8  address with higher level management, higher level
9  HR, you could always do that?
10     A.  No, no. Believe me, I used to have
11  problems. We could take care of it in-house. This
12  was my duty, responsibility, just my job description.
13  If I had a problem with making numbers match or
14  finding what kind of manufacturer this product here
15  belongs to, I could go to my store managers in-house
16  to take care of that. That was pretty much the only
17  problems I ever had until this incident happened.
18     Q.  Okay. But you knew by virtue of your
19  training at Lowe's --
20     A.  Mm-hmm.
21     Q.  -- and by virtue of Lowe's policy that
22  if you felt as though a manager was treating you
23  unfairly that you could go to somebody like Sherri
24  Smith and tell her about that? You knew that; right?

Page 50

1    A.    Oh, yes.
2    Q.    And no one ever prevented you from
3    doing that; correct?
4    A.    No.
5    Q.    I'm correct; right?
6    A.    Yes.
7    Q.    Who's Terry Johnson?
8    A.    Now, he was one of the big regional
9    managers that would come to the store frequently,
10   maybe twice a month, just to check on whatever he
11   did, you know, make sure everything was running
12   smooth.
13   Q.    Was he a decent guy?
14   A.    I thought so.
15   Q.    Did you ever speak with him?
16   A.    A few times.
17   Q.    Was he approachable?
18   A.    Oh, yes.
19   Q.    Did you ever tell him that you were
20   being mistreated in any way?
21   A.    Maybe once I complained to him about
22   all the stuff that kept being left in front of my
23   door. I might have went to him one time about that.
24   I said, Terry, man, you got to be able to do

Page 51

1    something about this.
2    Q.    What did you tell him the problem was?
3    A.    Well, you know, like, when I come back
4    off the weekend, all that stuff would be piled in
5    front of my door. I said maybe they can put it on
6    that side or something, but no, just continued to put
7    the stuff in front of the door.
8    Q.    Well, did you tell Mr. Johnson
9    anything other than the fact that things were being
10   piled in front of your door?
11   A.    That was pretty much it.
12   Q.    You didn't tell him that you thought
13   that people were mistreating you by piling that stuff
14   in front of your door; correct?
15   A.    No, I didn't say that to him.
16   Q.    You didn't give him any sense that you
17   thought that people were retaliating against you by
18   piling stuff in front of your door; correct?
19   A.    No, I didn't say that.
20   Q.    Why not?
21   A.    Well, because, like, he was the
22   manager, I mean he was the regional manager, and I
23   was just, you know, maybe asking him to talk to his
24   managers, you know, the store managers -- like Bob

Page 52

1    Estes, who was my warehouse manager who hired me --
2    tell them to stop putting the stuff in front of my
3    door.
4    Q.    And these were returns that were being
5    placed in front of your door?
6    A.    Yes.
7    Q.    And it's not that you cared about the
8    returns being placed in that area, you just wanted
9    them slightly to the side of the door; is that
10   correct?
11   A.    Correct.
12   Q.    Who's Kris Lovett?
13   A.    She was the dispatcher who worked in
14   the office right beside me. We came in together. We
15   was hired together. We bonded because, like, she was
16   a real nice lady.
17   Q.    Was she a friend?
18   A.    We became kind of friends, you know.
19   We never went out or anything or went to dinner or
20   breakfast or nothing; but she would bring me coffee,
21   I would bring her coffee, you know.
22   Q.    Was she someone you felt free to speak
23   with?
24   A.    Oh, definitely, most definitely.

Page 53

1    Q.    You never told her that you felt as
2    though you were being mistreated?
3    A.    She seen it. I didn't have to tell
4    her. She used to come and tell me.
5    Q.    What did she say?
6    A.    Oh, I'm sorry, David. Whatever, Kris,
7    don't worry about it.
8    Q.    Well, what was she commenting on, if
9    you know?
10   A.    She would see the way they would leave
11   the stuff in front of my door. She said, Dave,
12   uh-huh, you need to talk to somebody about that. And
13   I said, Well, Kris, it doesn't matter. I can get
14   blue in the face talking, ain't nobody listening.
15   Q.    Did she remark about anything other
16   than returns, and by that I mean return items, being
17   left in front of your door?
18   A.    That was pretty much it.
19   Q.    Do you know who was leaving the
20   returns in front of your door?
21   A.    Just associates from up in front. The
22   kids would be bringing all the stuff back. When it
23   gets too bulky up in the front, it gets so congested,
24   they start moving it down to the back of the store

Page 54

1   where I was.
2       Q.   Give me the names of the people who
3   were doing it?
4       A.   I don't know these people. I don't
5   know who these kids are.
6       Q.   Did they know who you were?
7       A.   They knew I was the RTM, yeah, they
8   knew that, but I don't know who they were.
9       Q.   Did they know anything else about you?
10      A.   No. Like what do you mean, know what?
11      Q.   I'm trying to understand from you
12  whether or not the people who were leaving things in
13  front of your door had any reason to do it?
14      A.   I guess they just thought it was a big
15  joke or something: Let's see how he climbs over
16  this. I don't know. That's what they did. They
17  just left stuff in front of there.
18      Q.   And you don't know their names?
19      A.   I do not know who these people are,
20  no.
21      Q.   Would you be able to recognize them if
22  you saw them?
23      A.   I guess so. I haven't been there in a
24  few years now. I guess if I see somebody I would

Page 55

1   know who they were.
2       Q.   How many people were involved in
3   leaving things in front of your door?
4       A.   They have different shift changes;
5   different people come, different people go. Their
6   job and responsibility is to move the stuff from the
7   back of the store and bring it to the warehouse.
8   When they bring it to the warehouse, somebody told
9   them to do that.
10      Q.   Do you know who told them to do that?
11      A.   I think he was one of the managers. I
12  think it might have been Glen DeLorean or the other
13  man -- or my manager, Bob Estes, might have been on
14  that too; I think he might have told them.
15      Q.   Do you have any idea why any of the
16  managers might have told those people to leave things
17  in front of your door?
18      A.   No.
19      Q.   You have no idea what their thought
20  process was?
21      A.   No.
22      Q.   Or what their motivation was?
23      A.   No.
24           Can I use the restroom, please?

Page 56

1               MR. CASEY: Yes.
2               (Whereupon, a recess was taken)
3   BY MR. CASEY:
4       Q.   Now, Mr. Dean, just before the break I
5   was asking you about who the people were who left
6   return items in front of the door to your work area,
7   and you said you didn't know who they were; correct?
8       A.   Okay.
9       Q.   Was that your testimony?
10      A.   Yes, sir.
11      Q.   You did not know who they were?
12      A.   Yes.
13      Q.   And I also asked you about why they
14  did it, and you said that some of the managers may
15  have told them to do it; is that your testimony?
16      A.   I said that, yes.
17      Q.   And I asked you if you had any idea as
18  to why the manager might have told them that, you
19  said you didn't; correct?
20      A.   Yes.
21      Q.   Is that correct?
22      A.   Correct.
23      Q.   Now, did anyone ever tell you who was
24  leaving things in front of your work area?

Page 57

1       A.   Well.
2       Q.   Just answer that question. Did anyone
3   ever tell you who was leaving those things there?
4       A.   No.
5       Q.   Did anyone ever tell you why people
6   were leaving things in front of your work area?
7       A.   No.
8       Q.   Did anyone ever tell you whether or
9   not the people who were leaving those things in front
10  of your work area were instructed to do so by someone
11  in management?
12      A.   Yes.
13      Q.   Who told you what in that respect?
14      A.   I would go back out --
15      Q.   First, who told you what; give me a
16  name?
17      A.   I don't remember the names too much,
18  different departments. You know, like the rug
19  department, they would come and leave, like,
20  remnants. Different departments would leave
21  different things there. Like the plumbing department
22  would leave all kinds of fixtures and stuff. The
23  appliance department was good for leaving big
24  appliances; refrigerators, wash machines, dryers --

Page 62

1  that time; correct?
2      A.   We were hi, how are you doing; good,
3  you know.
4      Q.   Prior to that noose incident you had
5  had no difficulty with Danny Puccio; correct?
6      A.   No.
7      Q.   Is that correct?
8      A.   Correct.
9      Q.   He seemed to be a decent guy?
10     A.   He seem to be.
11     Q.   When that happened you were surprised?
12     A.   Oh, man, where did that come from?
13     Q.   And at first when it happened you told
14 Bob Estes and Ken Godin and other managers that you
15 didn't want to see Puccio get into any trouble for
16 it?
17     A.   From what I understand now, people
18 say, oh, Dave, you had every right to call Danvers
19 police and have him arrested. I'm trying to keep my
20 job here. I got a family to support. I'm not trying
21 to make waves.
22     Q.   You simply said you didn't want to see
23 him get into any trouble; right?
24     A.   Yes.

Page 63

1      Q.   You told Godin that?
2      A.   Yes.
3      Q.   You told Estes that?
4      A.   Yes, and they went along with it too.
5      Q.   They accepted his resignation;
6  correct?
7      A.   I mean.
8      Q.   Did they accept his resignation?
9      A.   Two weeks later.
10     Q.   They accepted it immediately and then
11 he actually left two weeks later?
12     A.   Yeah.
13     Q.   During that two-week period they
14 separated him from you and reassigned him outside;
15 correct?
16     A.   Yeah, kind of.
17     Q.   Well, they assigned him into the lawn
18 and garden area which was literally outside; correct?
19     A.   Oh, yeah, okay, yeah.
20     Q.   Between the time of his resignation
21 and the time he actually left, in that two-week
22 period you didn't have any further problems with
23 Danny Puccio, did you?
24     A.   No.

Page 64

1      Q.   So management as soon as you told them
2  about this immediately investigated, immediately
3  separated you and Puccio, and you had no further
4  problems with Puccio; correct?
5      A.   Correct.
6      Q.   And you thought that they handled it
7  properly, didn't you?
8      A.   Kind of, yeah.
9      Q.   Well, you told them you thought --
10     A.   Yes.
11     Q.   -- they handled it properly, didn't
12 you?
13     A.   Okay, yeah.
14     Q.   And a number of them asked you if
15 there was something else they might do?
16     A.   They asked me like this: Dave, are
17 you all right? Are you okay, Dave?
18     Q.   And you told them you were?
19     A.   Yes, yeah, I good.
20     Q.   And they asked you, is there anything
21 else, anything more that you'd like to us to do to
22 make you feel okay, didn't they?
23     A.   No.
24     Q.   Didn't Ken Godin say that to you?

Page 65

1      A.   No.
2      Q.   You sure about that?
3      A.   Yes, I am.
4          MR. CASEY: Let's have marked as
5  Exhibit No. 3 a two-page document which is dated
6  November 9, '01; it appears to be a document prepared
7  by a Kenneth Godin.
8          (Marked Exhibit 3; Lowe's Incident
9          Report dated 11/9/01)
10     Q.   Have you seen Exhibit No. 3 before
11 today, Mr. Dean?
12     A.   I've never seen this before.
13     Q.   Okay. And does that look like Ken
14 Godin's signature at the bottom lower left-hand area
15 on page two?
16         MR. FEDERICO: I'll object to the
17 form. If you have any idea what his signature looks
18 like. If you don't, you don't have to answer the
19 question.
20     A.   I don't know what his signature look
21 like, sir.
22     Q.   Mr. Godin writes on the first page in
23 the third full paragraph, and I quote, "After the
24 conversation with Danny I called David Dean to the

Page 66

1  ASM office. Besides myself (Ken Godin) I had Mark
2  Gullotti ASM and Stephen Sexton ASM present to talk
3  to David." Close quote. Is that true; did you speak
4  with Godin, Gullotti, and Sexton on that day?
5      A.   I kind of remember that, yes.
6      Q.   And Godin goes on to write, quote, "I
7  immediately told him" -- meaning you -- "exactly what
8  Dan had told me. I also told him that Dan had given
9  me his two-week notice to end his employment with
10 Lowe's. David then said he did not want to see Dan
11 leave over this." Close quote. Is that the way the
12 conversation happened?
13     A.   I guess it kind of went that way. I'm
14 not sure.
15     Q.   At the end of this document, at least
16 on the first page Godin writes, and I quote, "I
17 completely agreed with him" -- meaning you?
18     A.   No, no.
19     Q.   Hold on. Let me rephrase the
20 question.
21          Godin writes at the end of the first
22 page, quote, "I then asked him" -- meaning you?
23     A.   Mm-hmm.
24     Q.   "...if he felt that I was handling

Page 67

1  this the way he wanted it to be handled and if he
2  felt that I needed to do more to tell me immediately.
3  He said no, he felt that I reacted very rapidly and
4  fairly." Close quote.
5          Is that a fair characterization of the
6  conversation between you and Godin in the presence of
7  Gullotti and Sexton?
8      A.   No, sir.
9      Q.   It's not?
10     A.   No.
11     Q.   What about that is not accurate?
12     A.   This part here where he says I
13 completely agreed with him. I then asked him if he
14 felt that I was handling this the way he wanted it.
15 It's not the way I wanted it to be handled. Handle
16 it the way it's supposed to be handled, not the way I
17 want it to be. I just want, like, this to be
18 resolved, that's all.
19     Q.   You're not understanding my question
20 correctly. I'm asking you whether or not Godin said
21 to you --
22     A.   No, he did not, sir.
23     Q.   -- do you feel as though I'm handling
24 this the way you wanted it to be handled?

Page 68

1      A.   I don't remember him saying that.
2      Q.   Do you deny that he said it or do you
3  just not remember it?
4      A.   I don't remember him saying that.
5      Q.   Okay. Do you remember him asking you
6  if you wanted him to do anything more?
7      A.   No, I don't remember him saying that.
8      Q.   You don't deny it; you just don't
9  remember it?
10     A.   I don't remember it.
11     Q.   Okay. Do you remember saying to him
12 that you felt that he had reacted rapidly and fairly?
13     A.   No, I did not. I did not say that.
14     Q.   You deny that?
15     A.   Yes.
16     Q.   So if Godin and Gullotti and Sexton
17 all remember you saying that, it's your testimony
18 that they're incorrect?
19     A.   Yes, sir.
20     Q.   Okay. Who is Wesley Anderson?
21     A.   Wesley Anderson was an associate that
22 worked in the shipping and receiving area inside the
23 warehouse.
24     Q.   Was he a decent guy?

Page 69

1      A.   Wes was cool, he was all right.
2      Q.   Did he ever do or say anything that
3  gave you any reason to believe that he was dishonest?
4      A.   No.
5      Q.   Did he ever do or say anything that
6  gave you any reason to believe that he didn't like
7  you?
8      A.   No.
9      Q.   Was he friendly to you?
10     A.   Yeah, he was; hi, how are you, you
11 know.
12     Q.   Did he ever do or say anything to
13 indicate to you that you couldn't trust him?
14     A.   No.
15     Q.   Who is Mark Gullotti?
16     A.   One of the ASMs, one of the managers.
17     Q.   Was he a decent guy?
18     A.   I didn't care for him too much.
19     Q.   Did he ever mistreat you in any way?
20     A.   No.
21     Q.   Did he ever give you any reason to
22 believe that you couldn't trust him?
23     A.   Just like I said, I didn't care for
24 him too much.

Page 70

1    Q.    I'm asking you a different question.
2    I understand what you're saying. I'm asking you did
3    he ever give you any reason to believe that you
4    couldn't trust him?
5    A.    No.
6    Q.    Did he ever give you any reason to
7    believe that he was dishonest?
8    A.    No.
9    Q.    Did he tell you on the day of the
10   incident that he was available to talk to if you ever
11   needed to talk to him?
12   A.    No.
13   Q.    Who is Steve Sexton?
14   A.    Now, I believe Steve was the assistant
15   manager under Bob Estes in the warehouse, I believe.
16   I'm not quite sure about the last name Sexton, but
17   there was a Steve and I believe maybe that was him.
18   Q.    Was he a decent guy?
19   A.    He was all right.
20   Q.    Did he ever do or say anything that
21   gave you any reason to think that he was dishonest?
22   A.    No.
23   Q.    Did he ever do or say anything that
24   gave you any reason to believe that you couldn't

Page 71

1    trust him?
2    A.    You know, like, for a long time I
3    thought that maybe he had a little something to do
4    with why all the stuff was being piled up in front of
5    my door, I really felt that.
6    Q.    You didn't have any reason to know one
7    way or the other; you just thought it might be the
8    case?
9    A.    He'd usually be the first person there
10   in the mornings and he had to see whoever was
11   bringing this stuff. And by me talking to him about
12   the stuff being left in front of my door, I would
13   just think that he would have told them, no, don't
14   bring that right there, put that over there, but I
15   guess -- you know, I think he knew a little something
16   about the stuff being put in front of my door.
17   Q.    But you're not sure, you're guessing?
18   A.    Yeah.
19   Q.    Did he ever give you any reason to
20   believe that you couldn't trust him?
21   A.    He had a different behavior than
22   everybody else. Certain people act different ways.
23   He was -- I don't know, I don't know.
24   Q.    What about Kat Richard, who was she?

Page 72

1    A.    Now, she was our human resource person
2    at the Danvers store.
3    Q.    What was she like, describe her for
4    me?
5    A.    I thought she was a pleasant lady, she
6    was all right.
7    Q.    Decent person?
8    A.    I would think so, yes.
9    Q.    Approachable?
10   A.    Yes.
11   Q.    Someone you could talk to?
12   A.    Yes.
13   Q.    And she sat in on a discussion between
14   you and Frank Romano regarding the incident with
15   Danny Puccio; right?
16   A.    Okay.
17   Q.    Do you remember that?
18   A.    I kind of, yes.
19   Q.    In that discussion Romano told you
20   that the matter was being addressed, and that Lowe's
21   was going to take steps to rectify the situation,
22   didn't he?
23   A.    Correct.
24   Q.    And he told you that he had confronted

Page 73

1    Danny and that Danny had given his two weeks' notice?
2    A.    Correct.
3    Q.    He told you that he had moved Danny to
4    the lawn and garden area to finish out his notice
5    period and you would not have any more contact with
6    him?
7    A.    Correct.
8    Q.    And he asked you how you felt about
9    how the situation was addressed and you told him that
10   all the managers had acted quickly and
11   professionally?
12   A.    Okay.
13   Q.    Is that correct?
14   A.    Correct.
15   Q.    And you also told him that you and
16   Danny had been friends and that you had worked well
17   together; correct?
18   A.    Mm-hmm, that's what I thought, yeah,
19   correct.
20   Q.    You also told Mr. Romano that you did
21   not want anyone to get into trouble or lose their job
22   over this?
23   A.    Correct.
24   Q.    And Kat Richard told you that if there

Page 74

1  was anything that you needed to talk with her about
2  going forward that you should feel free to come see
3  her?
4      A.  Correct.
5      Q.  And you never did go to complain to
6  her about anything, did you?
7      A.  No.
8      Q.  Danny Puccio apologized to you after
9  this incident, didn't he?
10     A.  Yeah.
11         MR. CASEY: I want to have marked as
12 Exhibit No. 4 a document dated November 8, 2001, two
13 pages in length, which appears to be Mr. Dean's
14 statement regarding the Puccio incident.
15         (Marked Exhibit 4; Lowe's Incident
16         Report dated 11/8/01)
17     Q.  Mr. Dean, do you recognize the
18 document that's been marked Exhibit No. 4?
19     A.  Yes, sir.
20     Q.  That's your handwriting?
21     A.  Yes, sir.
22     Q.  And that's your signature on the
23 second page?
24     A.  Yes, sir.

Page 75

1      Q.  No one forced you to write that;
2  correct?
3      A.  Correct.
4      Q.  You were given all the time you needed
5  to write that; correct?
6      A.  Yes, sir.
7      Q.  What you wrote there was true; right?
8      A.  Yes, sir.
9      Q.  You didn't leave anything out, did
10 you?
11     A.  Let me just go over and see.
12     Q.  Sure. Why don't you read into the
13 record what you wrote and that will serve two
14 purposes: I'll be sure I know what your handwriting
15 says, and you have a chance to review what you wrote.
16 Read into the record exactly what this document says.
17     A.  To whom this may concern: Today,
18 11/8, around 10:30 a.m. I was with two
19 representatives doing buy backs for one and just
20 basic RTMs with the other when a fellow associate,
21 Danny, says to me, Dave, I left something for you on
22 your desk. I responded, Yeah, Danny, I'll get to it
23 when I am through with these two reps. When I made
24 it, when I made it back to my desk, one of the reps

Page 76

1  and myself could not believe what was on my desk. It
2  was a black hangman's noose which was very
3  distasteful and rather embarrassing. So I says to
4  Danny, What's all this about? And he just started
5  laughing. But there was nothing funny and that's
6  when I brought this --
7      Q.  Infraction?
8      A.  -- infraction to manager on duty, or
9  MOD, in the warehouse. Soon afterward I was called
10 to the office to hear my side of the story and to
11 make sure I was okay about what had just happened.
12 I'm all right, but no one needs to be hurt or
13 humiliated this way with distasteful, childish
14 behavior. Basically my fellow associates are nice
15 people. We all try to get along with each other and
16 when one crosses the line, such as this, this creates
17 matters, especially from someone who you trust to be
18 a friend. I am sorry for the situation that came
19 about. I just want to work in a safe, friendly
20 environment without the ugly side of racism -- I
21 can't read it.
22     Q.  Rearing?
23     A.  Rearing its ugly head. We're all
24 about, we're all adults here and what might be

Page 77

1  humorous to others can be very insulting to most.
2  I'm all right, but we as associated, as associated
3  and people don't need this kind of behavior. Thank
4  you for your time. David Dean.
5      Q.  You were asked by the manager on duty
6  to write a statement reflecting your side of the
7  story; correct?
8      A.  Correct.
9      Q.  And this is what you wrote?
10     A.  Yes.
11     Q.  And you didn't leave anything out?
12     A.  No, I didn't leave anything out.
13     Q.  And what you wrote was truthful?
14     A.  Very truthful.
15     Q.  This is how you felt at the time;
16 correct?
17     A.  Yes, sir.
18     Q.  Kat Richard was in the store every
19 day, wasn't she?
20     A.  Yeah.
21     Q.  And you would frequently see her in
22 the store; correct?
23     A.  Yes.
24     Q.  She was in the store after you were

| | Page 78 | | Page 80 |
|---|---|---|---|
| 1 | transferred into the lawn and garden center; correct? | 1 | Puccio; is that correct? |
| 2 | A. Yes. | 2 | A. Right, right. |
| 3 | Q. And you continued to see her? | 3 | Q. How did you learn that he had been |
| 4 | A. Yes. | 4 | rehired? |
| 5 | Q. You never complained to her about | 5 | A. I went into the cafeteria to get my |
| 6 | being transferred into the lawn and garden center, | 6 | soft drink, and the next room right beside there |
| 7 | did you? | 7 | where we did our orientation where they were bringing |
| 8 | A. No. | 8 | their new associates in, I seen Danny come out of |
| 9 | Q. You never told her you were having any | 9 | there with an apron on and I'm like, oh, my God. |
| 10 | problems with management or otherwise in the lawn and | 10 | Q. He wasn't, you later found out, |
| 11 | garden center, did you? | 11 | working in the Danvers store; correct? |
| 12 | A. No. | 12 | A. I don't know. That was the first time |
| 13 | Q. At the time you agreed to the transfer | 13 | I seen him after that incident. When he resigned or |
| 14 | into the lawn and garden center, didn't you? | 14 | whatever, that was the, that was the last time I seen |
| 15 | A. Yes. | 15 | him because I didn't see him no more after that. I |
| 16 | Q. And you thought it would give you a | 16 | knew that he was rehired somewhere. |
| 17 | fresh start; correct? | 17 | Q. When was that that you saw him with |
| 18 | A. Yeah. | 18 | the apron on? |
| 19 | Q. And you said that to Mr. Estes; | 19 | A. I really can't tell you, I can't tell |
| 20 | correct? | 20 | you. It had to be during the, maybe the end of the |
| 21 | A. Yeah. | 21 | summer or maybe the beginning of the fall because it |
| 22 | Q. After you were transferred into the | 22 | was still kind of warm out. |
| 23 | lawn and garden center, did you experience any | 23 | Q. You think it was the end of the |
| 24 | problems on the job at Lowe's? | 24 | summer? |

| | Page 79 | | Page 81 |
|---|---|---|---|
| 1 | A. Well, things just seemed different | 1 | A. Maybe. |
| 2 | after that, you know, because people would keep | 2 | Q. And you then worked for another three |
| 3 | coming out to me, why are you in lawn and garden, how | 3 | or four months after that; correct? |
| 4 | come you ain't in your office, and I had to explain | 4 | A. About right. |
| 5 | this over and over and over again. | 5 | Q. And you didn't have any other problems |
| 6 | Q. Other than people asking you why are | 6 | after you saw him with Danny Puccio; correct? |
| 7 | you in lawn and garden, did you experience any kind | 7 | A. Well, well, there was one problem. |
| 8 | of problems at work for Lowe's after you were | 8 | Like, when I was in the RTM in my office there, I had |
| 9 | transferred into the lawn and garden center? | 9 | a set schedule. I would come in every morning at |
| 10 | A. Until that one time there was one | 10 | 7:30 and I would leave every afternoon at 3:30. When |
| 11 | incident when I came out the lawn and garden, I came | 11 | they put me out in lawn and garden, man, my hours |
| 12 | into the employee cafeteria to get something cold, | 12 | went from six o'clock in the morning one day until |
| 13 | and I had seen that they had rehired Danny Puccio, | 13 | two in the afternoon; the next day they wanted me to |
| 14 | and that's when I couldn't believe my eyes. | 14 | come in at midnight to work until six o'clock in the |
| 15 | Q. Okay. So just so I understand your | 15 | morning. Just the fluctuation of the schedule, it |
| 16 | testimony, you agreed to be transferred into the lawn | 16 | was really bizarre. One minute I'd be working three |
| 17 | and garden center? | 17 | to eleven and -- oh, they just kept playing with my, |
| 18 | A. Mm-hmm. | 18 | you know what I mean. |
| 19 | Q. You went over there to work, you | 19 | Q. Were there legitimate business reasons |
| 20 | didn't have any problems whatsoever with Lowe's or | 20 | for that scheduling? |
| 21 | Lowe's management or having in any respect to do with | 21 | A. No, they just wanted to, I guess, |
| 22 | your job after you were transferred into the lawn and | 22 | bother me. |
| 23 | garden center other than the fact that you learned on | 23 | Q. That's what you think, they wanted to |
| 24 | one occasion that the company had rehired Danny | 24 | bother you? |

KACZYNSKI REPORTING

Page 82

1    A.   I really believe that.
2    Q.   Who was it that was doing that?
3    A.   Whoever was making up the schedule.
4    Q.   You don't know?
5    A.   I'm going to say Glen DeLorean.
6    Q.   Do you know or are you guessing?
7    A.   I'm going to say Glen DeLorean, he did
8    it.
9    Q.   That's your testimony under oath, you
10   know that he was doing it?
11   A.   I believe he was, yes.
12   Q.   How do you spell his last name?
13   A.   D E capital L O R E A N, DeLorean.
14   Q.   What was his supervisory relationship
15   to you; was he your direct manager?
16   A.   Yes.
17   Q.   When did you start working for him, as
18   soon as you were transferred into lawn and garden?
19   A.   Yes.
20   Q.   And why do you think that he was
21   trying to give you a hard time?
22   A.   I don't know, sir. I really don't
23   know.
24   Q.   Do you have any idea what his

Page 83

1    motivation was?
2    A.   No, I really don't. I just know all
3    of a sudden by me coming in at one set schedule and
4    now all of a sudden I'm coming in on Saturdays,
5    Sundays, I might have Monday off, and it was just --
6    it was hard.
7    Q.   Do you know whether or not that
8    fluctuating schedule was typical of people working in
9    the lawn and garden center, and if you don't know
10   tell me?
11   A.   I don't know, sir.
12   Q.   You don't know one way or the other?
13   A.   I don't know.
14   Q.   Did you ever speak with Mr. DeLorean
15   about this matter as to why your schedule was
16   fluctuating?
17   A.   I think I might have brought it to his
18   attention one time and he said, Hey, that's the way
19   it is.
20   Q.   Did you say anything further to him?
21   A.   No.
22   Q.   And you never complained to anybody
23   about the schedule?
24   A.   No, I just went, did my work.

Page 84

1    Q.   You never complained to anybody at
2    Lowe's about how Mr. DeLorean was treating you, did
3    you?
4    A.   No.
5    Q.   Why did you leave Lowe's?
6    A.   Glen DeLorean again at the end of my
7    shift, I did my shift, and I think it was five
8    o'clock that evening, and he says, Hey, we need you
9    to stay late. I said, I'm sorry, I can't. I have a
10   prior commitment. I have a part-time job that I have
11   to go get to. And he says, Well, Dave, you're not
12   going to leave me no choice. I said, Glen, do
13   whatever you want to, man. I've had it up to here
14   anyway. I went to my other job. He said, Hey, if
15   you leave, I'm going to have to write you up and
16   that's grounds for termination. I said, Whatever.
17        The next day, that was my day off and
18   I didn't go back to work, and I think he gave me a
19   phone call telling me that when I come in to come
20   straight -- don't punch in, just come straight to see
21   him, Glen DeLorean. And I knew what that meant. I
22   didn't even go back. I just didn't even go back.
23   Q.   Did you call to tell Mr. DeLorean or
24   to tell anyone else at Lowe's that you would not be

Page 85

1    returning to work?
2    A.   No, I didn't.
3    Q.   So you don't know if you were going to
4    be terminated; you were just guessing that might
5    happen?
6    A.   Yeah.
7    Q.   But it could have been short of
8    termination; it could have been a warning?
9    A.   I don't think so. I don't think so.
10   Q.   It could have been?
11   A.   It could have been. I guess it could
12   have been.
13   Q.   You didn't know?
14   A.   I didn't know, but what I did know is
15   that I was tired of being, you know, kicked around
16   like that.
17   Q.   Well, you say kicked around, but you
18   said under oath a few minutes ago you didn't know
19   what other people's schedules had been in lawn and
20   garden?
21   A.   I didn't.
22   Q.   They may have had fluctuating
23   schedules; correct?
24   A.   They could have. I don't know.

22 (Pages 82 to 85)

Page 86

1    Q.    Just like yours?
2    A.    It wasn't -- I didn't see too many
3    people in there at midnight but me. I was the only
4    one in there.
5    Q.    How many times did you go in at
6    midnight?
7            MR. FEDERICO: Object to the form,
8    argumentative.
9    A.    A couple times, few times.
10    Q.    Why were you asked to work late at
11    night on those occasions?
12    A.    To water the plants.
13    Q.    When did that happen?
14    A.    To put, to, to water the plants and to
15    put certain stock away.
16    Q.    When did that happen?
17    A.    Right after when they put me in lawn
18    and garden.
19    Q.    That was in April of 2002?
20    A.    I believe so, yes, sir.
21    Q.    So on a couple of occasions in your
22    first week or so working in lawn and gardens, they
23    had asked you either to stay or come in late to water
24    plants and put stock away?

Page 87

1    A.    Yes.
2    Q.    And that never happened again after
3    that?
4    A.    It happened a few times. That
5    happened for months. It happened for a few months.
6    Q.    It happened a few times over the
7    course of months?
8    A.    Yes.
9    Q.    Did you ever ask why they wanted you
10    to water the plants late at night?
11    A.    They said that's your job description.
12    No problem.
13    Q.    Was anyone else in the store when you
14    were there watering the plants?
15    A.    There might have been a few other
16    people in other departments, you know, putting stuff
17    up over there in them departments.
18            MR. CASEY: I need to break for lunch
19    now. I have a meeting that I have to attend for
20    roughly an hour. Why don't we break for an hour,
21    come back at one o'clock, and we shouldn't be
22    terribly long after that before we finish up, okay?
23            MR. FEDERICO: Well, sure.
24            (Whereupon, a lunch recess was taken)

Page 88

1        AFTERNOON SESSION
2        CONTINUED DIRECT EXAMINATION
3    BY MR. CASEY:
4        Q.    Back on the record after the lunch
5    break. Mr. Dean, I want to have several documents
6    marked as exhibits to the deposition.
7            I'd like to have marked Exhibit No. 5
8    a one-page document that is entitled Lowe's Employee
9    Orientation Training Record.
10            (Marked Exhibit 5; Lowe's Employee
11            Orientation Training Record)
12        Q.    Do you recognize this document,
13    Mr. Dean, Exhibit No. 5?
14        A.    Yes, sir.
15        Q.    Is that your signature near the bottom
16    of the page?
17        A.    Yes, sir.
18        Q.    And by signing is it fair to say that
19    it indicates that you received training regarding the
20    subject matters that are checked in the columns above
21    your signature?
22        A.    Yes, mm-hmm.
23        Q.    So that, among other things, you
24    received training regarding the company's open door

Page 89

1    policy?
2        A.    Yes.
3        Q.    And you understood what the company's
4    open door policy was?
5        A.    No, I kind of forgot.
6        Q.    But you knew it at the time; correct?
7        A.    I guess so, yes.
8        Q.    And that is that if you have a problem
9    at any time with your direct supervisor or with
10    co-workers, you can always go to people in the
11    company above your manager in the corporate hierarchy
12    or outside of the particular store in which you work
13    to make sure that you're getting objective people
14    from Lowe's to look at the situation?
15        A.    Yes.
16        Q.    You're aware of that?
17        A.    Yes.
18            MR. CASEY: I want to have marked as
19    Exhibit No. 6 a one-page document that relates to
20    Mr. Dean's employment with Lowe.
21            (Marked Exhibit 6; Acknowledgement
22            dated 1/6/01)
23        Q.    Mr. Dean, do you recognize this
24    document?

23 (Pages 86 to 89)

Page 90

1    A.    Yes.
2    Q.    And is that your signature toward the
3    bottom of the page?
4    A.    Yes, sir.
5    Q.    This is also something that you signed
6    as part of your orientation and training before you
7    actively commenced work with Lowe's; is that correct?
8    A.    Yes, sir.
9    Q.    And did you read this document before
10   you signed it?
11   A.    Yes.
12   Q.    So you knew that in Section I, where
13   it says "Notice of Lowe's policies," you were
14   instructed that, and I quote, "If you are subjected
15   to discrimination, including sexual harassment, or if
16   you are aware of a violation of any of the policies
17   above, report it immediately to your store/location
18   manager...If immediate satisfactory action is not
19   taken, call or write Lowe's Internal Audit
20   Department..." and then it provides both an address
21   and a telephone number, close quote. Do you see
22   that?
23   A.    Yes, I see that.
24   Q.    And you retained a copy of this

Page 91

1    document during the course of your employment at
2    Lowe's; correct?
3    A.    I believe so, yes.
4    Q.    So that you knew that if you had a
5    problem with what your managers were doing or how you
6    were being treated in any fashion by anyone while you
7    were employed at Lowe's that you could always go to
8    your department head, and indeed you could go above
9    the head of your department head, and call or write
10   Lowe's Internal Audit Department to address any
11   complaints you might have?
12   A.    Correct.
13   Q.    You understood not only you could do
14   that but that you were supposed to do that?
15        MR. FEDERICO:  Object to the form.
16   You can answer.
17   A.    Yes, correct.
18   Q.    Who is Janie Jordan?
19   A.    That was a friend of mine.
20   Q.    Is that a girlfriend?
21   A.    She was, yes.
22   Q.    A woman you lived with?
23   A.    In the past.
24   Q.    Okay. Are you still friends with her?

Page 92

1    A.    Yes.
2        MR. CASEY:  I'd like to have marked as
3    Exhibit No. 7 your application for employment at
4    Lowe's dated January 2, 2001 which is in two pages.
5        (Marked Exhibit 7; Application for
6        Employment dated January 2, 2001)
7    Q.    Do you recognize Exhibit No. 7?
8    A.    Yes.
9    Q.    Is that your signature at the bottom
10   of the first page?
11   A.    Yes, sir.
12   Q.    And in the lower left-hand column on
13   the second page is that your --
14   A.    Yes, it is, sir.
15   Q.    -- signature?
16   A.    Yes.
17   Q.    Okay. Now, you knew when you were
18   filling out this employment application that you were
19   to be truthful in doing so; correct?
20   A.    Correct.
21   Q.    And you were, in fact, answering these
22   questions fully and truthfully; correct?
23   A.    Yes.
24   Q.    You see in the section entitled "Work

Page 93

1    History" on page one of Exhibit 7 near the bottom --
2    A.    Work history, yes.
3    Q.    -- you were asked to identify your
4    last three or four employers immediately preceding
5    this application for employment at Lowe's; correct?
6    A.    Yes, sir.
7    Q.    And you identified your then current
8    employer as New Boston?
9    A.    Yes.
10   Q.    Is that correct?
11   A.    Yes, sir.
12   Q.    And you were, in fact, working for New
13   Boston in January of 2001; is that correct?
14   A.    I guess, yes.
15   Q.    And you had been working there for a
16   couple months?
17   A.    Yes, sir.
18   Q.    What were you doing for New Boston?
19   A.    It was a temp agency, and they would
20   send us out on assignments to different places. I
21   did work at McDonald's warehouse where we would store
22   the products in the truck to be sent to the local
23   McDonald's throughout the state.
24   Q.    And prior to that you had been working

24 (Pages 90 to 93)

Page 94

1  at Home Depot?
2      A.  Yes, sir.
3      Q.  And I take it from your job
4  application that you worked at Home Depot between
5  March of 2000 and November of 2000, approximately
6  eight months?
7      A.  Yes, sir.
8      Q.  Is that correct?
9      A.  Yes, sir.
10     Q.  What did you do for Home Depot?
11     A.  That's where I learned to do my RTM
12  work for Lowe's. I was a RTV which there is return
13  to vendor.
14     Q.  Okay. And did you work for Home Depot
15  at any time other than that eight-month period
16  between March of the year 2000 and November of the
17  year 2000?
18     A.  No, sir, just what's there.
19     Q.  Just that eight-month period?
20     A.  Yes.
21     Q.  All right, and you're sure of that?
22     A.  Yes.
23     Q.  Why did you leave Lowe's -- I'm
24  sorry -- why did you leave Home Depot?

Page 95

1      A.  Because it was, it was a little bit
2  difficult for me to get there because at this
3  particular store, it was in Salem, and by me living
4  in Lynn it was, like they just started a bus schedule
5  there, and I used to have to depend on friends to
6  pick me up and bring me to work.
7      Q.  Was there any reason -- did you leave
8  voluntarily?
9      A.  Yes.
10     Q.  You were not terminated?
11     A.  Yes.
12     Q.  Yes, what?
13     A.  I was terminated.
14     Q.  You were terminated?
15     A.  Yes.
16     Q.  So you left involuntarily?
17     A.  Okay, yes.
18     Q.  Why were you terminated?
19     A.  There was an accident where a fork, a
20  forklift, a fork jack rolled over my foot; and when
21  it rolled over my foot, their policy was to send me
22  straight to the hospital. When I went to the
23  hospital, they did some tests and stuff; and they
24  found something, some marijuana, in my system.

Page 96

1      Q.  So they terminated you for testing
2  positive for marijuana?
3      A.  Yes, sir.
4      Q.  And they told you that?
5      A.  Yes, sir.
6      Q.  And you knew that on or about the day
7  that you were terminated in November --
8      A.  Yes, sir.
9      Q.  -- of 2000?
10     A.  Yes, sir.
11     Q.  You knew that before you filled out
12  this work application?
13     A.  I filled out -- no, no, I -- like when
14  I filled -- they gave me a drug test when I filled
15  out this work application.
16     Q.  No, no, listen to me for a second.
17  When you prepared the information that's contained on
18  the document that's been marked as Exhibit 7 --
19     A.  Yes.
20     Q.  -- you did that work in January of the
21  year 2001; correct?
22     A.  Yes.
23     Q.  As of January 2d, 2001 you knew that
24  you had been terminated by Home Depot for testing

Page 97

1  positive for marijuana; correct?
2      A.  Yes.
3      Q.  So when you prepared this work history
4  portion of the job application for Lowe's, you were
5  not entirely truthful, were you?
6      A.  Oh, I was truthful because they tested
7  me there too.
8      Q.  Well, but when you were asked for the
9  reason for leaving Home Depot you answered, not
10  enough hours?
11     A.  Oh, right.
12     Q.  Correct, and that was not entirely
13  truthful, was it?
14     A.  Not entirely.
15     Q.  Because, in fact, you had been
16  terminated for testing positive for marijuana;
17  correct?
18     A.  Correct.
19     Q.  You didn't tell anybody at Lowe's that
20  you had been terminated by Home Depot for testing
21  positive for marijuana?
22     A.  No, I didn't, sir.
23     Q.  And when you filled out the date at
24  the bottom of page one of Exhibit 7, you made an

25 (Pages 94 to 97)

Page 98

1  error and filled it out as 1/2/00 when, in fact, you
2  prepared this document on 1/2/01 as is reflected
3  correctly on the second page of Exhibit 7; correct?
4      A.   Correct.
5      Q.   Now, in your complaint to the MCAD --
6  and I'll show you again the document that was marked
7  as Exhibit No. 2 -- you stated under oath to the MCAD
8  that you had worked at Home Depot for two years, and
9  that's in the second sentence of the second paragraph
10  under the section entitled, "The particulars are."
11  Do you see that? I quote, "I was hired as a Return
12  to Manufacturer, a position in which I had two years
13  of experience at Home Depot." Close quote. Have I
14  read it accurately?
15      A.   Yes, sir.
16      Q.   And when you wrote that to the MCAD,
17  you were not being entirely truthful, were you?
18      A.   Well, I didn't have all my, my dates
19  correct, you know. I was just saying this off the
20  top of my head.
21      Q.   So in your complaint to the MCAD, you
22  said that you had two years' experience at Home Depot
23  when, in fact, you only had eight months' experience
24  there; correct?

Page 99

1      A.   I think I had more than eight months
2  at Home Depot.
3      Q.   Look again at the first page of
4  Exhibit 7 where it indicates you worked at Home Depot
5  from March of 2000 to November of 2000; do you see
6  that?
7      A.   Yes, sir.
8      Q.   Is that accurate?
9      A.   I guess it is, yes. I'm not real
10  sure, but I guess it is.
11      Q.   Prior to that you had worked at Arrow
12  Electronics?
13      A.   Yes.
14      Q.   For approximately four years?
15      A.   Yes, sir.
16      Q.   Did you leave there voluntarily or
17  involuntarily?
18      A.   I left there voluntarily.
19      Q.   Under what circumstances?
20      A.   The assignment, what it says here, it
21  had ended. Arrow Electronics used to, it was, used
22  to be Ritchie Electronics, but Ritchie was sold to
23  Arrow, and then once they were sold and they were
24  going through their transition or switching the

Page 100

1  companies, they let a lot of people go, and I was one
2  of them.
3          MR. CASEY:  I want to have marked as
4  Exhibit No. 8 a copy of the Complaint and Jury Claim
5  that you filed in superior court in this matter.
6          (Marked Exhibit 8; Complaint and Jury
7          Claim)
8      Q.   Do you recognize the document that has
9  been marked as Exhibit No. 8, Mr. Dean?
10      A.   I guess this is the first time I ever
11  seen this.
12      Q.   Is that right, you haven't seen it
13  before?
14      A.   I believe this might be the first time
15  I ever seen this.
16      Q.   Do you know who Chris O'Connor is?
17      A.   No.
18      Q.   Just yes or no, did you speak with
19  anyone affiliated with Mr. Federico's law firm to
20  prepare a document for filing suit in this case, just
21  yes or no?
22      A.   No.
23          MR. CASEY:  I want to have marked as
24  Exhibit No. 9 a performance review related document

Page 101

1  dated at least with respect to your signature
2  August 31, '01; it's one page.
3          (Marked Exhibit 9; Lowe's Strategic
4          Training & Achievement Review/Career
5          Development Review dated August 31,
6          2001)
7      Q.   Do you recognize Exhibit No. 9?
8      A.   Yes, sir.
9      Q.   This is the first performance related
10  review that you received in writing from Lowe's after
11  you commenced work there in January of '01; correct?
12      A.   Yes, sir.
13      Q.   And it's signed by Robert Estes, your
14  supervisor, and by yourself at the lower left-hand
15  corner at the bottom of the page?
16      A.   Yes, sir.
17      Q.   You had a chance to review this
18  document before you signed it; correct?
19      A.   Yes, sir.
20      Q.   And you thought that it fairly and
21  accurately reviewed your work for the first eight
22  months of your tenure at Lowe's; correct?
23      A.   Yes, sir.
24      Q.   And you knew that you had an

Page 102

1  obligation to provide comments in a section entitled
2  "Employee Comments" if you wanted to disagree with or
3  add to anything that was contained in your review;
4  correct?
5      A.   That's correct.
6      Q.   And you knew that you could not only
7  write on the front page but you could go on and write
8  on the back of the page if you needed more space to
9  state your comments; correct?
10     A.   Yes, sir.
11     Q.   Mr. Estes noted in the supervisor
12 comments section that you needed, quote, "some
13 improvement on his" -- meaning your -- "attendance
14 and on the organization...his paperwork, like OFR and
15 cleared RTM reports." Close quote. Do you see that?
16     A.   Yes, sir.
17     Q.   Did I read it accurately?
18     A.   Yes, sir.
19     Q.   And you did not disagree with that
20 assessment; correct?
21     A.   Correct.
22     Q.   You thought that was a fair
23 assessment?
24     A.   Yes.

Page 103

1      Q.   You had missed some time from work?
2      A.   I had time to use, you know.
3      Q.   And you missed time because both you
4  had some car problems with an old van that you were
5  driving and because you had asthma; correct?
6      A.   Yes, sir.
7      Q.   And, in fact, Mr. Estes was fairly
8  understanding about that, wasn't he?
9      A.   Sure, he was fair.
10     Q.   And you generally found him to be fair
11 in the way he dealt with you, didn't you?
12     A.   Yes, he hired me.
13     Q.   And he was a pretty -- well, to use a
14 common term, he was a pretty laid back, easy-going
15 guy, wasn't he?
16     A.   Real big guy.
17     Q.   And laid back?
18     A.   Yes.
19     Q.   People liked him?
20     A.   I guess so, yes.
21     Q.   Nice guy?
22     A.   Yeah.
23     Q.   And after you transferred from the
24 return area to the lawn and garden area, he continued

Page 104

1  to be at least your second level supervisor; correct?
2      A.   Yes.
3      Q.   And you never registered any
4  complaints with him regarding how you were being
5  treated in the lawn and garden center, did you?
6      A.   No, sir.
7      Q.   I'm correct; right?
8      A.   Yes, you are.
9      Q.   And he was an approachable guy; if you
10 needed to speak with him, he was around and always
11 willing to listen, wasn't he?
12     A.   Yes.
13          MR. CASEY: I want to mark as Exhibit
14 No. 10 a one-page document that appears to be your
15 review effective January 6, '02 which you signed on
16 January 30, '02.
17          (Marked Exhibit 10; Lowe's Strategic
18          Training & Achievement Review/Career
19          Development Review dated January 30,
20          2002)
21     Q.   Do you recognize Exhibit No. 10?
22     A.   Yes, sir.
23     Q.   And is that your signature at the
24 lower left-hand portion of that document?

Page 105

1      A.   Yes, it is sir.
2      Q.   Now, as of January '02, according to
3  your earlier testimony in this deposition today,
4  people had been for some time, for several months at
5  that point, leaving return merchandise and appliances
6  and the like in front of your door to your work area,
7  which was called the cage; is that correct?
8      A.   Yes.
9      Q.   You did not make note of that in your
10 employee comment section of this document, did you?
11     A.   What training -- oh, employee
12 comments. Major concerns are appliances, tools, and
13 other items needs to be marked with what's wrong with
14 it, plus receipts of purchases, that helps the return
15 process turnover.
16     Q.   My question is, in the employee
17 comment section of this review, you did not make any
18 note or comment regarding --
19     A.   No, I did not, sir.
20     Q.   -- return items being placed in front
21 of the door leading to the cage area; correct?
22     A.   All I wrote here --
23     Q.   Is that correct?
24     A.   Correct.

1     Q.    You did talk about the return process
2  and your major concern being that appliances, tools,
3  and other items be properly marked with what's wrong
4  with them?
5     A.    Right.
6     Q.    That was the only concern that you
7  expressed?
8     A.    Exactly.
9     Q.    In this review, as opposed to the
10 review that you received some five months earlier,
11 you received four "does not meet standard"
12 indications out of the twelve performance criteria,
13 whereas in the first review you received all "meets
14 standard" scores; is that correct?
15    A.    Correct, sir.
16    Q.    And you did not complain about that;
17 you thought it was fair that Bob Estes registered a
18 score of "does not meet standard" on four out of the
19 twelve criteria; correct?
20    A.    Correct.
21         MR. FEDERICO:  I'll object to the
22 form.
23    Q.    Your answer was correct?
24    A.    Correct, sir, but that's like when

1  this -- if I can, if I can speak.
2     Q.    You can when your lawyer asks you
3  questions, if he'd like to.
4     A.    Okay.
5     Q.    At this time, in January of '02,
6  Mr. Estes wrote, "David has the knowledge and can
7  certainly perform this job. I think that his
8  constant time away from work is directly affecting
9  the productivity. He also needs to be more organized
10 especially with all the reports and OFR log."  Do you
11 see that he writes that, have I accurately read it?
12    A.    Yes, sir.
13    Q.    And you did not indicate on this
14 document or otherwise that you disagreed with that,
15 did you?
16    A.    No, I didn't write that on this
17 document.
18    Q.    In fact, you did agree with that
19 assessment, didn't you?
20    A.    Kind of.
21    Q.    You had missed a fair amount of work
22 time in December of 2001; correct?
23    A.    I can't quite remember how much I
24 missed, but I think I said my asthma was acting up at

1  that time.
2     Q.    That was the reason you were missing
3  work, because of your asthma?
4     A.    Yes.
5     Q.    And that was the only reason; correct?
6     A.    Yes.
7         MR. CASEY:  I want to now have marked
8  as Exhibit No. 11 a one-page employee performance
9  report dated January 20, 2002.
10         (Marked Exhibit 11; Lowe's Employee
11         Performance Report dated January 20,
12         2002)
13    Q.    Do you recognize Exhibit No. 11?
14    A.    Yes, sir.
15    Q.    And is it, in fact, true that on or
16 about January 20th of 2002, some two weeks after you
17 received your performance review which has been
18 marked as Exhibit No. 10, Mr. Estes and Mr. Vaughn
19 sat down with you to talk about the condition of the
20 RTM cage and to tell you that you needed to do a
21 better job with it?
22    A.    Yes, sir.
23         MR. FEDERICO:  Excuse me, if I can
24 object to the form that Exhibit 10 is dated after

1  Exhibit 11. You indicated the opposite. Exhibit 11
2  is dated before Exhibit 10.
3         MR. CASEY:  Well, I guess it is in
4  terms of its signature. That's a fair statement.
5         MR. FEDERICO:  Well, it is in terms of
6  the signature of the supervisor.
7         MR. CASEY:  Fair statement. My
8  apologies, I was wrong about that. I was looking at
9  the date in the upper right-hand corner of
10 Exhibit 10, which is January 6 of '02.
11         MR. FEDERICO:  Right.
12    Q.    And you did not disagree with this
13 performance initial warning, did you?
14    A.    I did not, no, I didn't.
15         MR. CASEY:  I want to have marked as
16 Exhibit No. 12 a document dated April 1, 2002
17 concerning Mr. Dean's performance.
18         (Marked Exhibit 12; Lowe's Employee
19         Performance Report dated April 1,
20         2002)
21    Q.    Do you recognize Exhibit No. 12,
22 Mr. Dean?
23    A.    Yes, sir.
24    Q.    This was a second written warning for

Page 110

1  poor job performance that Mr. Vaughn and Mr. Estes
2  provided to you and discussed with you on or about
3  April 1 of 2002; correct?
4      A.  Correct.
5      Q.  And you signed acknowledging receipt
6  of this in the lower right-hand corner; correct?
7      A.  Yes, sir.
8      Q.  And you had an opportunity to write in
9  employee comments and you did not; correct?
10     A.  I was told to read this here, which I
11 did, and sign it.
12     Q.  Well, you also saw that there was a
13 section provided for employee comments; correct?
14     A.  Correct.
15     Q.  And that section is provided in all
16 the performance review templates that Lowe's uses or
17 at least that you saw; correct?
18     A.  Yes.
19     Q.  And you knew because you had provided
20 employee comments with respect to prior performance
21 documents that you had the right to insert comments
22 if you wished to do so; correct?
23     A.  Correct.
24     Q.  And you did not make any comments on

Page 111

1  this document?
2      A.  No, I didn't.
3      Q.  Nor did you ever complain to anybody
4  at Lowe's about this second written warning, did you?
5      A.  No, sir.
6      Q.  Do you know who Andy Ramos was?
7      A.  No.
8      Q.  You do not challenge the fact that
9  Andy Ramos was in the Danvers Lowe's facility
10 conducting a review of operations in or about --
11     A.  Inventory.
12     Q.  -- March of 2002, do you?
13         MR. FEDERICO:  I'll object; if he
14 doesn't know who he is, how can he observe that he
15 was there.
16     Q.  Do you know from time to time that
17 people from outside the particular Danvers store came
18 to that store on behalf of Lowe's and performed
19 various inventory reviews?
20     A.  Yes, sir.
21     Q.  Do you have any reason to believe that
22 Andy Ramos was not truthful in telling Mr. Vaughn and
23 Mr. Estes that he found your work area to be poorly
24 managed?

Page 112

1          MR. FEDERICO:  I'll object; same
2  objection, he can't fairly be asked to speculate
3  about Mr. Ramos.
4      Q.  Do you have any reason to believe that
5  anybody affiliated with Lowe's reported falsely
6  regarding the status of your work site and/or
7  regarding the quality of your work as they reviewed
8  it in an inventory in March of '02?
9          MR. FEDERICO:  Same objection; it just
10 simply calls for speculation which wouldn't be useful
11 testimony.
12         MR. CASEY:  I don't know.  You may
13 answer.
14     A.  All I know is on this one particular
15 time when we did this inventory, all the stuff that
16 was outside of my door, when I came in that morning I
17 couldn't even get in the office because they took all
18 the stuff from outside and put it inside my office.
19     Q.  You didn't write that down in the
20 employee comment section in this document, did you?
21     A.  No, I didn't.
22     Q.  The document reads, "Just recently we
23 had inventory, and Andy Ramos was conducting some
24 reviews for operations.  When Andy went to view the

Page 113

1  RTM cleared report to see it was work[ed] properly,
2  he found that it was not worked at all.  Dave had
3  been instructed and shown how to print this on
4  several occasions, both by myself and Steve Vaughn.
5  To this day the report is still not printed or
6  worked."  Close quote.  Have I read that accurately?
7      A.  Yes, sir.
8      Q.  And you read that on April 1 of 2002
9  before you signed this document; correct?
10     A.  Correct.
11     Q.  And you did not take issue with or
12 challenge the accuracy of that statement, did you?
13     A.  No, sir.
14     Q.  And you agree with it as you sit here
15 today, don't you?
16     A.  Yes, but they were informed, Bob Estes
17 and Steve Vaughn was informed.  That's why when you
18 said something about another name, Steve, I thought
19 that was his name, but this now is real clear to me.
20 Steve Vaughn had it -- where I was, my job
21 responsibility, became too overwhelming; I had too
22 much stuff to do.  Between sorting out all the stuff
23 that was there and printing out the reports, that
24 took a long time.  What was more important to them

KACZYNSKI REPORTING

Page 114

1   was clean this up, get this straightened up. That
2   took a majority of my time.
3           Q.   And you didn't print the reports?
4           A.   As to their satisfaction.
5           Q.   Or at all; correct?
6           A.   I did print them. That's what they
7   wrote down. That's why I gave them no arguments
8   because I knew my time was going to be short there
9   because of the way they kept coming with these
10  reports.
11          Q.   You knew that you were supposed to
12  print RTM cleared reports and you were not doing it
13  to their satisfaction; correct?
14          A.   Correct.
15          MR. CASEY: I'd like to have marked as
16  Exhibit No. 13 a one-page employee performance report
17  concerning Mr. Dean also dated April 1 of 2002.
18          (Marked Exhibit 13; Lowe's Employee
19          Performance Report dated April 1,
20          2002)
21          Q.   Do you recognize Exhibit 13?
22          A.   Yes, sir.
23          Q.   Is that your signature toward the
24  bottom of the page?

Page 115

1           A.   Yes, it is.
2           Q.   And this was the third written warning
3   that you had received in the course of four months
4   and it also followed a performance review in which
5   four out of twelve criteria were identified as your
6   not meeting standard; correct?
7           A.   Correct.
8           Q.   This was a final written warning,
9   meaning that you could be terminated if there was any
10  further problem with your work; correct?
11          A.   Correct.
12          Q.   And you did not challenge the accuracy
13  or the fairness of this final written notice, did
14  you?
15          A.   Never.
16          Q.   In fact, when you were given a final
17  written warning regarding the RTM area being in an
18  "atrocious" state, you agree that it would be better
19  for you to move to the lawn and garden center so that
20  you could have an opportunity still to succeed with
21  Lowe's; correct?
22          A.   Correct.
23          Q.   Did Mr. Estes ever say or do anything
24  to you or in your presence that in any way reflected

Page 116

1   that he was a racist?
2           A.   I guess I might have seen something.
3   I don't know.
4           Q.   I'm not asking you to speculate. This
5   is a serious question.
6           A.   I don't know. I can't answer that. I
7   don't know. I don't know.
8           Q.   Did anybody affiliated with Lowe's
9   ever do or say anything to you or in your presence
10  that you thought reflected they were a racist?
11          MR. FEDERICO: I'll just object to the
12  term "racist." I don't think it would elicit
13  favorable or unfavorable testimony since the claim is
14  racial discrimination. We're not claiming the people
15  were racists. I think that term -- just requesting
16  that the question be reformed.
17          Q.   You can answer the question. Did
18  anyone affiliated with Lowe's ever do or say anything
19  to you that reflected that they had any animosity
20  toward you because you were a black man?
21          A.   I felt that.
22          Q.   Who did what that made you feel that
23  way? Be precise, who? First give me the name.
24          A.   Oh, see, that's where -- they were

Page 117

1   unfair to me; Steve Vaughn was unfair to me and Bob
2   Estes was unfair to me.
3           Q.   When?
4           A.   Through my whole ordeal there. After
5   I was hired and after they see me doing a good job
6   and they see how I behave myself, other people, I
7   notice a change in their attitude toward me, and I
8   knew it was a matter of time before they were in
9   cahoots to get me moved out of that warehouse.
10          Q.   You're saying that Bob Estes and the
11  people who work with you --
12          A.   Bob Estes hired me.
13          Q.   Here's a guy who hires you; after he
14  sees you're doing a good job, he wants to get rid of
15  you?
16          A.   Mm-hmm, because I also heard the lady
17  who replaced me as the RTM clerk, it was told to me
18  by Kris Lovett that she told Bob, I want his job, and
19  that was when I was moved out.
20          Q.   Well, what, if anything, did Mr. Estes
21  ever do or say that suggested that he moved you out
22  of that job or treated you improperly in any fashion
23  because of your race?
24          A.   Nothing.

Page 118

1    Q.   What, if anything, did Mr. Vaughn ever
2    say or do that led you to suspect that he mistreated
3    you in any respect because of your race?
4        A.   Nothing.
5        Q.   So do I understand your testimony to
6    be you thought these guys didn't like you and they
7    liked somebody else more?
8        A.   (Witness nods head).
9        Q.   Is that correct?
10       A.   Yes.
11       Q.   And it had nothing to do with your
12   race; is that correct?
13           MR. FEDERICO: I'll object to the
14   form.
15       A.   Correct.
16           MR. CASEY: That's all I have.
17           MR. FEDERICO: I have no questions.
18           MR. CASEY: Thank you, Mr. Dean.
19           THE WITNESS: Thank you, sir.
20           (Whereupon, the deposition was
21   concluded at 1:51 p.m.)
22
23
24

Page 119

1        I have read the foregoing transcript and the
2    same contains a true and accurate recording of my
3    answers given to the questions therein set forth.
4
5
6    _____
7        DAVID H. DEAN
8
9    On this_____day of_____, 2005, before me, the
10   undersigned notary public, personally appeared David
11   H. Dean, proved to me through satisfactory evidence
12   of identification, which were _____,
13   to be the person whose name is signed on the
14   preceding or attached document, and who swore or
15   affirmed to me that the contents of the document are
16   truthful and accurate to the best of his knowledge.
17
18
19   _____
20       NOTARY PUBLIC
21
22
23
24

Page 120

1    COMMONWEALTH OF MASSACHUSETTS)
                                   )
2    SUFFOLK, SS.                  )
3
4        I, Cynthia A. Powers, Shorthand Reporter and
     Notary Public in and for the Commonwealth of
5    Massachusetts, do hereby certify that there came
     before me on the 10th day of March 2005, at 10:10
6    a.m., the person hereinbefore named, who was by me
     duly sworn to testify to the truth and nothing but
7    the truth of his knowledge touching and concerning
     the matters in controversy in this cause; that he was
8    thereupon examined upon his oath, and his examination
     reduced to typewriting under my direction; and that
9    the deposition is a true record of the testimony
     given by the witness.
10
         I further certify that I am neither attorney
11   or counsel for, nor related to or employed by, any of
     the parties to the action in which this deposition is
12   taken, and further that I am not a relative or
     employee of any attorney or counsel employed by the
13   parties hereto or financially interested in the
     action.
14
         IN WITNESS WHEREOF, I have hereunto set my
15   hand and affixed my notarial seal this 16th day of
     March 2005.
16
17
18
                         CYNTHIA A. POWERS
19                       NOTARY PUBLIC
                         MY COMMISSION EXPIRES
20                       JULY 2, 2010
21
22
23
24

31 (Pages 118 to 120)

KACZYNSKI REPORTING

1

```
 1              UNITED STATES DISTRICT COURT

 2              COMMONWEALTH OF MASSACHUSETTS

 3

 4     ***********************************

 5     DAVID DEAN
                      Plaintiff
 6
       VS.                       No.  04-1265MEL
 7
       LOWE'S HOME CENTERS, INC.
 8                    Defendant

 9     ***********************************

10

11

12              DEPOSITION OF ROBERT ESTES, a witness

13       called on behalf of the Plaintiff, taken

14       pursuant to the provisions of the Massachusetts

15       Rules of Civil Procedure, by telephone, before

16       Janice M. Dayton, a Notary Public in and for the

17       Commonwealth of Massachusetts, at 60 V.F.W.

18       Parkway, Revere, Massachusetts on Friday, April

19       29, 2005, commencing at 10:00 a.m.

20

21

22              JANICE M. DAYTON, COURT REPORTER
                      19 Sea Fox Lane
23              Gloucester, Massachusetts 01930
                      (978) 281-8446
24
```

1                         I N D E X

2

3       Witness       Direct Cross Redirect Recross

4       ROBERT ESTES

5       (By Mr. Federico)  5

6                    E X H I B I T S

7       Exhibit No.            Page    Line

8       (1-page document, post offer   32      16
        questionnaire, was marked
9       for identification as
        Exhibit No. 1.)
10      (1-page document, Family and   38       7
        Medical Leave Act, was
11      marked for identification as
        Exhibit No. 2.)
12      (2-page document, Lowe's       42      17
        EEOC policy, was marked for
13      identification as Exhibit
        No. 3.)
14      (1-page document, Lowe's       48      13
        strategic tracking
15      achievement review, was
        marked for identification as
16      Exhibit No. 4.)
        (1-page document,             59      21
17      Certificate of
        Accomplishment, was marked
18      for identification as
        Exhibit No. 5.)
19      (1-page document, Lowe's       72      11
        incident report, was marked
20      for identification as
        Exhibit No. 6.)
21      (1-page document, Lowe's       81      21
        strategic tracking
22      achievement review, was
        marked for identification as
23      Exhibit No. 7.)

24
                                               5

2

APPEARANCES:

RAINER & O'CONNOR
(By: Daniel Federico, Esq.)
60 V.F.W. Parkway
Revere, Massachusetts 02150
Counsel for the Plaintiff

LITTLER MENDELSON
(By: David Casey, Esq.)
One International Place
Boston, Massachusetts 02110
Counsel for the Defendant

4

1     EXHIBITS CONTINUED:            93

2
      (3-page document, Lowe's
3     employee performance report,
      was marked for
4     identification as Exhibit
      No. 8.)
5     (2-page document, equal       116     4
      employment opportunity
6     forms, was marked for
      identification as Exhibit
7     No. 9.)

STIPULATIONS

1  **STIPULATIONS**
2         It is hereby stipulated and agreed by
3  and between counsel for the respective parties
4  that the reading and signing of the deposition
5  within 30 days after receipt shall not be
6  waived.
7         It is further stipulated that all
8  objections, except as to the form of the
9  question and motions to strike will be reserved
10  until the time of the trial.
11         ROBERT ESTES, having first been duly
12  sworn, testified as follows to direct
13  interrogatories
14  BY MR. FEDERICO:
15      Q.    Could you state your name, Mr. Estes?
16      A.    **Robert Estes.**
17      Q.    I am going to speak to counsel.
18         MR. FEDERICO: Do you agree to the
19  usual stipulations, counsel?
20         MR. CASEY: Yes. And to be clear,
21  that means that all objections except as to form
22  and motions to strike are reserved until the
23  trial, and the witness will have 30 days to
24  read, review and sign and make any corrections

6

1  that are necessary to the transcript after my
2  receipt of it, 30 days after my receipt, and he
3  will sign under the penalties of perjury only,
4  which will obviate the need for his signing in
5  front of a Notary.
6      Q.    My name is Dan Federico and I am an
7  attorney at Rainer & O'Connor in Boston,
8  Massachusetts.
9         And how are you this morning?
10      A.    **I am good, sir. How are you?**
11      Q.    Good. I represent an individual
12  named David Dean in allegations in which he
13  charges racial discrimination and retaliation
14  against Lowe's that's filed in Federal court.
15         Have you had your deposition taken
16  before, Mr. Estes?
17      A.    **Yes, sir.**
18      Q.    When was the last time that you had
19  your deposition taken before?
20      A.    **Back last summer.**
21      Q.    Were you a plaintiff, a defendant or
22  a witness in that deposition?
23      A.    **Plaintiff.**
24      Q.    And in what state and county was that

1  lawsuit, if you know?
2      A.    **It was in New York state, Jefferson
3  County.**
4      Q.    And what were the, briefly, what were
5  the circumstances around the lawsuit?  What were
6  the claims and defenses, briefly?
7      A.    **Divorce case.**
8      Q.    Okay.  Is that case still pending?
9      A.    **Yes, sir.**
10      Q.    Before the divorce case had you had
11  any other depositions before that?
12      A.    **No, sir.**
13      Q.    Let me go over the ground rules very
14  briefly.  Since we are on the telephone today
15  it's very important that you understand if you
16  don't understand a question that I ask, it's not
17  clear for whatever reason, please ask me to
18  rephrase that, okay?
19      A.    **Okay.**
20      Q.    If you don't ask me to rephrase it
21  I'll assume that you heard the question and
22  understood it and are going to provide an
23  accurate answer, okay?
24      A.    **Yes, sir.**

8

1      Q.    If you need a break at any time, we
2  can accommodate that; do you understand that?
3      A.    **Yes.**
4      Q.    It's very important for you to answer
5  verbally.  I think that goes without saying.
6         We have a stenographer here in Boston
7  recording the testimony and you will have a
8  chance to read the transcript:  Do you
9  understand that?
10      A.    **Yes, sir.**
11      Q.    Okay.  Also, you have a right to
12  speak with your attorney, Attorney Casey, at any
13  point during the deposition, with the exception
14  of if there is a question asked of you you must
15  answer the question before the break.
16         One other point, then we can continue
17  with the deposition, and that point is; please
18  wait until I am finished with my entire question
19  before you answer and I will respect that same
20  right for you, okay?
21      A.    **Yes, sir.**
22      Q.    Are you taking any medications or
23  drugs today that would impair your ability to
24  answer any questions that I may have?

1    A.    **No, sir.**

2    Q.    What is your current address, Mr.

3    Estes?

4    A.    **4845 Transit Road in Lancaster, New**

5    **York.**

6    Q.    How long have you lived there, sir?

7    A.    **Since October.**

8    Q.    October of 2004?

9    A.    **Yes.**

10    Q.    Who lives with you at that address?

11    A.    **My fiancee.**

12    Q.    And do you have -- your most recent

13    address before Lancaster, New York, before the

14    Transit Road address, what was that?

15    A.    **435 Gaffney Drive, Watertown, New**

16    **York. And the Zip escapes me.**

17    Q.    Okay. In 2001 did you live in

18    Massachusetts at all?

19    A.    **I'm not sure about that.**

20    Q.    Okay. Why are you not sure? You

21    can't remember?

22    A.    **I can't remember because I was living**

23    **in Maine, traveling there and then at one point**

24    **in time I actually lived there for a few months**

---

10

1    **and then moved back to Maine, and I can't**

2    **remember when that time period was.**

3    Q.    What is your social security number,

4    sir?

5    A.    **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.**

6    Q.    What is the highest level of

7    education that you have achieved?

8    A.    **High school diploma.**

9    Q.    Where did you receive your high

10    school diploma?

11    A.    **Portland high school, South Portland,**

12    **Maine.**

13    Q.    And what year did you graduate?

14    A.    **1991.**

15    Q.    Do you hold any certificates or

16    licenses related to a vocational endeavor?

17    A.    **No, sir.**

18    MR. CASEY: Objection to the

19    question.

20    Q.    I am going to ask you a couple of

21    questions that are just necessary for the

22    deposition. I don't want you to take offense.

23    Have you been convicted of a

24    misdemeanor in the past five years?

---

1    A.    **No, sir.**

2    Q.    Have you been convicted of a felony

3    in the past ten years?

4    A.    **No, sir.**

5    Q.    Are you currently employed, Mr.

6    Estes?

7    A.    **Yes, sir.**

8    Q.    Where are you employed? What is the

9    name of your employer?

10    A.    **Lowe's Companies, Incorporated.**

11    Q.    And what is the location of your

12    current employment?

13    A.    **Location is Orchard Park, New York.**

14    Q.    What is your occupation or, another

15    way to say that, what is your position with

16    Lowe's right now?

17    A.    **I'm store manager.**

18    Q.    How long have you worked for Lowe's?

19    A.    **Just over five years.**

20    Q.    You started sometime in 1999 or 2000?

21    A.    **Yes, end of '99.**

22    Q.    Do you remember what month in '99

23    that you started with Lowe's?

24    A.    **It was November, I believe.**

---

12

1    Q.    Currently do you have responsibility

2    for managing the entire store of Lowe's or are

3    you a department manager?

4    MR. CASEY: Objection.

5    A.    **The entire store.**

6    Q.    When you began with Lowe's in 1999

7    what was your position that you started at?

8    A.    **Department manager.**

9    Q.    You were a department manager?

10    A.    **Yes.**

11    Q.    Who was your last employer right

12    before you started with Lowe's, if any?

13    A.    **Home Quarters Warehouse.**

14    Q.    Why did you leave Home Quarters

15    Warehouse?

16    A.    **They were going out of business.**

17    Q.    Could you briefly describe what your

18    responsibilities are as a store manager?

19    A.    **Yes, I have to oversee the day to day**

20    **operations of the store and employees.**

21    Q.    As a store manager do you have any

22    responsibility in hiring employees?

23    A.    **Yes.**

24    Q.    Could you describe what that

1    responsibility is in hiring?

2    A.    I take part in the interviewing

3    process and at this level make the final

4    decisions.

5    Q.    Do Lowe's employees have to fill out

6    any paperwork associated with being hired?

7         MR. CASEY: Objection.

8    A.    Yes.

9    Q.    Are you familiar then with the

10    typical paperwork that employees are given to

11    fill out prior to hiring at Lowe's?

12         MR. CASEY: Objection.

13    A.    I am.

14    Q.    Speaking again about your

15    responsibility as a store manager, do you have

16    any responsibility in the process of termination

17    of employment of employees?

18         MR. CASEY: Objection.

19    A.    Some.

20    Q.    I thought I heard you say some: Is

21    that what you said?

22    A.    Yes.

23    Q.    Could you describe in a general way

24    what you believe your responsibilities are in

---

14

1    terms of termination of employees?

2    A.    To make sure the paperwork is in

3    order and then confer with the area human

4    resources manager and the district manager.

5    Q.    I'd like to turn now to January of

6    2001.

7         Were you employed in January of 2001

8    in the Danvers Lowe's store?

9    A.    Yes.

10    Q.    All right. And what was your

11    position at the Danvers store, Mr. Estes?

12    A.    Assistant manager.

13    Q.    Could you give me the name of the

14    manager at that time -- strike that.

15         Could you give me the name on

16    January 10, '01 of the store manager of Lowe's

17    in Danvers, Massachusetts?

18    A.    I'm trying to remember. It's between

19    two. I'm not sure when they switched out.

20    Q.    Could you give me the two names that

21    you recall the people who may have been store

22    manager in 2001?

23    A.    Jamie Chatman and Frank Ramano.

24    Q.    During the time period of January of

---

1    2001 up to May of 2002 were you ever the store

2    manage in Danvers at that time?

3    A.    No, sir.

4    Q.    When did you leave Lowe's at the

5    Danvers location?

6         MR. CASEY: Objection.

7    A.    It was, say, July, end of July of

8    2002. End of July, 2002 when I went to

9    Watertown.

10    Q.    Okay. Why did you leave in July of

11    2002, speaking of the Danvers location?

12    A.    Because I took a store manager

13    position.

14    Q.    Could you describe what your

15    responsibilities were as an assistant manager

16    when you were at the Danvers location?

17    A.    To run the back end with the

18    receiving department deliveries and stocking.

19    Q.    Did you have a certain number of

20    employees that were under you or reported to you

21    in that department?

22    A.    Yes.

23    Q.    Do you remember how many employees

24    that you had?

---

16

1    A.    It varied.

2    Q.    I am not asking you to name

3    employees, but if I were to ask you do you think

4    you could name some employees?

5    A.    I may be able to name some of them.

6    Q.    What were the position titles of the

7    employees that were under you? Do you follow

8    what I mean?

9    A.    Job titles, sir?

10    Q.    Exactly.

11    A.    My direct reports would be department

12    managers. And then under them would be customer

13    service associates, and classified as stockers

14    and R.T.M.s, receiving clerks, delivery drivers.

15    That about covers them.

16    Q.    Could you describe what you mean by

17    R.T.M.s?

18    A.    Return to manufacturer.

19    Q.    And could you describe for me what

20    the responsibilities are of the R.T.M. position

21    or was at that time?

22    A.    At that time it was buy backs on

23    merchandise from vendors, take care of any

24    defects and damage, any products with missing

---

1   **parts.**

2   Q.   Okay.  What do you mean by buy backs

3   from vendors?

4   A.   **Yes, sir.**

5   Q.   What do you mean by that, could you

6   describe that phrase?

7   A.   **That would be anything where a vendor**

8   **sends down communication where they will be**

9   **pulling merchandise from the sales floor and**

10   **replacing it with different merchandise.**

11   Q.   And in the Danvers store is it fair

12   to say that, in general terms, the R.T.M.s are

13   the personnel at Lowe's that did that job were

14   responsible for receiving merchandise that had

15   been returned for a variety of reasons; is that

16   a fair summary of what they did?

17   MR. CASEY:  Objection.

18   A.   **Yes.**

19   Q.   And in the Danvers store during the

20   time that you were there, which was between

21   January of 2001 and July of 2002, where did the

22   merchandise get returned to in the store?

23   A.   **They returned to receiving, either**

24   **inside the receiving R.T.M. cage or to the**

18

1   **outside of the cage depending on space.**

2   Q.   How many R.T.M. cages were there

3   there, just one?

4   A.   **Yes, sir.**

5   Q.   And could you describe the size of

6   the R.T.M. cage itself by feet; do you know what

7   it was, ten feet by ten feet or that kind of

8   thing?

9   A.   **I couldn't accurately, no, sir.**

10   Q.   Just to get some kind of a sense, was

11   the R.T.M. cage larger or smaller than a 25 by

12   25-foot area, if you can remember?

13   A.   **I would have to say smaller but,**

14   **again, that's a guess.  I can't remember.  The**

15   **cages change from store to store.**

16   Q.   Sure.  All right.  There is one cage,

17   is that right?

18   A.   **Yes, sir.**

19   Q.   And the routine was that if people

20   have merchandise to return they bring it back

21   and they would do what with it?

22   A.   **Leave it there with general comments**

23   **so it could be either returned to manufacturer,**

24   **destroyed or get credit for it.**

20

1   Q.   Was the merchandise supposed to be

2   left inside the cage or outside the cage?

3   MR. CASEY:  Objection.

4   A.   **Generally it's left outside of the**

5   **cage.**

6   Q.   Okay.  Why would the merchandise not

7   be left inside the cage?

8   A.   **That would be up to the R.T.M. clerk**

9   **to organize the cage so they didn't just dump**

10   **things in there.**

11   Q.   And was the R.T.M. cage equipped with

12   a door or a gate that locked or was it an open

13   space inside -- strike that.

14   Was there a gate or lock on the

15   R.T.M. cage?

16   MR. CASEY:  Objection.

17   A.   **Yes, sir.**

18   Q.   And what kind of lock was it, do you

19   remember?

20   A.   **A chain with a padlock.**

21   Q.   By a padlock, was there a combination

22   to it?

23   A.   **No, sir.  A key.**

24   Q.   A key.  Okay.  Who had access to the

1   key to the R.T.M. cage?  Just talking about

2   positions, I don't want to know anybody's name

3   at this point, I'm not asking you names.

4   A.   **If I recall properly, department**

5   **manager, all the senior level managers of the**

6   **building, and the R.T.M. clerk.**

7   Q.   How many R.T.M. clerks were there at

8   the time that you were working at Lowe's in

9   Danvers?

10   A.   **One.**

11   Q.   And if a customer was returning

12   merchandise to the store, would a customer be

13   instructed or allowed to go in the cage area and

14   to leave that merchandise there?

15   MR. CASEY:  Objection.

16   A.   **No, sir.**

17   Q.   Who was instructed or allowed to

18   leave merchandise at the R.T.M. cage?

19   A.   **Any associate taking it from the**

20   **returns desk.**

21   Q.   How about any stockers?  Would

22   stockers be allowed to leave merchandise at the

23   R.T.M. desk?

24   MR. CASEY:  Objection.

1    A.    **Yes.**

2    Q.    And would customer service

3    associates, if necessary, be allowed to leave a

4    returned item at the R.T.M. desk?

5    A.    **Yes.**

6    Q.    And would department managers be

7    allowed to leave returns at the R.T.M. desk?

8         MR. CASEY:  Objection.

9    A.    **Yes.**

10    Q.    And did you ever give your employees

11    instructions on how to leave merchandise in or

12    around the R.T.M. cage?

13    A.    **Not specifically. Just an area right**

14    **by -- it's pretty much common sense so, I guess.**

15    Q.    You never gave any of your employees,

16    to your memory, any instructions about how to

17    leave returned items in or around the R.T.M.

18    cage?

19    A.    **Not that I can remember.**

20    Q.    Were there any written policies or

21    written instructions concerning leaving

22    merchandise at the R.T.M. cage as far as you

23    know?

24    A.    **I'm not sure.**

---

22

1    Q.    Have you ever seen any such policies

2    written down?

3    A.    **I have not.**

4    Q.    Do you ever write down any policies

5    anywhere, whether it be typewritten or on a sign

6    or anything like that?

7    A.    **I don't remember, honestly.**

8    Q.    The R.T.M. cage itself, what is that

9    made out of? For instance, is it a chain link

10    fence, chicken wire; do you remember what it was

11    made out of?

12    A.    **Set up around steel that would be**

13    **made for the base for merchandise and then it**

14    **would be chicken wire and wood.**

15    Q.    Okay. So, if you were standing on

16    the inside of the R.T.M. cage and I was standing

17    on the outside could I see you through the

18    chicken wire?

19    A.    **I believe so.**

20    Q.    And how high up? Did the cage have a

21    ceiling on it, the R.T.M. cage, a ceiling of any

22    kind?

23    A.    **No, sir.**

24    Q.    So it's fair to say it was a -- how

---

1    high was the cage wall would you say in feet?

2    A.    **Approximately 12 feet for the size of**

3    **the steel, I would guess.**

4    Q.    Okay. At that time in Danvers,

5    January 3, '01 to July of '02, what were the

6    store hours; for instance, was the store open

7    seven days a week?

8    A.    **It was.**

9    Q.    And do you remember what the hours of

10    the operation were?

11    A.    **I don't remember exactly what that**

12    **store had.**

13    Q.    Okay. Could you give me your best

14    estimation on approximately when the store would

15    open up on Monday through Friday?

16    A.    **It would most likely be seven in the**

17    **morning until ten at night Monday through**

18    **Saturday. And eight to eight on Sundays.**

19    Q.    Okay. What were the hours of

20    operation for the R.T.M. cage?

21    A.    **Best guess, because I think they**

22    **differ, seven to four Monday through Friday.**

23    Q.    What were the hours of operation of

24    the R.T.M. cage, if any, on Saturday and Sunday?

---

24

1    A.    **There weren't any.**

2    Q.    Prior to January of 2001, now we are

3    talking about December of 2000, do you remember

4    who your R.T.M. cage worker was? Do you

5    remember?

6    A.    **I don't remember when the hiring was**

7    **done because I thought we were training at that**

8    **time. So it would have been David Dean.**

9    Q.    Before David Dean was the R.T.M.

10    clerk do you remember who, if anybody, was the

11    R.T.M. clerk?

12         MR. CASEY:  Objection.

13    A.    **I don't believe there was anybody,**

14    **but I'm not sure.**

15    Q.    Then prior to David Dean being the

16    R.T.M. clerk how were the returns handled?

17    A.    **I don't believe the store was opened**

18    **at that time.**

19    Q.    When did the store open, do you

20    remember?

21    A.    **I believe it was opened in January,**

22    **that we opened in January. I'm not 100 percent**

23    **sure at all.**

24    Q.    Okay.

25

**MR. CASEY:** Just to be clear, you
believe the store opened in January of '01, Mr.
Estes?

**A.** **Yes, sir.**

**Q.** Mr. Estes, when was the first time
what you meet David Dean?

**A.** **I believe it was in the hiring
office.**

**Q.** Okay. Is that located at the Danvers
store in Lowe's or was that at a different site?

**A.** **That was at an off site.**

**Q.** And what was your purpose there of
meeting with Mr. Dean in the hiring office?

**A.** **Part of the interview process.**

**Q.** What was your impression of Mr. Dean
at that time?

**A.** **I don't recall exactly what the
impression was, but it was all right to hire,
so, must have been all right.**

**Q.** Did you have an opportunity to speak
with Mr. Dean, do you recall?

**A.** **During the interview process I would
have been one of the folks that talked to him.**

**Q.** Do you recall whether or not you had

26

1  any issues or concerns about Mr. Dean at that
2  first meeting with him?
3  **A.** **Not that I can remember.**
4  **Q.** What was Mr. Dean's position at
5  Lowe's when he started in January, 2001?
6  **A.** **R.T.M. clerk.**
7  **Q.** Could you describe for me what his
8  responsibilities in that position were at that
9  time as R.T.M. clerk?
10  **MR. CASEY:** Objection.
11  **A.** **That would be to process buy backs,
12  damaged and defective merchandise and anything
13  that came back with missing parts.**
14  **Q.** What do you mean by process? Could
15  you describe what that is in processing those
16  items that you listed?
17  **A.** **Would be either going into the system
18  to find out if they were automatic destroy and
19  field destroy them and get credit or if the
20  vendor was to come back in and inspect them to
21  find out if we would get credit.**
22  **Q.** All right. At the time that you met
23  Mr. Dean in the hiring office what role, if any,
24  did you play in the decision to hire Mr. Dean?

27

1  **A.** **I did the second interview.**
2  **Q.** Was there a third interview?
3  **A.** **I'm not sure. At that time generally
4  the store manager has the last interview.**
5  **Q.** Did you give any reference to the
6  store manager about Mr. Dean? In other words,
7  did you have any opinion about whether he should
8  be hired or not?
9  **A.** **We would have talked about it. What
10  exactly was said I'm not sure.**
11  **Q.** Do you remember who the store manager
12  was at that time, January of '01?
13  **A.** **That one at that time would have been
14  Jamie Chatman.**
15  **Q.** Do you know where Mr. Chatman is
16  employed now?
17  **A.** **Yes.**
18  **Q.** Where is that?
19  **A.** **Lowe's of Brunswick, Maine.**
20  **Q.** Do you know how to spell the last
21  name Chatman, Mr. Estes?
22  **A.** **I can guess, but I'm not sure.**
23  **Q.** Okay. Don't guess. I wouldn't want
24  you to guess.

28

1  At any point in time during the time
2  that Mr. Dean worked at Lowe's, had you become
3  aware of any medical conditions that Mr. Dean
4  had?
5  **A.** **Not that I can recall.**
6  **Q.** And just to be clear, Mr. Dean was an
7  employee under you in the back end/receiving and
8  delivery department, isn't that right?
9  **A.** **Yes.**
10  **Q.** You would have had access to his
11  personnel file and all the paperwork associated
12  with his employment, is that correct?
13  **MR. CASEY:** Objection.
14  **A.** **No, sir.**
15  **Q.** You wouldn't?
16  **A.** **No, sir.**
17  **Q.** Why would you not have access to the
18  paperwork for Mr. Dean concerning his
19  employment?
20  **A.** **That's kept in the human resources
21  office in locked cabinets where only the H.R.
22  manager and store manager can access.**
23  **Q.** You're aware that every employee at
24  Lowe's, aren't you, fills out basically the same

29

1  paperwork for employment?

2  **A.   I am now.**

3  Q.    At the time that you took your

assistant manager job with Lowe's of Danvers you

5  had to fill out paperwork and you were given a

6  number of policy papers and that sort of thing,

7  isn't that right?

8  **A.   No, sir.**

9  Q.    Did you transfer to the Lowe's store

10 from somewhere else?

11 **A.   Yes, sir.**

12 Q.    When you were first hired by Lowe's

13 you went through a series of policies and rights

14 acknowledgement papers to work with Lowe's?

15 **A.   I believe so when I was first hired.**

16        MR. FEDERICO:  Is there another

17 caller?

18        MR. CASEY:  Dan, I lost connection

19 for a moment.  Can you just, without necessarily

20 having the stenographer read back, tell me what

21 was said and what happened during the last

22 roughly 60 to 90 seconds.

23        MR. FEDERICO:  I'm not sure that I

24 can.  In terms of timeframe I certainly will do

30

1  my best.

2        I was asking Mr. Estes if he was

3  aware of the paperwork and personnel file of Mr.

4  Dean and he said no.

5        Did you hear that question?

6        MR. CASEY:  Yes.

7        MR. FEDERICO:  Then after that I

8  asked him if he was aware of the paperwork, in

9  general, the policies, the rights statement in

10 the paperwork that Lowe's provided in 2001 and

11 he said that he did not know.

12        So then I asked him basically whether

13 he, paraphrasing, at his first initial

14 employment with Lowe's that he did receive, you

15 know, Lowe's employment paperwork policies and

16 those sorts of things.

17        And he said to the effect that he

18 would have received that at the time of his

19 initial employment.

20        MR. CASEY:  Okay.

21        MR. FEDERICO:  I think that's

22 basically what was asked and answered.

23        MR. CASEY:  Okay.

24 Q.    All right.  I am going to refer to a

31

1  document now.  Do you have small stack of

2  documents, Mr. Estes, that I provided to your

3  attorney?

4  **A.   Yes.**

5        MR. FEDERICO:  And, Counsel, you have

6  the small stack of documents, I assume.

7        MR. CASEY:  I do.

8  Q.    Right.  On the bottom of the page on

9  the right-hand corner of all of these documents,

10 Mr. Estes, there is a number.

11 **A.   Okay.**

12 Q.    It's called a Bates number, but -- in

13 case I use that term.  I will try not to use

14 that term but, if I do, that is what I mean.

15        I am going refer to that number on

16 the bottom of the page.  And what I am going to

17 do is I am going to have the stenographer here

18 mark the exhibit and what I want you to do, do

19 you have a pen, Mr. Estes?

20 **A.   Yes, sir.**

21 Q.    Just mark the exhibits as we mark

22 them so, for example, I'm going to refer to

23 L0094 and on top of that document it says post

24 offer questionnaire.

32

1  **A.   Okay.**

2  Q.    I am going to mark that as exhibit

3  one, if you both found that.

4        MR. CASEY:  The very last page, I

5  think.

6        MR. FEDERICO:  Probably was.  I

7  shuffled them around quite a bit.

8  **A.   I'm not finding it yet.**

9  Q.    It is the last page, Mr. Estes.  If

10 the stack came to you in the same order.

11        MR. CASEY:  I don't know that the

12 Bates stamp number photocopied completely on

13 mine.  It's L009 and the four wasn't caught.

14        Look at top, Mr. Estes, and look for

15 a document entitled Post Offer questionnaire.

16 **A.   I have got it.**

17        (1-page document, post offer

18 questionnaire, was marked for identification as

19 Exhibit No. 1.)

20 Q.    I am going to ask you a couple of

21 questions now about exhibit one, Mr. Estes.

22        Do you have it in front of you?

23 **A.   Yes.**

24 Q.    Would you take a moment to just

33

1   familiarize yourself with that, scan it. When
2   you're done just acknowledge that you have
3   completed reading it.
4       A.    **Okay.**
5       Q.    All right. I am not talking about
6   this particular document, just referring to the
7   form. It's called a post offer questionnaire.
8       A.    **Um-hum.**
9       Q.    And the first question it states, are
10  there any physician or mental limitations which
11  might keep you from performing the job you have
12  been offered?
13          Do you recall ever seeing this form
14  before?
15          MR. CASEY: Objection. The document
16  with respect to the one that was filled out by
17  Mr. Dean or the form in the abstract?
18      Q.    The form in the abstract.
19      A.    **I haven't.**
20      Q.    Okay. Did you receive any training
21  with Lowe's concerning pre employment paperwork,
22  policies, applications and the like?
23      A.    **A little, but this is on the H.R.**
24  **side.**

34

1       Q.    All right. This is not a document
2   that you would use in your everyday work, isn't
3   that right?
4       A.    **I would not.**
5       Q.    I want to turn your attention to the
6   bottom of exhibit one just above the -- strike
7   that.
8          Just below the signature line there
9   is an oblong box, a very long rectangle: Do you
10  see that?
11      A.    **Yes.**
12      Q.    Inside the box there is a bold
13  writing which says completed post offer
14  questionnaires should be filed in the employee's
15  medical file at the location. Do not mail to
16  the G, G O.
17          Do you see that?
18      A.    **Yes, sir.**
19      Q.    So, does this mean if you are an
20  employee of Lowe's this form, this post offer
21  questionnaire, is not to be filed at H.R. but
22  should be at the location?
23          MR. CASEY: Objection.
24      A.    **H.R. is in the store. That would be**

35

1   **the human resources personnel at our store.**
2       Q.    You testified earlier that the
3   personnel files kept with H.R., that's kept on
4   file at each store?
5       A.    **Yes.**
6       Q.    And let me direct your attention to
7   question one, then there is the next question
8   down, and just reading the form, not reading
9   what is answered here on the form: Do you have
10  any medical condition which may cause an
11  emergency situation that you feel we need to be
12  aware of? And then this says no or yes and if
13  yes describe.
14          Do you see that?
15      A.    **Yes, sir.**
16      Q.    Now, as a manager of the store or
17  assistant manager would you agree it would be
18  important for the store manager to know if an
19  employee had any medical condition, isn't that
20  correct?
21          MR. CASEY: Objection.
22      A.    **Yes, sir.**
23      Q.    And you can see at the bottom of this
24  page, this one, this form in particular, exhibit

36

1   one, the signature is signed by David Dean.
2          Do you see that?
3       A.    **Yes, sir.**
4       Q.    And the date is 1.6.01?
5       A.    **Yes, sir.**
6       Q.    And getting back to question one, it
7   states: Are there any physical or mental
8   conditions which might keep you from performing
9   the job you've been offered?
10          And the answer is no.
11          Do you see that?
12      A.    **Yes, sir.**
13      Q.    And next question is: Do you have a
14  medical condition which may cause an emergency
15  situation that you feel we need to be aware of?
16          And the answer there is, yes, isn't
17  that right?
18      A.    **Yes, sir.**
19      Q.    And the description it says one word,
20  asthma, correct?
21      A.    **Yes, sir.**
22      Q.    All right. So, you were David Dean's
23  manager while he was there, right?
24      A.    **Yes, sir.**

1    Q.    And he indicated on this form that he
2    had asthma which could result in an emergency
3    situation, isn't that correct?
4        A.    **Yes, sir.**
5        Q.    You had no idea that David Dean had
6    asthma, did you?
7        A.    **I don't recall if I did or didn't.**
8    **I'm not sure.**
9        Q.    You testified a few minutes ago that
10   you weren't aware of any serious medical
11   condition that David Dean had?
12       A.    **Correct, I wasn't aware. I am not**
13   **sure. I can't remember if anybody said anything**
14   **or not.**
15       Q.    Did you ever take the time to look up
16   David Dean's post offer questionnaire?
17             MR. CASEY: Objection.
18       A.    **Not something that I have access to,**
19   **no.**
20       Q.    Why not? You were his manager?
21             MR. CASEY: Objection. Dan, his
22   manager? I'll object.
23       Q.    I'll continue. Let's look at another
24   document, just very briefly. We are done with

---

1             MR. CASEY: Objection.
2        A.    **I was.**
3        Q.    If you could take a look at exhibit
4    two, this document was produced by Lowe's
5    through their attorney. And it's fair to say
6    this is part of the employment paperwork and
7    policies and so forth that employees are given
8    at Lowe's, isn't that right?
9             MR. CASEY: Objection.
10       A.    **Yes, sir.**
11       Q.    Now, the top paragraph of exhibit two
12   states that FMLA, Family Medical Leave Act,
13   requires covered employers to provide up to 12
14   weeks of unpaid job protected leave to eligible
15   employees for certain family and medical
16   reasons.
17             Do you see that?
18       A.    **Yes.**
19       Q.    And at the time you were in the
20   Danvers store as assistant manager did you know
21   that was a rule, according to this act?
22             MR. CASEY: Objection.
23       A.    **I believe I did. I'm not sure.**
24       Q.    Okay. You knew that it was your

---

1    exhibit one.
2             And I'd like to move on to what is
3    going to be exhibit two, the top of exhibit two
4    states: Your rights under the Family and
5    Medical Leave Act of 1993.
6             And the number on this, Mr. Estes, is
7    L0183. And the very first word on the form
8    itself it says appendix.
9             (1-page document, Family and Medical
10   Leave Act, was marked for identification as
11   Exhibit No. 2.)
12       A.    **I've got it.**
13             MR. CASEY: What is the number again.
14             MR. FEDERICO: L0183.
15             MR. CASEY: Yes, I have it. Is that
16   going to be Exhibit two?
17             MR. FEDERICO: Yes.
18       Q.    Mr. Estes, as part of your position
19   as an assistant manager and then as manager at
20   Lowe's I am sure you're aware of the federal law
21   called the Family Medical Leave Act of 1993.
22             Isn't that right? You are aware of
23   that?
24       A.    **Okay.**

---

1    responsibility to know the rule though, didn't
2    you?
3             MR. CASEY: Objection.
4        A.    **Yes, sir.**
5        Q.    And the next sentence states that
6    employees are eligible if they have worked for a
7    covered employer for at least one year and for
8    1,250 hours over the previous 12 months, and if
9    there are at least fifty employees within
10   75 miles.
11             Do you see that?
12       A.    **Yes, sir.**
13       Q.    And we know that -- well, do you
14   recall when Mr. Dean stopped being employed at
15   Lowe's? Was it 2001 or 2002? Do you remember
16   as we sit here?
17       A.    **I really don't.**
18       Q.    If I were to represent it was on or
19   about April of 2002 that Mr. Dean's employment
20   was discontinued with Lowe's, would that sound
21   about right?
22             MR. CASEY: I don't think that is
23   right.
24       A.    **I'm not sure.**

43

1  Q.   If I were to say May of 2002, do you
2  remember?
3  A.   **I don't, I really don't.**
4  Q.   You do know that in January of 2002
5  Mr. Dean was working at Lowe's, correction?
6  A.   **Correct.**
7  Q.   And you know Mr. Dean worked
8  continuously for 12 months at Lowe's in Danvers
9  from January of '01 to January of '02, isn't
10 that right?
11 A.   **Yes.**
12 Q.   And therefore he would have been
13 potentially eligible for the Family Medical
14 Leave Act in January of '02, isn't that right?
15        MR. CASEY: Objection.
16 A.   **Yes.**
17 Q.   And you also know now that you have
18 seen the questionnaire that Mr. Dean filled out
19 in January of '01 that he had asthma, which was
20 a medical condition that could cause an
21 emergency, that he made Lowe's aware of.
22        Are you aware of that now?
23        MR. CASEY: Objection.
24 A.   **I am now.**

42

1  Q.   And in January, February, March,
2  April or May of 2002 did you or anybody at
3  Lowe's offer Mr. Dean the Family Medical Act
4  Leave?
5        MR. CASEY: Objection.
6  A.   **I'm not sure.**
7  Q.   Are you certain though, Mr. Estes,
8  that you didn't offer Mr. Dean the Family
9  Medical Act Leave?
10        MR. CASEY: Objection.
11 A.   **I don't remember if I did or didn't.**
12 Q.   Let's put Exhibit two down and we
13 will move to exhibit three, which is actually a
14 two page exhibit.
15        The title of it is, again, very top
16 of Appendix, but under that it says Lowe's Equal
17 Employment Opportunity Policy, policy summary.
18 The number is L0187, and L0188, that two page
19 exhibit. L0187 and L0188.
20        (2-page document, Lowe's EEOC policy,
21 was marked for identification as Exhibit No. 3.)
22 Q.   Mr. Estes, I want you to take a look
23 at exhibit three, I want you to briefly read
24 through it and familiarize yourself with it and

1  let me know and I'll ask you a couple of
2  questions about it, okay?
3        (Discussion off the record.)
4  Q.   Mr. Estes, have you had a chance to
5  review that exhibit three?
6  A.   **Almost.**
7  Q.   Take your time. I don't mean to rush
8  you.
9  A.   **Done.**
10 Q.   Okay. As a manager at Lowe's you're
11 familiar with Document 3, isn't that right?
12        MR. CASEY: Objection.
13 Q.   I didn't hear you. Were you familiar
14 with exhibit three?
15 A.   **Yes.**
16 Q.   Very briefly, could you summarize
17 what that document is?
18        MR. CASEY: Objection.
19 A.   **Equal Employment Opportunity Policy.**
20 Q.   Okay. The first line of the document
21 you'd agree states that Lowe's is an equal
22 opportunity employer and administers all
23 personnel practices without regard to race,
24 color, religion, sex, age, national origin,

44

1  disability, marital status veteran's status or
2  any other category that may be protected under
3  applicable law.
4        Do you see that?
5  A.   **Yes.**
6  Q.   Are there any duties for managers
7  listed on the first page that you see?
8  A.   **Yes, sir.**
9  Q.   That would be -- are we all here?
10        MR. CASEY: Yes.
11 Q.   That would be in the middle of page
12 capital B, isn't that right, Mr. Estes?
13 A.   **Yes.**
14 Q.   And it says, quote, all managers are
15 charged with the responsibility of assuring
16 complete and consistent application of Lowe's
17 policy of equal opportunity employment including
18 be aware of practices within their area of
19 responsibility and taking immediate corrective
20 action when warranted. Close quote.
21        Do you see that, Mr. Estes?
22 A.   **Yes, sir.**
23 Q.   And you knew or should have known
24 about this policy in 2001, 2002, isn't that

1    right?

2         MR. CASEY: Objection.

3    A.    **Yes, sir.**

4    Q.    And then the next box down after

5    capital C, accountability, do you see that?

6    A.    **Yes, sir.**

7    Q.    And under capital A it says, quote,

8    employees found to be in violation of the

9    company commitment to nondiscrimination will be

10   subject to disciplinary action up to and

11   including termination.

12        Do you see that?

13   A.    **Yes, sir.**

14   Q.    And in your time at the Danvers store

15   did you ever have to implement through the

16   accountability statement that I just described

17   there disciplinary action, termination: Did you

18   ever have to implement this policy and, if so,

19   describe the situation?

20        MR. CASEY: Objection.

21   A.    **I myself have not.**

22   Q.    Okay. Did you ever witness this

23   equal employment opportunity policy being

24   implemented?

1    A.    **Mike Romano or Jamie Chatman.**

2    Q.    Was there a supervisor in between you

3    and Mr. Dean?

4    A.    **Yes, sir.**

5    Q.    What was the name of that individual?

6         MR. CASEY: Objection.

7    A.    **Steve Vaughn.**

8    Q.    Steve Vaughn?

9    A.    **Yes, sir.**

10   Q.    What was Mr. Vaughn's title?

11   A.    **Receiving department manager.**

12   Q.    Do you know whether or not Mr. Vaughn

13   is currently employed with the Lowe's company?

14   A.    **I do not.**

15   Q.    Do you know where Mr. Vaughn lives at

16   this time?

17   A.    **I don't.**

18   Q.    And did you do any performance

19   evaluations or reviews of Mr. Dean during his

20   employment?

21   A.    **Yes, sir.**

22   Q.    Do you remember the date of the first

23   employment review that you did?

24   A.    **I don't remember the date, I remember**

---

46

1         MR. CASEY: Objection.

2    A.    **Witnessed? I have not.**

3    Q.    Okay. Were you ever aware while you

4    were at the Danvers location of an employee who

5    had become the subject of disciplinary action up

6    to and including termination under the equal

7    employment opportunity policy as described here

8    in exhibit three?

9         MR. CASEY: Objection.

10   A.    **I became aware of one, yes.**

11   Q.    What was the name of the employee?

12   A.    **Danny Pucchio.**

13   Q.    And any other employees?

14   A.    **Not that I can recall, sir.**

15   Q.    What was the action taken against

16   Danny Pucchio, if you know?

17   A.    **I am not sure. I wouldn't have been**

18   **involved with that.**

19   Q.    Let's go to -- during his time at

20   Lowe's you were Mr. David Dean's supervisor,

21   isn't that right, Mr. Estes?

22   A.    **Yes, sir.**

23   Q.    And who was your supervisor at that

24   time?

48

1    seeing it on the form that was sent in. I don't

2    remember the date.

3    Q.    Do you remember discussing Mr. Dean's

4    progress at that first review?

5    A.    **Specifically, no. I know I do it in**

6    **all the reviews.**

7    Q.    You have no memory of Mr. Dean's

8    progress including his strengths or weaknesses

9    during his first review?

10        MR. CASEY: Different question.

11   Objection.

12   A.    **I don't.**

13   Q.    Okay. Let's take a look at document

14   L0108, and it's Lowe's strategic training and

15   achievements review?

16        (1-page document, Lowe's strategic

17   tracking achievement review, was marked for

18   identification as Exhibit No. 4.)

19        MR. CASEY: What is the title, Dan?

20        MR. FEDERICO: Couple of white outs

21   on the title, but mainly the first part is

22   Lowe's Strategic Training, but that word is

23   whited out and Achievement Review. It looks

24   like a hole punch.

1    MR. CASEY: I have it. That's
2 Exhibit 4?
3         MR. FEDERICO: Right.
4    A.    **Okay.**
5    Q.    Did you see that, Mr. Estes?
6    A.    **Yes, I found it.**
7    Q.    Exhibit four, take a minute to read
8 that over?
9    A.    **Okay.**
10   Q.    You have had time to look that over,
11 Mr. Estes?
12   A.    **Yes, sir.**
13   Q.    I want you to look at the bottom of
14 the document. There's a signature right above
15 the last line.
16        Is that your signature?
17   A.    **Yes, sir.**
18   Q.    And there's a date, says 8.04.01?
19   A.    **Yes.**
20   Q.    Is that the accurate description of
21 the date?
22   A.    **Yes, sir. From what I can see.**
23   Q.    Is it clear there?
24   A.    **It's pretty clear. The four could be**

---

50

1 **a nine, but it looks like a four.**
2    Q.    Then next to that it says
3 supervisor's name and that's your name there,
4 Robert Estes, right?
5    A.    **Yes.**
6    Q.    Is that your handwriting, sir?
7    A.    **Yes, sir.**
8    Q.    And the title of the document, as I
9 mentioned, is Lowe's Strategic Training and
10 Achievement Review, there is a word that's hard
11 to make out because of the place where the hole
12 punch was, it says Development Review.
13        Do you see that?
14   A.    **Yes, sir.**
15   Q.    Is this a familiar form to you?
16   A.    **Yes.**
17   Q.    And do you use these forms today?
18   A.    **We do.**
19   Q.    What is the purpose of the form in
20 general?
21   A.    **The purpose of the form is to conduct**
22 **a 90 day, annual and other types of reviews with**
23 **associates.**
24   Q.    And it was your practice to, as best

---

1 that you could, note all of the issues and
2 achievements and weaknesses of the employee on
3 the form?
4    A.    **Yes, sir.**
5    Q.    And in this particular form, this is
6 for David Dean, isn't that correct, states his
7 name and he signed it on the bottom, isn't that
8 right?
9    A.    **Yes, sir.**
10   Q.    And where is it indicated as to the
11 timing of the review, is it a 90 day at that
12 time or annual?
13   A.    **It's check marked on the second box**
14 **down on the far right-hand side other, 90 days.**
15 **First part is 90 days.**
16   Q.    The first part is standard, do you
17 see that?
18   A.    **Yes.**
19   Q.    And it refers to the back, the copy
20 that I have and that your attorney has and that
21 you have, it doesn't have any standard on the
22 back. It wasn't a double copy. Do you see
23 that?
24   A.    **Yes, sir.**

---

52

1    Q.    But basically there is a list of
2 areas like customer service, merchandising,
3 etcetera, and then there are three areas to be
4 assessed or to reflect an assessment exceeds
5 standards, meets standards or does not meet
6 standards.
7    A.    **Yes.**
8    Q.    Did you fill this form out?
9    A.    **I did.**
10   Q.    And without reading all of them in
11 the interest of time from customer services on
12 down to job performance did you check that Mr.
13 Dean met all of the standards on all of those?
14   A.    **Yes, sir.**
15   Q.    And Mr. Dean started in January of
16 '01, isn't that right?
17   A.    **I believe so.**
18   Q.    Sometime in late March or early April
19 of '01 that actually would have been his 90-day
20 period, right?
21   A.    **Yes, sir.**
22   Q.    And this review is dated August of
23 '01, correct?
24   A.    **Yes, sir.**

1  Q.    So, do you recall why it was that his
2  review wasn't done at 90 days?
3      A.    **The best I can recall, it was a brand**
4  **new store, all new employees, so everybody's was**
5  **late.**
6  Q.    Even though it says 90 day review in
7  effect it's more like an over 180-day review,
8  isn't that right? More than double 90?
9      A.    **If you go by the date, yes, sir.**
10  Q.    Approximately, really, a 200-day
11  review or so, isn't it?
12      MR. CASEY: Objection.
13      A.    **If you were to go by the date, yes.**
14  Q.    I don't know what you mean by go by
15  the date. Did you do it in August?
16      A.    **Yes sir.**
17  Q.    So, this review reflects the R.T.M.
18  performance, reflects David Dean's performance
19  as an R.T.M. clerk from January of '01 through
20  July of '01 and up through the date of this
21  form, right, 8.4.01, isn't that right?
22      A.    **Yes, sir.**
23  Q.    Next down it says supervisor's
24  comments: Did you write that?

1      A.    **There is a report whenever you**
2  **process a return to manufacturer, when you**
3  **actually put it in the system to get credit for**
4  **it. This report prints up and tells us if it's**
5  **cleared, you actually got the credit or if**
6  **something was wrong and you did not receive**
7  **credit for it.**
8  Q.    Okay. Did you in August of '01 give
9  David Dean any warnings that may lead to
10  termination if he did not improve his O.F.R.
11  record and R.T.M. reports, did you give him any
12  warnings, and I am being specific there?
13      MR. CASEY: Objection.
14      A.    **Not that I can remember.**
15  Q.    Now, the next line down is training
16  completed, and that area is blank, isn't that
17  right? Training completed since last review?
18      A.    **Yes.**
19  Q.    Now, is that blank because there
20  wasn't a review beforehand?
21      A.    **Yes, sir.**
22  Q.    Next line down says, training goes
23  for the next review description and date for
24  completion.

1      A.    **Yes, sir. That's my handwriting.**
2  Q.    Could you please read your comments
3  slowly?
4      A.    **Yes, sir. Dave has recently found**
5  **himself really grasping the different aspects of**
6  **the R.T.M. position. The area is coming**
7  **together. He needs some improvement on his**
8  **attendance and on the organization of paperwork**
9  **like O.F.R. and cleared R.T.M. reports.**
10  Q.    Okay. Could you describe what an
11  O.F.R. is?
12      A.    **Out for repair.**
13  Q.    Could you describe what the paperwork
14  was for an O.F.R. at the time that's relevant
15  here, 2001?
16      A.    **My best recollection, it was taking**
17  **the temporary tag we would have had to sell the**
18  **merchandise to our out for repair facility, to**
19  **be able to take it out of the store with a**
20  **repair ticket, keep that together until it came**
21  **back and was cleared and then all the paperwork**
22  **would go together in his file.**
23  Q.    And what do you mean by the phrase
24  cleared R.T.M. report?

1      Is that your handwriting there as
2  well.
3      A.    **Yes.**
4  Q.    Could you read the entry there that
5  you wrote?
6      A.    **I would like for Dave to complete the**
7  **S O S tests on W K L N, and all the receiving**
8  **tests as well.**
9  Q.    Did David Dean complete those? Did
10  Dave Dean complete those tests that you wanted
11  him to?
12      A.    **I do not remember, sir.**
13  Q.    And then in the comments part, was
14  that filled out by David Dean to your knowledge?
15      A.    **The bottom part?**
16  Q.    What training do you need?
17      A.    **Yes, sir.**
18  Q.    Did you see David Dean fill that out?
19      A.    **Yes, sir.**
20  Q.    And David Dean states, quote, S O S
21  training so I can be more understanding to this
22  procedure.
23      Then in creating this review, Mr.
24  Estes, isn't it fair to assume that you had a

**57**

1  conversation with Mr. Dean?
2      A.     **Yes, sir.**
3      Q.     Did you and he meet in your office or
4  in a quiet place and speak about his
5  performance?
6      A.     **Yes, sir, would have.**
7      Q.     And further there is a section called
8  employee comments and it states, quote, being
9  treated fairly is all right, being appreciated
10  is good. Being compensated for a job such as
11  R.T.M. is hopefully approaching. I like what I
12  do. With time I can do it better.
13           In the discussions that you had with
14  Mr. Dean did he give any indication about what
15  he meant when he said being treated fairly is,
16  quote, being treated fairly is all right, being
17  appreciated is good.
18           MR. CASEY: Objection.
19      A.     **I don't recall, sir.**
20      Q.     Okay. Let's move on. Exhibit four,
21  when you refer to your goals for the employee,
22  Mr. Estes, in this case David Dean, you wanted
23  him to complete S O S tests and W K L N as well.
24           What is meant by an S O S test?

**58**

1      A.     **There is a section on the computer to**
2  **cover special order sales. Part of the R.T.M.'s**
3  **job would be to do returns on these and there is**
4  **a test on line at that time that would have had**
5  **to be completed.**
6      Q.     And you stated before you weren't
7  sure whether Mr. Dean completed that or not, is
8  that correct?
9      A.     **Correct.**
10      Q.     And are you familiar with how long it
11  would take to do an S O S test on line?
12      A.     **It wouldn't take very long. It's**
13  **reading a little bit of a book and then**
14  **taking -- I can't remember how many questions.**
15  **It wasn't very long at all.**
16      Q.     Was your expectation that Mr. Dean
17  would do that sometime during working hours when
18  it was slow or something?
19      A.     **Yes, sir.**
20      Q.     Mr. Dean wouldn't have to go to a
21  Lowe's University quote/unquote?
22      A.     **Not that I know of.**
23      Q.     They wouldn't have to go to a
24  training facility?

**59**

1      A.     **No, sir.**
2      Q.     Okay. What is the W K L M, isn't
3  that correct, Mr. Estes?
4      A.     **Yes. N.**
5      Q.     Okay.
6      A.     **It's Intranet. Intranet, just to the**
7  **Lowe's corporation.**
8      Q.     And why did Mr. Dean need to do a
9  test on the Intranet W K L N?
10      A.     **That was the training computer.**
11  **That's what they call it.**
12      Q.     Okay. And was Lowe's in the practice
13  of giving certificates of accomplishment to
14  employees for various tests completed or quizzes
15  taken?
16      A.     **Yes, sir, they were.**
17      Q.     And are those all conducted over the
18  Intranet?
19      A.     **Yes, sir.**
20      Q.     I'd like you to take a look at
21  another document, this will be number five, it's
22  called on top Certificate of Accomplishment.
23  There are number of those.
24           This one is called the 90-day R.T.M.

**60**

1  clerk quiz and the number on it, Mr. Estes,
2  Attorney Casey, is L0192.
3           (1-page document, Certificate of
4  Accomplishment, was marked for identification as
5  Exhibit No. 5.)
6
7      Q.     Take a moment and scan that.
8      A.     **Yes, sir.**
9      Q.     This document is entitled Certificate
10  of Accomplishment, isn't that correct?
11           Is everybody still here?
12      A.     **I am.**
13      Q.     Attorney Casey? Attorney Casey?
14           (Short break taken.)
15      Q.     We were looking for exhibit five.
16           MR. CASEY: I found it.
17           MR. FEDERICO: We noticed you weren't
18  there. Mr. Estes had a drink and he is coming
19  back.
20      Q.     Everybody has L0192 in front of them?
21      A.     **Yes.**
22      Q.     Very quickly, this states that David
23  Dean has completed the R.T.M. clerk quiz.
24           Do you see that?

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | And he had a score of 93 percent. |
| 3 | | Do you see that? |
| 4 | A. | Yes, sir. |
| 5 | Q. | Have you ever taken the R.T.M. clerk |
| 6 | quiz, Mr. Estes? |
| 7 | A. | I would have, sir. |
| 8 | Q. | You would have. Okay. Do you |
| 9 | remember what, just generally speaking, what |
| 10 | that entails? In other words, could you |
| 11 | describe what the quiz is, the 90-day R.T.M. |
| 12 | clerk quiz? |
| 13 | A. | The quiz is of the basic job |
| 14 | functions of that area. |
| 15 | Q. | And what would be your description of |
| 16 | the basic job functions of R.T.M. |
| 17 | | MR. CASEY: Objection. |
| 18 | A. | Knowing what you need to do as far as |
| 19 | processing those buy backs, the damaged, defects |
| 20 | and missing parts. |
| 21 | Q. | The 93 percent score, is that -- do |
| 22 | you have any idea what type -- is this scored on |
| 23 | a 100 percent scale? |
| 24 | A. | Yes, sir. |

62

| | | |
|---|---|---|
| 1 | Q. | So, how would you characterize a |
| 2 | 93 percent score? |
| 3 | | MR. CASEY: Objection. |
| 4 | A. | Passing. |
| 5 | Q. | Okay. Correct me if I am wrong, when |
| 6 | I was in high school 93 percent, I think, was an |
| 7 | A, isn't that right? |
| 8 | | MR. CASEY: Objection. |
| 9 | A. | I believe that is correct in school, |
| 10 | but this is different. |
| 11 | Q. | So it's fair to say 93 percent is |
| 12 | passing and adequate, isn't that right? |
| 13 | A. | Yes, sir. |
| 14 | Q. | This document doesn't have a date on |
| 15 | it; do you have an independent memory of |
| 16 | approximately when Mr. Dean took the 90 day |
| 17 | R.T.M. clerk quiz? |
| 18 | A. | I don't know the date, no. In the |
| 19 | beginning, in the beginning when you're hired |
| 20 | they did some training in another store. |
| | That's -- that would have been done at the |
| 21 | beginning of his hire. |
| 23 | Q. | It's fair to say then that Mr. Dean |
| 24 | took the 90 day R.T.M. clerk quiz prior to |

| | | |
|---|---|---|
| 1 | | August of '01? |
| 2 | A. | Yes, sir. |
| 3 | Q. | And without going through all of the |
| 4 | certificates in the interest of time, can I ask |
| 5 | you if Mr. Dean also had received and completed |
| 6 | the 90-day quiz in general knowledge? Would |
| 7 | that most likely have been done around the same |
| 8 | time as the 90 day R.T.M. quiz? |
| 9 | A. | I believe so. |
| 10 | Q. | Now, you mentioned earlier that Dan |
| 11 | Pucchio was disciplined under the equal |
| 12 | employment policy, opportunity policy but you |
| 13 | didn't have any direct knowledge of that, but |
| 14 | you were aware of that? |
| 15 | | MR. CASEY: Objection. |
| 16 | A. | No direct knowledge but that was |
| 17 | second-hand information, so. |
| 18 | Q. | One of the claims in this lawsuit is |
| 19 | that David Dean has asserted that Mr. Pucchio |
| 20 | put a black hangman's noose on Mr. Dean's desk |
| 21 | at the R.T.M. cage one day. |
| 22 | | Do you remember hearing about that? |
| 23 | | MR. CASEY: Objection. |
| 24 | A. | I remember hearing about it. |

64

| | | |
|---|---|---|
| 1 | Q. | The date of that I will represent to |
| 2 | you from all of the various statements that were |
| 3 | given by Lowe's employees the date of that |
| 4 | incident was November 8th of 2001. |
| 5 | | Were you working that day? |
| 6 | A. | I do not remember. I can't remember |
| 7 | if that was when I was working over nights or |
| 8 | what. |
| 9 | Q. | What do you remember? When did you |
| 10 | first hear about this noose incident? |
| 11 | A. | Are you asking for a specific date? |
| 12 | Q. | Your best memory of what you heard, |
| 13 | whether it's the date, time, month, the year, |
| 14 | whatever your memory is. When did you first |
| 15 | hear about the incident? |
| 16 | A. | Honestly, I don't remember. |
| 17 | Q. | Who did you first hear from when you |
| 18 | heard about this incident involving my client |
| 19 | and Mr. Pucchio? |
| 20 | A. | Again, it would be a guess. But -- |
| 21 | | MR. CASEY: Don't guess. |
| 22 | A. | I don't know. |
| 23 | Q. | What did you hear about this |
| 24 | incident? |

65

1    A.    **I heard that there was some joking**
2  **around on the dock and then Danny had left the**
3  **black rope tied up in the noose on Dave's desk**
4  **and Dave was upset about it.**
5    Q.    What did you hear about the joking
6  around? In other words, who was joking around
7  with whom?
8        MR. CASEY: Objection.
9    A.    **I'm not sure of all the people that**
10  **were there. It was group as I recall.**
11    Q.    And that group of people, they were
12  all under you, those were your employees at the
13  receiving dock?
14    A.    **Those would have been receiving and**
15  **anybody else who happened to be on the dock at**
16  **that time.**
17    Q.    The dock was a place where people
18  would being congregating to have a smoke and --
19    A.    **No, no, pull freight or ask questions**
20  **of the receiving people.**
21    Q.    Employees were expected to be working
22  out there?
23    A.    **Yes, sir.**
24    Q.    It wasn't a place for a break, the

66

1  receiving dock?
2    A.    **No, sir.**
3    Q.    Do you recall somebody employed by
4  Lowe's at that time, Ken Godin, G-O-D-I-N?
5    A.    **Yes, sir.**
6    Q.    What was Ken Godin's position?
7    A.    **He was an assistant manager as well.**
8    Q.    What was his department?
9    A.    **At that time, I can't remember.**
10    Q.    Did you ever talk to Ken Godin about
11  the incident?
12        MR. CASEY: Objection.
13    A.    **Not that I can remember.**
14    Q.    All right. Getting back to your
15  statement about what you heard about the
16  incident, did you ever see the noose?
17    A.    **I don't believe I have seen that, no,**
18  **sir.**
19    Q.    Do you know where it was that Danny
20  Pucchio got the -- strike that.
21        Just for the record, you were aware
22  that Mr. Pucchio came forward at some point in
23  time and admitted to tying the noose and putting
24  it on Mr. Dean's desk?

67

1    A.    **I might have been, sir, but it's over**
2  **several years ago. I'm really not sure.**
3    Q.    Do you know where Mr. Pucchio got the
4  rope for the noose?
5    A.    **I do not.**
6        MR. CASEY: Objection to the
7  question.
8    Q.    Was Mr. Pucchio somebody that you
9  supervised?
10    A.    **Yes, sir.**
11    Q.    What was his position?
12    A.    **Receiver/stocker.**
13    Q.    Who at Lowe's disciplined Mr. Pucchio
14  for placing the noose on Dean's desk?
15    A.    **It would have been the store**
16  **manager's responsibility to do that.**
17    Q.    And you said earlier it was either
18  Mr. Chatman or Mr. Romano, is that correct?
19    A.    **Yes, sir.**
20    Q.    Would Mr. Godin have been involved in
21  disciplining Mr. Pucchio?
22    A.    **I'm not sure.**
23    Q.    Were you involved at all in the
24  aftermath of what Mr. Pucchio did up to and

68

1  including any discipline that Mr. Pucchio
2  received from Lowe's?
3        MR. CASEY: Objection.
4    A.    **I was not.**
5    Q.    You were his direct manager, correct?
6    A.    **Yes, sir.**
7    Q.    Why were you not involved in
8  disciplining Mr. Pucchio?
9    A.    **I was not there during the incident**
10  **so it would have been the store manager and the**
11  **manager that it was reported to at the time, if**
12  **anybody.**
13    Q.    Did Mr. Dean make any reports to you
14  about this incident either before on after
15  November 8th of '01?
16        MR. CASEY: Objection.
17    A.    **After the fact I believe he talked to**
18  **me about it, told me about it.**
19    Q.    How long after November 8th did Mr.
20  Dean tell you about it?
21    A.    **I don't remember, sir.**
22    Q.    Within the same week as November 8th?
23    A.    **It might have been, I don't know.**
24    Q.    Was it in December of '01 that Mr.

69

1    Dean told you about the incident?
2        A.    **I don't remember.**
3        Q.    What did Mr. Dean say to you?
4        A.    **Umm, I couldn't verbatim. I don't**
5    **remember, sir, but I know it was upsetting.**
6        Q.    How do you know it was upsetting to
7    Mr. Dean? What was the gist of his
8    communication to you?
9        A.    **That it upset him.**
10       Q.    Could you please give me the gist of
11   the communication between you and Mr. Dean?
12       A.    **What was the gist of it, sir? I**
13   **don't recall, again, the specifics.**
14       Q.    If you can't remember any of his
15   words or the gist of his words, what in his
16   behavior was indicating to you, if anything,
17   that he was upset?
18             MR. CASEY: Objection.
19       A.    **I am trying to picture it, sir, and I**
20   **can't.**
21       Q.    Okay. What did you say in response
22   to Mr. Dean when he was upset about the
23   incident?
24       A.    **Again, not knowing the specifics of**

70

1    **what was said, you know, it would have been**
2    **trying to comfort him and, you know, letting him**
3    **know the process of who would be taking care of**
4    **it.**
5        Q.    Were you angry at Mr. Dean about this
6    incident?
7        A.    **No, sir.**
8        Q.    Of the employees who were under you
9    at that time, at the time of the incident, how
10   many of those employees were black?
11       A.    **I can't remember, sir. It was**
12   **several. One on the day crew and some on the**
13   **night.**
14       Q.    Did any of the other black employees
15   have anything to say to you about this incident?
16       A.    **No, sir, not that I remember.**
17       Q.    After the conversation that you had
18   with Mr. Dean when you noticed that he was
19   upset, did you have any other conversations with
20   him about the noose incident after that?
21       A.    **Not that I can remember.**
22       Q.    What did you do, if anything, in
23   terms of managerial work, what did you do in
24   response to this incident that occurred between

1    Mr. Pucchio and Mr. Dean?
2             MR. CASEY: Objection.
3        A.    **I didn't do anything differently.**
4        Q.    I'm going to ask the names of some
5    individuals to see if you recollect them and
6    their position or positions at Lowe's?
7             Stephen Sexton; do you recognize that
8    name?
9        A.    **Yes, sir.**
10       Q.    What was his position at Lowe's in
11   November of '01?
12       A.    **He was assistant manager or an**
13   **assistant manager in training.**
14       Q.    And what would the indication ASM 3
15   mean?
16       A.    **Assistant manager of zone three.**
17       Q.    What area of the store is in zone
18   three, what products?
19       A.    **Lumber, building materials, hardware,**
20   **tools.**
21       Q.    Okay. Wesley E. Anderson?
22       A.    **Receiver/stocker.**
23       Q.    One of your employees?
24       A.    **Yes.**

72

1        Q.    Was Wesley a black person or a
2    Caucasian?
3        A.    **Caucasian.**
4        Q.    Another individual, Chris Lovett?
5        A.    **Receiving clerk.**
6        Q.    Is Chris female?
7        A.    **Yes, sir.**
8        Q.    And what's her race?
9        A.    **Caucasian.**
10       Q.    Just give me a minute. I need to
11   find a passage in the document so I can quickly
12   go through it.
13             I am going to mark a two-page
14   document, it's among the incident reports, says
15   Lowe's incident report. It's dated 11.9.01 by
16   Ken Godin and it's number L0034 and the next
17   page is L0035.
18             (1-page document, Lowe's incident
19   report, was marked for identification as Exhibit
20   No. 6.)
21             (Discussion off the record.)
22             MR. CASEY: What is the number?
23             MR. FEDERICO: L0034, and the next
24   page is 35. L0034 and the second page is 35.

1  MR. CASEY: I have it.

2  A.  **I do too.**

3  MR. CASEY: This is Exhibit 6.

4  MR. FEDERICO: Yes, it is.

5  Q.  Just to clarify, before I ask you

6  about this, because this is not your report, I

7  am not asking you to authenticate this report,

8  so please just skim the report and I want to

9  mark it and ask a question based on a statement

10  in the report. I am not going to ask you to

11  adopt anything, just skim this over. There is a

12  lot -- start with the last paragraph on the

13  first page.

14  It says after the conversation with

15  Danny I called David Dean. Start with that. Go

16  to the end, which is on the second page.

17  A.  **Okay.**

18  Q.  Just to restate your testimony, Ken

19  Godin was in the position of an assistant store

20  manager, is that correct?

21  MR. CASEY: Objection.

22  A.  **Yes.**

23  Q.  And I've forgotten; what department

24  was he in?

---

1  described there by Mr. Godin?

2  MR. CASEY: Objection.

3  A.  **I don't, sir.**

4  Q.  And it appears from Mr. Godin's

5  statement that you weren't present at that

6  meeting, isn't that correct? You're not listed

7  there?

8  A.  **Correct.**

9  Q.  But out of all of those individuals

10  listed, you're the only one who was Mr. Dean's

11  supervisor, isn't that right?

12  A.  **I was his direct supervisor. All the**

13  **ASMs would be over the people in the store.**

14  Q.  Okay. They would all be over the

15  position above Mr. Dean, but they're not his

16  direct supervisor, as you point out, right?

17  A.  **That is correct.**

18  Q.  Why did you not attend this meeting

19  which may have or may not have taken place on

20  11.9.01, but it's dated 11.9.01. Why did you

21  not attend the meeting that's described in the

22  first sentence or two of exhibit six?

23  MR. CASEY: Objection.

24  A.  **I don't know. The only reason I**

---

74

1  A.  **I don't remember what zone he was**

2  **running at that time.**

3  Q.  He was not Mr. Dean's direct manager

4  right, you were?

5  MR. CASEY: Objection.

6  A.  **Correct.**

7  Q.  The last paragraph on page one of the

8  Exhibit 6 starts with; after the conversation

9  with -- strike that.

10  This is Exhibit 6, Lowe's incident

11  report dated 11.9.01, and it's signed by,

12  appears to be signed by Ken Godin.

13  Do you see where I have referenced

14  that?

15  A.  **Yes, sir.**

16  Q.  Subject is David Dean versus Danny

17  Pucchio. The last paragraph on the first page

18  begins, quote, after the conversation with Danny

19  I called David Dean to the ASM. Strike that.

20  After the conversation with Danny I

21  called David Dean to the ASM office. Besides

22  myself, Kenneth Godin, I had Mark Gillotti, ASM

23  and Steven Sexton, ASM present to talk to David.

24  Do you recall the meeting that's

---

76

1  **could think of -- I don't want to guess, so I**

2  **don't know.**

3  Q.  Is it possible that you were working

4  that day and you simply had other

5  responsibilities and you weren't able to attend

6  the meeting?

7  MR. CASEY: Objection.

8  A.  **That wouldn't be what I would do. I**

9  **would go in because it was my associate. I**

10  **can't assume anything, but I don't remember.**

11  Q.  Okay. What exactly was the

12  discipline done on Danny Pucchio by Lowe's, do

13  you know?

14  MR. CASEY: Objection.

15  A.  **I'm not for sure.**

16  Q.  Again, you had no role in the

17  discipline of Danny Pucchio at all, right?

18  A.  **I wasn't involved with that, no.**

19  Q.  Looking at the last paragraph on page

20  one of exhibit six, right after the first two

21  sentences it says; I immediately told him

22  exactly what Dan had told me. I also told him

23  that Dan had given me his two weeks' notice to

24  end his employment with Lowe's.

1    Did Dan Pucchio work at Lowe's under
2  you for two weeks after November 9th of '01?
3    A.    I believe so.
4    Q.    So you know then that Dan Pucchio was
5  not immediately terminated on November 9th of
6  '01, right?
7    A.    I believe he was not.
8    Q.    At some point during Mr. Dean's work
9  under you did his organization at the R.T.M.
10  cage become an issue?
11    A.    I believe so.
12    Q.    In fact, in particular, wasn't there
13  a problem of returns, the actual items
14  themselves, they were piling up too much outside
15  of the cage on a fairly consistent basis, was
16  that one of the problems?
17    A.    As I recall, sir.
18    Q.    When was the first time you noticed
19  that problem at the R.T.M. cage when Mr. Dean
20  was running it?
21    A.    I can't be exact, sir. I don't know.
22    Q.    Well, it's clear from your August of
23  '01 review that you did not state on the review
24  there was a pile of returns problem with Mr.

1  problem straightened out.
2    Q.    Did you talk to any other employees
3  or anyone else in the store about putting the
4  returns in front of the cage?
5    A.    Not that I recall, no.
6    Q.    Why not?
7    A.    There is only one section to put it
8  in and that's where they were.
9    Q.    You could have changed the section if
10  you wanted to, couldn't you?
11    MR. CASEY: Objection.
12    A.    The way the cage is configured, sir,
13  not really.
14    Q.    When did Mr. Dean first complain to
15  you about the piling the returns in front of his
16  cage at the R.T.M. area, if at all?
17    Had Mr. Dean complained at all?
18    MR. CASEY: Objection.
19    A.    I don't remember. I don't remember
20  the complaints or when it might have been.
21    Q.    Do you recall that at some point Mr.
22  Dean was moved to lawn and garden?
23    A.    I believe that's what happened, yes
24  sir.

---

78

1  Dean, isn't that correct?
2    A.    Yes, sir.
3    Q.    Up until August of '01 there was no
4  problem with returns being piled in front of the
5  cage, is that a correct statement?
6    A.    Best of my knowledge.
7    Q.    Sometime after August of '01 you
8  started to notice an organization problem with
9  the piles of returns in front of the cage, the
10  R.T.M. cage, is that right?
11    MR. CASEY: Objection.
12    A.    To the best of my knowledge, yes,
13  sir.
14    Q.    What did you first do about the
15  problem as David Dean's manager to address the
16  problem of the piling of returns?
17    A.    Sorry. Could you repeat?
18    Q.    What did you first do, if anything,
19  what first do about the problem of the
20  piling of returns in front of the R.T.M. cage
21  concerning Mr. Dean?
22    A.    As I recall, it would have been
23  sitting down with David and finding out what was
24  going on or what we could do to help to get the

80

1    Q.    Do you know when that was?
2    A.    I can't be sure.
3    Q.    Do you know why he was moved to lawn
4  and garden?
5    A.    It would have been based on job
6  performance, sir.
7    Q.    Did he go willingly?
8    A.    Yes, sir.
9    Q.    Did he receive a reduction in his pay
10  when going to lawn and garden?
11    A.    That I don't know.
12    Q.    After the end of the two-week period
13  after November 9th of '01, did Mr. Pucchio leave
14  employment?
15    A.    I don't remember.
16    Q.    After November of '01, during the
17  time that you were there at the Danvers store
18  did Mr. Pucchio ever come back to employment?
19    A.    I'm not sure.
20    MR. CASEY: Objection.
21    Q.    Do you know were Mr. Pucchio is
22  employed today?
23    A.    I do not.
24    Q.    Did you ever talk to Mr. Pucchio

1  about this incident?

2      A.    **I don't recall.**

3      Q.    Did you do any investigation, in

4  other words, did you talk to anybody involved in

5  the incident other than Mr. Dean about the noose

6  incident?

7      A.    **No, it wouldn't have been me to do an**

8  **investigation after it had been reported and**

9  **taken care of by H.R. and the store manager,**

10 **sir.**

11     Q.    Did Mr. Dean make you aware that when

12 he discovered the noose on his desk -- strike

13 that.

14         Were you aware of anybody who was

15 with Mr. Dean when he discovered the noose?

16     MR. CASEY:  Objection.

17     A.    **I don't remember the circumstances,**

18 **no.**

19     Q.    So, none of vendors or any of the

20 customers of Lowe's came to you after the noose

21 incident to talk to you about the incident?

22     A.    **No, sir, not that I remember.**

23     Q.    I'd like to mark another document,

24 it's similar to exhibit four and states -- same

---

82

1  form called Lowe's Strategic Training and

2  Achievement Review Career Development Review.

3  And the Bates number is L0115.  One page.

4         (1-page document, Lowe's Strategic

5  Training and Achievement Review, was marked for

6  identification as Exhibit No. 7.)

7      A.    **I have it.**

8      Q.    Okay.  Mr. Estes, exhibit seven,

9  Bates number L0115, take a moment to review

10 that.

11     A.    **Okay.**

12     Q.    All right.  In exhibit seven, is that

13 your signature on the line which is next to the

14 bottom line?

15     A.    **Yes, sir.**

16     Q.    And the date on this is 1.24.02,

17 isn't that correct?

18     A.    **Yes, sir.**

19     Q.    This is the Lowe's Strategic Training

20 and Achievement Review Career Development Review

21 for David Dean, effective 6.02.  Do you see

22 that?

23     A.    **Do I see that?  Yes.**

24     Q.    And at this time you're Mr. Dean's

---

84

1  supervisor, correct?

2      A.    **Yes, sir.**

3      Q.    So, much like the August review you

4  were responsible for doing this review?

5      A.    **Yes, sir.**

6      Q.    And like the August review did you

7  sit down with Mr. Dean and go over his

8  performance?

9      A.    **Yes.**

10     Q.    Do you recall what it is that you

11 said to him, what the gist of what you said to

12 him was, if you can recall, for the January of

13 '02 review?

14     A.    **I don't remember.  I don't recall the**

15 **specifics of '02.**

16     Q.    Similar to the other one, there are

17 star standards and a number of these are checked

18 off that Mr. Dean meets the standards but there

19 are four of them that are checked off that he

20 does not meet the standards, do you see that?

21     A.    **Yes, sir.**

22     Q.    And it's fair to assume that you

23 filled those categories out at the top of the

24 form?

---

84

1      A.    **Yes, sir.**

2      Q.    In the area of the attendance and

3  functionality and I believe that is one, that he

4  didn't meet the standard, isn't that right?

5      A.    **That is correct.**

6      Q.    What, if you recall, what did you

7  base that on?

8      A.    **Which one specifically, sir?**

9      Q.    That Mr. Dean's attendance and

10 functionality did not meet standard?

11     A.    **Call out, sir.**

12     Q.    He was calling in sick?

13     A.    **Calling out with different problems,**

14 **as I recall, would have been sick and also a lot**

15 **of car trouble as I recall.**

16     Q.    Okay.  And do you have any memory of

17 how many times Mr. Dean called out sick?

18     A.    **No, sir.**

19     Q.    And when he called in sick did he

20 relay to you or anybody else what the problem

21 was?

22     A.    **He would have told the administer on**

23 **duty when he called out.  So it would have**

24 **gotten back to me through that form.**

---

1    Q.    Just to be clear, the period of time
2    that you're reviewing now from the last review,
3    which was August of '01, right, so you're
4    reviewing some of August, September, November,
5    December of '01 and then January, a couple of
6    days into January of '02, isn't that right?
7    A.    **Right.**
8          MR. CASEY: Objection.
9    A.    **Yes, sir.**
10    Q.    Prior to November 9, 2001, how many
11    times did Mr. Dean call out?
12    A.    **I don't remember.**
13    Q.    After November 9th of '01, how many
14    times did Mr. Dean call out?
15    A.    **I don't not remember.**
16    Q.    What did you base your review on then
17    when you said he didn't meet the attendance and
18    functionality standards?
19          MR. CASEY: Objection.
20    A.    **Number of absenteeism days and I'm**
21    **not sure how many there were right now.**
22          **I would have known back then.**
23    Q.    How would you have known back then?
24    A.    **The amount would have been reported**

1    **to me through the managers on duty or to me**
2    **myself.**
3    Q.    Is that recorded anywhere? When an
4    employee calls out or calls in sick, however you
5    term it, when they don't come in, is that
6    recorded on paperwork somewhere within Lowe's?
7    A.    **H.R. manager has attendance cards, I**
8    **believe, sir.**
9    Q.    So you didn't look at the attendance
10    cards, did you?
11          MR. CASEY: Objection.
12    A.    **I don't believe I looked at that**
13    **card, no, sir.**
14    Q.    You were just basing this on your
15    memory of talking to the other managers and so
16    forth?
17    A.    **And him not being there when I was**
18    **working in the morning, sir.**
19    Q.    Did you ever ask him why he was not
20    there?
21    A.    **I would have had those conversations**
22    **to see what was going on.**
23    Q.    Did he ever say that he was -- state
24    that he was having problems with his asthma

1    condition?
2    A.    **Not that I can recall. It was all**
3    **mostly van trouble.**
4          MR. CASEY: Van as V-A-N?
5    A.    **Yes, sir.**
6    Q.    All right. The next standard down is
7    07, organization.
8          Do you see that?
9    A.    **Yes, sir.**
10    Q.    He doesn't meet the standard here,
11    according to you.
12          What do you base that on?
13    A.    **That would be from the previous where**
14    **I talked about the organization of paperwork in**
15    **the cage. And that wouldn't have been any**
16    **better on this one so I would have put a does**
17    **not meet standards.**
18    Q.    But on exhibit four, he met the
19    standard for the organization according to you
20    at that time?
21    A.    **Correct, he met the standard at that**
22    **time and I put down on the notes to watch that**
23    **because it was becoming a concern.**
24    Q.    Did you see Mr. Dean's work

1    performance get worse after the incident with
2    Mr. Pucchio?
3    A.    **Honestly, I don't know if that was as**
4    **a result, but it was declining.**
5          MR. CASEY: Was what?
6    A.    **Declining.**
7          MR. CASEY: It was declining.
8    A.    **His performance was declining.**
9    Q.    Not testifying as to cause and
10    effect, but the fact is that his performance
11    declined after the Pucchio incident, right?
12          MR. CASEY: Objection.
13    A.    **It declined after August of that**
14    **review. That date I can't be sure of.**
15    Q.    All right. Could you look at the
16    comments section in the first box, says
17    supervisor's comments.
18          Could you read what you wrote there,
19    assuming that is your writing?
20    A.    **Yes, sir. David has the knowledge**
21    **and can certainly perform this job. I think**
22    **that his consistent time away from work is**
23    **directly affecting the productivity. He also**
24    **needs to be more organized, especially with all**

1   **reports and the out for repair log.**
2   Q.    What steps did you take, Mr. Estes,
3   to help Mr. Dean reach his organizational and
4   his productivity goals?
5   A.    **I showed him -- I spent over nights**
6   **getting the cage organized for him, to get it on**
7   **its feet, get him on the right track and all he**
8   **had to do was maintain it.**
9   Q.    Did you ever speak with the other
10  employees about the marking and the placing of
11  the appliances and merchandise in front of the
12  cage?
13        MR. CASEY: Objection.
14  A.    **At one point in time I did have to**
15  **get a bay for appliances because they were**
16  **becoming more and more abundant.**
17  Q.    And what do you mean a bay? What do
18  you mean by that? Where did you get a bay?
19  A.    **On the receiving docks there's**
20  **different bays where you put products in, mostly**
21  **special orders and such, and I had to take one**
22  **of those and put R.T.M. appliances in and cut**
23  **down on my special order bays.**
24  Q.    When did you start using that bay for

1   the R.T.M. appliances?
2   A.    **I don't remember the exact date I**
3   **just knew it was becoming a problem.**
4   Q.    Was Mr. Dean still on the R.T.M. or
5   had he moved on to lawn and garden?
6   A.    **I believe that's when Dave was still**
7   **there.**
8   Q.    You're not certain about that?
9   A.    **Not 100 percent.**
10        (Short break taken.)
11  Q.    We are back on the record looking at
12  exhibit seven.
13        And, so, on or about January 24th of
14  2002, your assessment, Mr. Estes, was that the
15  following areas needed improvement: Attendance,
16  functionality, organization, recordkeeping and
17  overall job performance.
18        And that would be for Mr. Dean, isn't
19  that right?
20  A.    **Yes, sir.**
21  Q.    And if you could take out exhibit
22  four, which was his 90-day review, that actually
23  was done August of '01, isn't that right?
24  A.    **Yes, sir.**

1   Q.    You'd agree this is before the noose
2   incident which happened in November of '01,
3   correct?
4   A.    **Yes, sir.**
5   Q.    So, the August of '01 review, your
6   review stated that he met all of the standards
7   from customer service to organization to job
8   performance as you have it marked here on
9   exhibit four, isn't that right?
10        MR. CASEY: Objection.
11  A.    **Yes, sir.**
12  Q.    And in August of '01 you state that
13  some improvement was needed on attendance and
14  organization, which is what you wrote, isn't
15  that right?
16  A.    **Yes, sir.**
17  Q.    Getting back to exhibit seven, Mr.
18  Estes, do you see on the bottom where that says
19  employee comment?
20  A.    **Yes, sir.**
21  Q.    And Mr. Dean is presumed to have
22  written that, right?
23        MR. CASEY: Objection.
24  A.    **Yes, sir.**

1   Q.    It states: Major concerns are
2   appliances, tools and other items need to be
3   marked with what is wrong with it, plus receipts
4   of purchases. That helps the return prices turn
5   over?
6        MR. CASEY: I think it's process.
7   Q.    You're correct. That helps the
8   return process turn over.
9        · What, if anything, in relation to
10  that statement by Mr. Dean, what, if anything,
11  Mr. Estes, did you do to make sure that
12  appliances, tools and other items were marked
13  with what is wrong with it after January.
14  A.    **Would have been meeting with the**
15  **front end personnel that run the cash registers,**
16  **run the desk.**
17  · Q.    Do you have a specific memory of
18  having a meeting or just speaking generally
19  about what you wanted done?
20  A.    **No, I remember having meetings with**
21  **the front end to get this process straight.**
22  Q.    What I'd like to do to be a little
23  more efficient at this point is to take and mark
24  the rest of these, what I have as employee

93

95

1  performance reports and I will give you all the
2  Bates numbers, there are three of them.
3       One of them is a two-page one so the
4  first one is L0107; second one is L0106; third
5  one is L0135.
6       Actually, L0135, sorry to confuse
7  you, just scratch that. That's a different
8  thing.
9       So there are three and they're each
10  one page so it's 105 to 107 including 106.
11       MR. CASEY: You want to mark those in
12  the aggregate as exhibit number eight?
13       MR. FEDERICO: Sure, if that's
14  agreeable.
15       (3-page document, Lowe's employee
16  performance report, was marked for
17  identification as Exhibit No. 8.)
18  Q.    They will go in order of date, which
19  is 107, 106, 105. That's actually
20  chronological.
21       You found those three?
22  A.    Yes, sir.
23  Q.    Let me just ask you a couple of
24  questions about September and October of 2001.

1  don't know whether those records still exist,
2  but I will make inquiry to see if they do.
3       MR. FEDERICO: Okay.
4       MR. CASEY: If they do I will produce
5  them.
6  Q.    Okay. If you could think back, Mr.
7  Estes, to the August of '01 review, where Mr.
8  Dean met all the standards categories, do you
9  recall whether or not he met the standards of
10  performance in September and October of '01?
11       MR. CASEY: Objection.
12  A.    **As far as doing a review I'm not**
13  **sure, sir. I know it steadily got worse as we**
14  **went along every month after that.**
15  Q.    Did he ever receive an employee
16  performance report in October of '01?
17  A.    **No.**
18  Q.    Did he receive an employee
19  performance report in September of '01?
20  A.    **Not that I can recall, not from me,**
21  **sir.**
22  Q.    All right. What is the purpose of an
23  employee performance report in general?
24  A.    **To coach and counsel an individual to**

94

96

1       What attendance problems, if any, did
2  you have with Mr. Dean in September and October
3  of '01?
4  A.    **I don't remember specifically, sir.**
5  Q.    Okay. Like you said, that would have
6  been recorded by H.R. if he did call in with an
7  illness or something else?
8  A.    **Recorded by H.R. or someone took a**
9  **call or him just not being there.**
10       MR. FEDERICO: That would be part of
11  our document request, that would be attendance
12  records from H.R. and I would request that
13  formally, if you'd like, but Counsel --
14       MR. CASEY: Yes, I'm not sure what
15  the question is.
16       MR. FEDERICO: Wondering if there is
17  an attendance sheet for this employee. I didn't
18  see that in any of the material that I looked
19  through from your production.
20       I am sure it was probably, you know,
21  requested. If it was part of his personnel file
22  it should have been there.
23       MR. CASEY: I don't know. I don't
24  have the document request in front of me and I

1  **help them identify the areas of opportunities**
2  **and make them better.**
3  Q.    Is it fair to say it's to point out
4  to an employee where they need to improve on and
5  how to help them improve on it?
6       MR. CASEY: Objection.
7  A.    **It would be, yes, that would be**
8  **accurate. Also to show them areas where they**
9  **need -- all the areas of improvement, yes, sir.**
10  Q.    Let's take a look at Exhibit 8, and
11  on Exhibit 8 do you recognize your signature on
12  the bottom line of that?
13  A.    **Yes, sir.**
14  Q.    There is also a line on this one for
15  the supervisor's name. Do you see that? Steven
16  Vaughn, junior?
17  A.    **Yes, sir.**
18  Q.    What was his position in relationship
19  to Mr. Dean then?
20  A.    **Manager, department manager of**
21  **receiving.**
22  Q.    He was department manager?
23  A.    **Yes.**
24  Q.    Was Mr. Vaughn at all involved in the

97

1  previous performance reviews?
2    A.    He would have given me his feedback
3  to write them. He would have had more direct
4  contact with Mr. Dean.
5    Q.    The date of the employee performance
6  report is 1.20.02, is that correct?
7    A.    Right, yes.
8    Q.    Is there a difference between the
9  strategic training and achievement review and
10  the employee performance report?
11        MR. CASEY: Objection.
12    Q.    I'm not really referring to a
13  document, just talking about the two forms, one
14  form, Mr. Estes, is Lowe's strategic training
15  and performance report or review and career
16  development review, and the other form is the
17  employee performance report.
18        I am just wondering what, Mr. Estes,
19  you think the difference is between those forms,
20  if any?
21    A.    The strategic training and
22  achievement review is a form used for 90 day
23  reviews, annual reviews to see where you're
24  going and where you want to be.

98

1        The employee performance report is
2  the report for performance coaching and
3  counseling strategies.
4    Q.    Okay. In September and October of
5  '01, is it fair to conclude there was no need
6  for employee coaching or counseling for Mr.
7  Dean, otherwise you would have done an employee
8  performance report with him?
9        MR. CASEY: Objection.
10    A.    There could still have been a problem
11  but I wouldn't have put it in a paper form, I
12  would have sat down with Dave and talked to him
13  about it.
14    Q.    Okay. Problems then in September and
15  October, assuming there were any problems, were
16  not significant to the point that you would have
17  to make out the employee performance report,
18  correct?
19        MR. CASEY: Objection.
20    A.    That would be correct.
21    Q.    Focusing on Exhibit 8, the first
22  page, which is dated 1.20.02, did you write this
23  report or did someone else, or did Steven Vaughn
24  write the report?

99

1    A.    No, I wrote this report.
2    Q.    Okay. You have had a moment to
3  review the report. Tell me what was happening
4  in January of '02 that led to the need for
5  Exhibit 8?
6    A.    Would have been consistent overnights
7  that I have done to help get the dock cleaned or
8  the receiving cage, R.T.M. cage and get it
9  organized leaving it to Dave to maintain it and
10  keep it going and it kept getting back into
11  disarray, so it led to me having to sit down and
12  do a performance counseling session and coaching
13  session with him, to help him find out what was
14  going on and see what we could do.
15    Q.    Why in your view was it getting in
16  disarray, the R.T.M.?
17        MR. CASEY: Objection.
18    A.    In my opinion it would be because the
19  R.T.M.s were not being processed at the rate
20  that they needed to be processed.
21    Q.    Was that because Mr. Dean was absent?
22    A.    I can only speculate on that, but
23  that would have something to do with it.
24    Q.    Is it because you were having an

100

1  unusually high level of returns?
2    A.    Like I said, I can't tell you exactly
3  what it was. It could have contributed both but
4  it was due to performance issues.
5    Q.    It's after Christmas in January of
6  '02, isn't that right?
7    A.    Um-hum.
8    Q.    You have been in retail for many
9  years?
10    A.    Um-hum.
11    Q.    And wouldn't you agree that,
12  generally speaking, a lot of returns occur after
13  Christmas?
14    A.    Not in the home improvement field,
15  sir.
16    Q.    Okay.
17    A.    Busy season for us is May through
18  July with sales and returns.
19    Q.    Fair enough. At that time prior to
20  sitting down with Mr. Dean on or about January
21  20, '02, did you talk with any of the other
22  employees under you about placement of the
23  returns or anything else?
24        MR. CASEY: Objection.

101

1    A.    **I don't remember specifically, sir.**

2    Q.    Did you call a meeting with all of

3    your employees concerning the returns?

4          MR. CASEY: Objection.

      A.    **I would have meetings generally on**

6    **the dock to discuss several issues and I can't**

7    **recall what specifically was said.**

8    Q.    What was Mr. Dean's response to you,

9    do you remember?

10   A.    **I don't, sir. I don't remember**

11   **exactly what it was, sir, no, sir.**

12   Q.    In your report you write that Dave

13   has agreed and says that his efforts will

14   increase to ensure the area is well kept?

15         Do you see that?

16   A.    **Yes, sir.**

17   Q.    Is that what you recall Mr. Dean

18   saying to you?

19   A.    **Sounds accurate, sir, but, again, I**

20   **can't be for sure.**

21   Q.    Now, at this meeting with Mr. Dean

22   did you take any opportunity to ask him about

23   any other issues that he might be having?

24         MR. CASEY: Objection.

102

1    A.    **I don't remember. That's usually**

2    **protocol for how I do it, but I don't remember**

3    **again the specific conversation that long ago.**

4    Q.    At that meeting in January of '02 did

5    you ask Mr. Dean how he was doing in terms of

6    the noose incident?

7          MR. CASEY: Objection.

8    A.    **I don't believe I did, sir.**

9    Q.    At any time in January or February of

10   '02 did you ask Mr. Dean about how he was doing

11   concerning the noose incident?

12         MR. CASEY: Objection.

13   A.    **I, again, I don't know.**

14   Q.    Did you talk to Mr. Dean at all after

15   November 9th of '01 concerning the noose

16   incident?

17         MR. CASEY: I think he had already

18   testified he did, but note my objection. Go

19   ahead.

20   A.    **He came to me after it happened that**

21   **one time and that's, I believe, the last time.**

22   **I can't remember any other time after that.**

23   Q.    When he came to you that one time,

24   Mr. Estes. Strike that. When he came to you

103

1    that one time after the noose incident you had

2    testified earlier that he was upset, right?

3    A.    **Yes, sir.**

4    Q.    Did he convey to you that he felt as

5    though he was discriminated because of race?

6    A.    **I don't believe so, sir.**

7    Q.    Do you know whether he conveyed to

8    other managers that he thought it was racial

9    discrimination or racism, the placing of the

10   noose?

11   A.    **I don't know, sir.**

12   Q.    Do you think that's racism, placing

13   of a noose on a black person's desk?

14         MR. CASEY: Objection.

15   Q.    What's that?

16   A.    **I don't know. I wouldn't make the**

17   **judgment call on that. I don't think -- if it**

18   **hurt his feelings it wasn't right to do.**

19   Q.    Let's take a look at page two of

20   Exhibit 8, which is 106 and it's dated 4.1.02?

21   A.    **Yes, sir.**

22   Q.    That's your signature on the bottom

23   line, Mr. Estes?

24   A.    **Yes, sir.**

104

1    Q.    And this is, as with Exhibit 8, it is

2    concerning David Dean, the employee's name, the

3    first page on Exhibit 8 was an initial notice,

4    this page is a written notice, isn't that

5    correct?

6    A.    **Yes.**

7    Q.    Are you following some kind of a

8    procedure here with an initial notice and a

9    written notice?

10   A.    **This is performance management**

11   **guidelines.**

12   Q.    Okay. What do the performance

13   guidelines allow in this kind of situation with

14   David Dean?

15   A.    **Sorry. Could you clarify that for**

16   **me?**

17   Q.    Yes. What process do the performance

18   guidelines allow in a process such as this, when

19   there is an issue that had been raised with

20   David Dean: Could you just describe the

21   process?

22   A.    **What issue is what I'm trying to**

23   **understand.**

24   Q.    A performance issue. What is the

1  process that is followed when there's
2  performance issues? In other words, first
3  there's an initial report then a written
4  warning, and what comes after that?
5       A.    **There would be a final notice.**
6       Q.    Okay. What happens after the final
7  notice?
8       A.    **A final notice and after that would**
9  **be a termination.**
10      Q.    Okay. So if you're an employee after
11  the final notice if you're not keeping up with
12  the requests and with the standards of your job,
13  what comes after a final notice is termination,
14  right?
15      A.    **Yes, sir.**
16      Q.    Getting back to the one that's dated
17  4.1.02, they're both dated 4.1.02, next two, but
18  there is 106, do you see that?
19      A.    **Yes.**
20      Q.    This is a written notice and it
21  refers to Andy Ramos. Who is Andy Ramos?
22      A.    **At that time Andy Ramos would have**
23  **been district loss prevention manager.**
24      Q.    In this report you refer to Andy

---

1       Q.    And what was your assessment at that
2  time as to why the report wasn't getting worked?
3           MR. CASEY: Objection.
4       A.    **He just wasn't doing it.**
5       Q.    But, why, Mr. Estes, was Mr. Dean not
6  doing it?
7           MR. CASEY: Objection.
8       A.    **That was my question, sir. I don't**
9  **know.**
10      Q.    So, it could have been that Mr. Dean
11  was feeling like he was being discriminated
12  against due do his race and was upset and wasn't
13  doing the report, isn't that possible?
14          MR. CASEY: Objection.
15      A.    **I don't know, sir.**
16      Q.    Did you inquire of Mr. Dean why he
17  wasn't doing the report?
18      A.    **I would sit down during the**
19  **counseling sessions and ask him, sir, yes, sir.**
20      Q.    What do you mean by the counseling
21  sessions? That is the meeting around this
22  employee performance report?
23      A.    **Yes, sir.**
24      Q.    Who would have been present at that

---

1  Ramos. What was the reason that you were
2  referring to Andy Ramos in this report?
3       A.    **Because when Andy comes in and does**
4  **his audits of the R.T.M. area, one of the areas**
5  **that Mr. Dean was responsible for, R.T.M. clear**
6  **report is one that Andy had audited and he**
7  **commented on it on a couple of occasions before**
8  **and let us know the report wasn't being worked**
9  **properly and we had losses due to it and that**
10 **this time, again, it's happening and we needed**
11 **to put it on paper.**
12      Q.    Okay. Why was the report not getting
13 done?
14          MR. CASEY: Objection.
15      A.    **It wasn't being worked.**
16      Q.    What do you mean worked? It just
17 wasn't done?
18      A.    **Correct.**
19      Q.    And the person responsible for doing
20 the report was who?
21      A.    **David Dean.**
22      Q.    And we are talking about the R.T.M.
23 cleared report?
24      A.    **Yes, sir.**

---

1  meeting? Mr. Vaughn?
2       A.    **Yes, sir.**
3       Q.    Did Mr. Vaughn have any idea why the
4  reports weren't getting done, the R.T.M. cleared
5  reports?
6           MR. CASEY: Objection.
7       A.    **That I don't recall, sir.**
8       Q.    So, you weren't sure why Mr. Dean
9  wasn't getting these reports done, but you were
10 just making it clear to him that he needed to
11 get them done, right?
12          MR. CASEY: Objection.
13      A.    **As far as why he wasn't doing them,**
14 **sir, I don't know. I was doing it, showing him**
15 **why it needs to be done, especially after we**
16 **showed him on several occasions how to do it.**
17      Q.    So your testimony is that you showed
18 him how to do the R.T.M. reports, right?
19      A.    **He had been showed by both Andy**
20 **Ramos, myself and Steve Vaughn.**
21      Q.    Between January of '02 and April 1,
22 '02 how many days absent from work was Mr. Dean?
23      A.    **I don't know.**
24      Q.    Do you have any memory at all? Was

1   it --
2       A.    **I don't know.**
3       Q.    -- a lot or a little, you just don't
4   know?
5       A.    **I don't know what frequency it was**
6   **between those dates, I really don't.**
7       Q.    It's possible that he had asthma and
8   that he was out of work, isn't it?
9             MR. CASEY:  Objection.
10      A.    **That would be speculating. I don't**
11  **know.**
12      Q.    You know from the records here that
13  he has a serious condition of asthma, don't you?
14            MR. CASEY:  Objection.
15      A.    **I did not know it at the time.**
16      Q.    Okay. You were his supervisor and
17  you weren't aware of a serious medical
18  condition?
19            MR. CASEY:  Objection.
20      Q.    What he had?
21            MR. CASEY:  Objection.
22      A.    **I did not know, sir.**
23      Q.    Nowhere on this report does it state
24  why these R.T.M. cleared reports are not being

1   done, isn't that correct?
2             MR. CASEY:  Objection.
3       A.    **That is correct.**
4       Q.    The report is just simply summarizing
5   that they are not done?
6       A.    **That is correct.**
7       Q.    Then what is expected in the future
8   to include the follow up dates.
9             Do you see that section?
10      A.    **Yes.**
11      Q.    And do you see where it says what is
12  expected in the future, question mark.
13            Do you see that part of the form?
14      A.    **I do.**
15            MR. CASEY:  Which page now?
16      Q.    Sorry, still on 106.
17            MR. CASEY:  Which line?
18      Q.    The written notations under the line,
19  what is expected in the future, question mark,
20  include follow up dates?
21      A.    **Sorry. What is -- I see it, yes.**
22      Q.    Is that your handwriting, Mr. Estes?
23      A.    **Yes, sir.**
24      Q.    Could you tell me what you wrote as

1   far as what to expect in the future?
2       A.    **Yes, sir. It states: David is**
3   **expected to print the reports pertinent to his**
4   **function, follow up is done. Any violation of**
5   **this or any other kind will be dealt with by**
6   **disciplinary action up to and including**
7   **termination.**
8       Q.    Okay. And the report is also signed
9   by David Dean?
10      A.    **Yes, sir.**
11      Q.    He knew that it was possible that he
12  would have been terminated if the reports
13  weren't printed, correct?
14      A.    **Yes.**
15      Q.    Last page is dated 4.1.02?
16      A.    **Yes.**
17      Q.    Your signature is on the bottom of
18  the last page, which is also an employee
19  performance report, right?
20      A.    **Yes, sir.**
21      Q.    And this is to David Dean on 4.1.02,
22  a final notice, is that right?
23      A.    **Yes, sir.**
24      Q.    So, on 4.1.02 you gave David Dean a

1   written notice, is that correct?
2       A.    **Yes.**
3       Q.    And you told him that if he did not
4   do the report he may be subject to disciplinary
5   action up to and including termination, right?
6       A.    **Yes.**
7       Q.    On the same day you gave him his
8   final notice?
9       A.    **Yes, sir.**
10      Q.    Why did he receive his written notice
11  and final notice on the same day?
12      A.    **Two separate instances on that day**
13  **and Andy Ramos wanted us to take care of it.**
14  **The other that I wanted to address already,**
15  **that's --**
16      Q.    The other one that you were going to
17  address, which is the final notice?
18      A.    **Yes.**
19      Q.    What led up to the final notice; what
20  happened?
21      A.    **Same thing we had been seeing**
22  **previously with the area not being kept up, with**
23  **R.T.M.s not being processed.**
24      Q.    And your expectation in and at the

| | |
|---|---|
| 1 time in question on the form, what is expected | 1 policy up until 4.1.02? |
| 2 in the future, did you write, quote, Dave will | 2    **A.    Just the job performance for company** |
| 3 be moved out of R.T.M. and placed in a different | 3 **policy and to answer your question, no, sir.** |
| 4 position that will allow him to succeed in this | 4    Q.    And Mr. Dean did go to a different |
| 5 company instead of decline. | 5 department after that, right? |
| 6       Did you write that? | 6    A.    **Yes, sir.** |
| 7    A.    **Yes, sir, that looks familiar.** | 7    Q.    Was he still under you? I mean, were |
| 8    Q.    On the same day you were threatening | 8 you still his supervisor? |
| 9 disciplinary action for 4.1.02, I guess later in | 9    A.    **It was a split and there was two** |
| 10 the day is it your testimony you then moved him | 10 **managers because I believe he went to outside** |
| 11 to a different position? | 11 **garden receiver.** |
| 12       MR. CASEY: Objection. | 12    Q.    Who was Mr. Dean's R.T.M.? |
| 13    A.    **Well, sir, that would have been a** | 13    A.    **I don't remember.** |
| 14 **conversation between Dave and myself to see if** | 14    Q.    Do you remember the race of the |
| 15 **he wanted to stay and try to make it as an** | 15 person that replaced Mr. Dean as R.T.M.? |
| 16 **R.T.M. or if he wanted to go to another position** | 16    A.    **Could I --** |
| 17 **which he may be able to succeed at, where he** | 17       MR. CASEY: Don't guess. |
| 18 **wasn't doing R.T.M.s because of write ups, so** | 18    A.    **I don't know the person, so, I don't** |
| 19 **before I wrote that part I would have talked to** | 19 **know. I don't know, sorry.** |
| 20 **Dave.** | 20    Q.    Was Mr. Dean replaced by an African |
| 21    Q.    Prior to writing that part did you | 21 American person or not? |
| 22 talk to Dave? | 22    A.    **I do not believe so, sir.** |
| 23    A.    **Yes, as we sat down with the top part** | 23    Q.    And what happened in terms of Mr. |
| 24 **being filled out and a counseling session I** | 24 Dean's employment with Lowe's after that to the |

| | |
|---|---|
| 114 | 116 |
| 1 **asked Dave, I would have asked Dave what** | 1 best of your recollection? |
| 2 **happened, what was happening, does he think that** | 2    A.    **I'm not sure, sir, because I believe** |
| 3 **he could do it because I don't want to see us** | 3 **I left before anything else happened.** |
| 4 **lose a good person, I'd rather if he thought he** | 4    Q.    Just let me look through my notes for |
| 5 **could take over somewhere else and gave him a** | 5 a few seconds and I think we can wrap up. I did |
| 6 **couple of options, and what does he think and** | 6 forget to look at one thing, one more document. |
| 7 **that's what we ended up doing.** | 7 Let's look at two documents. It's a equal |
| 8    Q.    And then on the final notice you | 8 employment opportunity form, it's a grid of |
| 9 state that any violation of this or other kind | 9 break down of the employees by race. And there |
| 10 will be dealt with by disciplinary action up to | 10 are -- L0109 and L0189. |
| 11 and including termination. Did I read that | 11       MR. CASEY: Those two documents |
| 12 correctly? I don't think I quite did. To | 12 together are being marked as Exhibit 9, Dan? |
| 13 summarize that again, you are stating that any | 13       MR. FEDERICO: Correct. |
| 14 violation of this or any other kind will result | 14       (2-page document, equal employment |
| 15 in disciplinary action or termination, is that | 15 opportunity forms, was marked for identification |
| 16 correct? | 16 as Exhibit No. 9.) |
| 17    A.    **Correct.** | 17    A.    **I've got them.** |
| 18    Q.    If you were transferring him to | 18    Q.    Okay. Do you both have the |
| 19 another department, according to this report, | 19 documents? |
| 20 what are you talking about in terms of a | 20       MR. CASEY: Yes. |
| 21 violation? | 21    A.    **Yes.** |
| 22    A.    **Any kind of violation, if he was to** | 22    Q.    Let's take a look at 189 first. It's |
| 23 **violate company policy. Could be anything.** | 23 entitled Equal Employment Opportunity 2001 |
| 24    Q.    Had Mr. Dean violated any company | 24 Employer Information Report. |

117

| | |
|---|---|
| 1 | A. Yes. |
| 2 | Q. And have you ever seen a document |
| 3 | like this before? |
| 4 | A. Actually, I have not. |
| 5 | Q. All right. In your position as |
| 6 | assistant store manager you've never been |
| 7 | involved in creating or giving information |
| 8 | pertaining to this document? |
| 9 | A. This particular document, sir, no, |
| 10 | sir, unless they have changed since I became a |
| 11 | store manager. I have not ever seen this. |
| 12 | Q. How about a document like this? Are |
| 13 | you familiar with a document similar to this? |
| 14 | A. Nothing that looks anything like |
| 15 | this. |
| 16 | Q. Okay. All right. This document in |
| 17 | 2A do you see, Mr. Estes, where it says Lowe's |
| 18 | Home Centers, Incorporated, store number 1094, |
| 19 | in the middle of the page? |
| 20 | A. I see it. |
| 21 | Q. 153 Andover Street, Danvers, |
| 22 | Massachusetts. Is that the store where you |
| 23 | worked and Mr. Dean worked, right? |
| 24 | A. Yes. |

118

1   Q.   And do you see there's a grid where
2   it says employment data, and on the grid it's
3   broken down into various races, statement of
4   different races, and gender.
5        The first box is male and the second
6   is female; do you see that?
7   A.   Yes.
8   Q.   And in the categories to the far left
9   outside of the grid it says sales workers and
10  then the third box over says black not of
11  Hispanic origin and names five. Do you see
12  that?
13  A.   I can't tell if it's a five or --
14       MR. CASEY: I guess it is a five, if
15  you add up the numbers.
16  Q.   Do you see that, Mr. Estes?
17  A.   I see that, yes.
18  Q.   This is for the year, again, just to
19  remind you, 2001. Assuming for the purposes of
20  this question that sales workers would fall, at
21  least some of them would fall under your
22  department, at that time, again, how many
23  individuals were of African American decent or
24  black?

119

1        MR. CASEY: Objection.
2   A.   I had one during the day and one or
3   two at night. There were several at night doing
4   stocking. That's it.
5   Q.   During the relevant time to this suit
6   we know that David Dean is African American, he
7   worked during the day and who else was black who
8   worked during the day?
9        MR. CASEY: Are you talking now at
10  that store as a whole or about those who
11  reported directly or indirectly to Mr. Estes
12  or --
13  Q.   Under you, Mr. Estes?
14  A.   Just Dave during the day.
15  Q.   Okay.
16       MR. FEDERICO: I won't go over the
17  other one. That's all the questions that I
18  have.
19       MR. CASEY: I have nothing. I take
20  it the deposition is concluded?
21       MR. FEDERICO: Yes, it is.
22       (Whereupon, at 1:11 p.m., the deposition
23  was concluded.)
24

120

1
2        I, ROBERT ESTES, having read the
3   foregoing transcript of my testimony, do hereby
4   certify the same contains a true and accurate
5   record of my answers to the questions herein set
6   forth, together with correction pages, if any,
7   attached.
8
9        _____
10
11
12
13
14
15
16
17
18
19  Subscribed and sworn to before me
20  this _____ day of _____, 2005.
21
22  _____
23  Notary Public
24

```
 1          ERRATA SHEET
 2
 3    Correction          Page  Line
 4    _____ ___  ___
 5    _____ ___  ___
 6    _____ ___  ___
 7    _____ ___  ___
 8    _____ ___  ___
 9    _____ ___  ___
10    _____ ___  ___
11    _____ ___  ___
12    _____ ___  ___
13    _____ ___  ___
14    _____ ___  ___
15    _____ ___  ___
16    _____ ___  ___
17    _____ ___  ___
18    _____ ___  ___
19    _____ ___  ___
20    _____ ___  ___
21    _____ ___  ___
22
23
24
```

122

```
 1          C E R T I F I C A T E
 2    COMMONWEALTH OF MASSACHUSETTS
 3    SUFFOLK, SS.
 4
 5              I, Janice M. Dayton, a Notary Public
 6    in and for the Commonwealth of Massachusetts, do
 7    hereby certify:
 8              That ROBERT ESTES, the witness whose
 9    testimony is set forth, was duly sworn by me and
10    that such testimony is a true accurate record of
11    my stenotype notes taken in the foregoing
12    matter, to the best of my knowledge, skill and
13    ability.
14              IN WITNESS WHEREOF, I have hereunto
15    set my hand and Notarial Seal this 11th day of
16    May, 2005.
17
              -------------------------
18              JANICE M. DAYTON
                Notary Public
19    My Commission Expires:  September 19, 2008
20
21
22
23
24
```

**EXHIBIT 5**

4/29/05

# CERTIFICATE OF ACCOMPLISHMENT

### david dean

### Has completed

### The 90-Day RTM Clerk Quiz

### With a score of

### 93%

We hereby recognize and congratulate the above individual
and award this certificate of accomplishment
from Lowe's Store Training.

**Theresa Anderson**
Vice President of Store Support

**Brian Emerson**
Director of Store Training



**LOWE'S** ®

Home Improvement Warehouse

Successful completion requires a score of 80% or higher.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

**CIVIL ACTION NO: 04-12605-mel**

|  |  |
|---|---|
| **DAVID DEAN,** | ) |
| **Plaintiff,** | ) |
|  | ) |
| **v.** | ) |
|  | ) |
| **LOWE'S HOME CENTERS, INC.** | ) |
| **Defendant.** | ) |

## PLAINTIFF'S ANSWERS TO FIRST SET OF INTERROGATORIES PROPOUNDED BY THE DEFENDANT

1.  State your full name, residential address and business address.

    ANSWER:    David H. Dean, 46 Sagamore Street, #1, Lynn, MA 01902.

2.  Identify any person who has assisted you in gathering information and/or preparing your answers to these interrogatories, and any person who has assisted you in gathering information or searching for documents in order to respond to the accompanying Defendant's First Request for the Production of Documents.

    ANSWER: None.

3.  Identify each person with knowledge or information concerning the facts on which you base your claims as set forth in the Complaint, and identify the knowledge or information each such person has concerning same.

    ANSWER:    Daniel Puccio, Barry Rowell, Sherri Smith, Terry Johnson, Kris Lovett, Wes Anderson, Ken Golden,

4.  Identify each document which you contend evidences wrongful conduct of any kind of Lowe's

or which otherwise supports the claims asserted in the Complaint.

ANSWER:    Objection. "Evidences wrongful conduct" is vague and ambiguous as such this
question is not calculated to lead to the discovery of admissible material.
Without waiving said objection the plaintiff refers: Defendant to Plaintiff's
Responses to Document Requests.

5.    Identify each element of damages, including without limitation , lost wages, emotional distress,
attorneys' fees and costs which you claim to have suffered as a result of Lowe's alleged
unlawful conduct.

ANSWER:    I have suffered lost wages in the amount of $60,000.00 as back pay based on
my salary at termination up to the present, and based on potential front pay of
$60,000.00 for a total of $120,000.00. I have suffered emotional distress and
humiliation and litigation costs which are ongoing.

6.    Identify all physicians and/or health care professionals (including mental health professionals)
you have consulted at any time as a consequence of Lowe's alleged unlawful conduct, and
indicate the reason why you consulted each named physician or health care professional, each
symptom you presented or discussed and all treatments recommended and/or provided in each
such case.

ANSWER:    Lynn Community Health Center, Sonya Pena, - for stress. 269  Union Street,
Lynn, Ma. 781 581 3900.

7.    Identify all prescription medications you have taken since 1999 including in your answer the
duration and frequency of your use of the medication and the name of the physician who
prescribed the medication.

ANSWER: Plaintiff agrees to supplement.

8.    State the precise dollar amount, per physician or other health care professional (including
mental health professionals) you have expected as a consequence of Lowe's alleged unlawful
conduct.

ANSWER: Plaintiff agrees to supplement.

9.      Describe fully and in complete detail all sources of income and/or support you have received since your employment at Lowe's ended, including but not limited to the source of income, the amounts received, and the dates upon which the income was received.

ANSWER: Handyman work - minimal amount of odd jobs.

10.     Identify each entity or person, including without limitation, each present or former employee, agent, representative or contractor of Lowe's, with whom you communicated at any time about any harassment, discrimination or retaliation to which you allege you were subjected by Lowe's, and describe in as much detail as possible each such communication, including not only that which you communicated to Lowe's but also that which Lowe's communicated to you.

ANSWER: Bob Davis - Sinco nail representative.

11.     Identify each person who allegedly harassed, discriminated or retaliated against you during the course of your employment with Lowe's based on your race, and for each such person, set forth the date(s) and a full description of each incident of allegedly discriminatory, harassing and/or retaliatory activity.

ANSWER:     Placing of noose on desk by Daniel Puccio  - 11/8/01.
            Frequent returns piled up in front of door – between 11/8/01 and 4/8/02.
            In Spring - demoted to lawn and garden - Bob Estes - Spring , 2002.

            Glenn DiGorio – had me on unpredictable schedule, he asked me to stay late,
            and when I said I could not stay late due to a commitment, he said he would
            have not choice but to fire me – April 2002.
            Others told me my office was "ghetto office" - so much returns piled outside -
            11/8/01-4/02

12.     Please identify any documents used in any manner to prepare or assist in preparing any of the answers to these interrogatories and, for each such document, identify the particular interrogatory answer(s) or portion thereof for which it was used.

ANSWER:     None.

13.    Identify all applications or other efforts you have made to obtain employment subsequent to your employment with Lowe's. For each application effort, please include the name of the employer and type of business, the name of the person at the place of employment with whom you made contact; the job title or position for which Plaintiff applied; whether you were offered the position; and if you declined the offer, your reason for doing so.

ANSWER:    None.

14.    Identify all employers for whom you have worked since your employment ended with Lowe's through the time of trial. State the dates on which you were employed by such employers, the positions held or job title with such employers and what compensation and privileges of employment, including benefits, received during such employment and the reason for leaving such position, if applicable.

ANSWER:    N/A.

15.    Identify all persons that you intend to call as a fact witness at trial, stating the general substance of the facts about which he/she will testify, and identify any and all documents relevant or related to his/her testimony and about which he/she will testify.

ANSWER:    My attorney informs me that no decision had been made at this time regarding trial witnesses. I reserve the right to supplement this answer with due notice prior to trial.

16.    Identify each person that you expect to call as an expert witness at the trial of this case. Include in your answer:

a.    the subject matter on which the expert is expected to testify;
b.    the substance of any fact to which the expert is expected to testify;
c.    the substance of any opinion to which the expert is expected to testify;
d.    a summary of the grounds of each opinion to which the expert is expected to testify; and
e.    the qualifications of the witness.

ANSWER:    My attorney informs me that no decision had been made at this time regarding trial witnesses. I reserve the right to supplement this answer with due notice prior to trial.

**SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY**

**THIS** _____4'_____ **DAY OF** _____March_____, **2005.**

David H. Dean

As to objections,
Counsel for plaintiff,

Daniel C. Federico, Esquire
BBO No. 645717
Rainer & O'Connor
60 V.F.W. Parkway
Revere, MA 02151
(781) 289-7900

**Certificate of Service**

I, Daniel C. Federico, hereby certify that on this _____4_____ day of
_____March_____, 2005, the foregoing was forwarded to counsel for the defendants in this
action by first class mail, postage prepaid.

Daniel C. F.

Daniel C. Federico, Esq.

**The Commonwealth of Massachusetts**
**Commission Against Discrimination**
**One Ashburton Place , Boston, MA 02108**
**Phone: (617) 994-6000 Fax: (617) 994-6024**

---

MCAD DOCKET NUMBER: 02BEM01196          EEOC/HUD CHARGE NUMBER: 16CA201712
FILING DATE: 04/09/02                              VIOLATION DATE: 04/08/02

----------------------------------------------------------------------------

Name of Aggrieved Person or Organization:
David H. Dean
26 Broad Street #17
Lynn, MA 01902
Primary Phone: (781)646-9099 ext. ____


----------------------------------------------------------------------------

Named is the employer, labor organization, employment agency, or state/local government agency who
discriminated against me:
Lowes Home Improvement
Human Resources
P.O. Box 1111
North Wilkesbor, NC 28656
Primary Phone: (336)658-4374 ext. ____


No. of Employees:        25+

Work Location: Danvers

----------------------------------------------------------------------------

Cause of Discrimination based on:
Race, Color, Black (Non-Hispanic).

----------------------------------------------------------------------------

**The particulars are:**
I, David H. Dean, the Complainant believe that I was discriminated against by Lowes Home Improvement,
on the basis of Race, Color. This is in violation of M.G.L. 151B Section 1 Paragraph 1 and Title VII.

I have worked for Lowes Home Improvement since it opened the Danvers store in December 2000. I was
hired as a Return to Manufacturer, a position in which I had two years of experience at Home Depot. I was
trained by the management and sent to Springfield for further training. I enjoyed my job and performed it
well. I am the only Black employee in that department. On November 8, 2001, an incident occurred that
changed everything. I was meeting with two customers. When we returned to my office, we found a big
black hangman's noose placed on my desk. My customers were embarrassed. They said that I should call
a manager. When I did, the Manager asked a group of white employees who had done this. One white
employee admitted that he had done it. The white employee told management that he would give them two
weeks notice and leave. Within about three weeks, he was gone. But, after that incident, the atmosphere in
the warehouse changed dramatically. I continued doing my work. But I would come in in the morning and
find all of the returns from the night before placed in front of my office door. It would sometimes take me
45 minutes of crawling over sinks, refrigerators, furnaces, bathtubs, boxes of tile and marble, etc. just to get
into my office. I would find that, although my office was supposed to be locked, it had been used during
the night. There would be trash on the floor and on my desk. Management still seemed to approve of the
job I was doing. However, this week I was suddenly informed that I would not have my job any longer
and that they were going to give the job to someone else. They were moving me to the Lawn and Garden
Department, which entails doing a job I don't know and having a completely different schedule. I was not
even allowed to clean out my office. I believe that this demotion happened to me because the white
employee who put the hangman's noose on my desk is a friend of the managers and is trying to get back at
me for his loosing his job because of the racial act he performed against me.

MCAD Docket Number 02BEM01196, Complaint                                    $\mathcal{D} \cdot \mathcal{H} \cdot \mathcal{D}$.

--------------------------------------------------------------------------------

I swear or affirm that I have read this complaint and that it is true to the best of my knowledge, information and belief.

_Daniel H. Dean_
(Signature of Complainant)

SWORN TO AND SUBSCRIBED BEFORE ME ON THIS DAY of 4/9/2002.

NOTARY PUBLIC: Jessica Thrall

SIGNATURE NOTARY PUBLIC: _[signature]_
MY COMMISSION EXPIRES: 1/09/09

**MASSACHUSETTS COMMISSION AGAINST DISCRIMINATIO COMPLAINT**
10' 11' 2
02-13-0119C

**L. AKE INTERVIEW FORM**

\ME __DAVID H. Dean__ LEVEL OF EDCUCATION __2nd YR College__
DRESS STREET __21. BROAD ST # 11__ RACE __BLACK__
TY __LYON__ STATE __MM__ ZIP CODE __01902__
OME TELEPHONE (781__ 592-6563 __ WORK (978__- 646 - 90 99
'1# __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__ MARITAL STATUS __MARRIED__ DOB __7/17/54__
\ME/TITLE OF POSITION HELD OR SOUGHT: __RTM : RETURN TO MANUFACTURER__

**ENTIFY PERSON YOU MAY BE CONTACTED THROUGH IF NEEDED:**
ME __JANIE JORDAN__ PHONE __781-595-5589__
DRESS __LYNN, MA 01902__

**IPLOYER OR DISCRIMINATING OFFICIAL**
ME __LOWES'__
DRESS STREET __153 ANDOVER ST__ PHONE __978 - 046 - 9099__
'Y __DANVERS__ STATE __MA__ ZIP CODE __01923__
MBER OF EMPLOYEES_____ DATE OF LAST DISCRIMINATORY ACT __1/2/02__

**ELIEVE I WAS DISCRIMINATED AGAINST IN** (PLEASE CHECK APPROPRIATE BOX)
MPLOYMENT [ ]PUBLIC ACCOMODATION [ ]EDUCATION [ ] CREDIT [ ]OTHER SERVICES

**EUEVE I WAS DISCRIMINATED AGAINST BECAUSE OF** (PLEASE CHECK APPROPRIATE BOX)
RACE,COLOR [ ]NATIONAL ORIGIN [ ]ANCESTRY [ ]AGE(DOB)_____ [ ]SEX [ ]SEXUAL
RASSMENT [ ]SEXUAL ORIENTATION [ ]DISABILITY [ ]MATERNITY LEAVE [ ]RELIGION [ ]CRIMINAL
CORD [ ]RETALIATION

**E TYPE OF DISCRIMINATION IS** (PLEASE CHECK APPROPRIATE BOX)
ERMINATION [ ]LAYOFF [ ]HARASSMENT [ ]TERMS & CONDITIONS [✓]DENIED PROMOTION
AILURE TO HIRE [ ]REASONABLE ACCOMODATION [✓]OTHER

**NTIFY OTHER PERSON(S) WHO WERE TREATED DIFFERENTLY THAN YOU (NOT DISCRIMINATED INST) TO WHICH YOU COMPARE YOURSELF TO.**
/E __HENRY__ (I.E., RACE,SEX, DISABILITY) __RACE__
/E_____

**IMARIZE THE ACT(S) OF DISCRIMINATION YOU ARE COMPLAINING ABOUT:**
__on Nov. 8th a black "hang noose" was left on my desk by co-worker__

MCAD is also interested in resolving complaints in a meaningful manner that promotes long-term lutions, improves relations and brings healing to all the parties involved. As such, the MCAD is uraging parties, where appropriate, to consider a non-monetary damages alternative to resolving lleged claim of discrimination. If this option is selected you will be contacted by an MCAD official iscuss the parameters of this process. The official will then contact the named Respondent(s) to ss their willingness to participate in this informal remedial process. Once determined the parties convene to consummate early resolution. The parties will have 90 days to resolve this matter. If conditions of the settlement are satisfactory the matter will be closed. Please indicate if you are ng to pursue the following options:

n apology with a commitment to refrain from engaging to any future discriminatory conduct.

nplementation of a Commission approved training where feasible and appropriate.

eimbursement of out-of-pocket expenses only.

ther (please indicate):_____

'gned __[signature]__ Date __4/7/02__

' OFFICIAL USE ONLY (Note that this is not a complaint form) 8/99
' complaints filed against respondent_____

## COMMONWEALTH OF MASSACHUSETTS

**ESSEX, ss**

**SUPERIOR COURT DEPARTMENT**
**CIVIL ACTION NO.** ⊂ᵘᵢ ǀ ǀ ǀˑ

---

)
**DAVID H. DEAN,** )
 **Plaintiff,** )
 )
**v.** )
 )
**LOWE'S HOME CENTERS, INC.,** )
 **Defendant.** )
_____)

## COMPLAINT AND JURY CLAIM

1. Plaintiff, David H. Dean is a resident of the Commonwealth of Massachusetts, residing at 36 Sagamore Street, Lynn, Essex County.

2. Defendant, Lowe's Home Centers, Inc., is a corporation organized under the laws of the State of North Carolina with its principal place of business at 1605 Curtis Bridge Road; Wilkesboro, North Carolina 28659 and is registered to conduct business in the Commonwealth of Massachusetts with a resident agent located at 153 Andover Street; Danvers, Massachusetts 01923

## FACTS

3. Plaintiff was employed by Lowe's Home Centers, Inc. at its Danvers, Massachusetts location from December 2000 to October 2002 as a Return to Manufacturer Clerk.

4. While employed by Lowe's Home Centers, Inc. Plaintiff was the only African-American in the Return to Manufacturer Department.

5. On or about November 8, 2001, while on duty at Lowe's Home Centers in Danvers, Massachusetts, Plaintiff found a hangman's noose on his desk upon returning to his office.

6. On or about November 8, 2001 the Plaintiff immediately notified his manager, Ken Golden of the incident.

7.   On or about November 8, 2001 Plaintiff's manager, Ken Golden questioned several employees about the incident, one of whom admitted to placing the noose on Plaintiff's desk.

8.   On or about November 8, 2001 upon accepting responsibility for the incident, the employee who put the noose in the Plaintiff's office gave two weeks notice of leaving his employment with the Defendant, Lowes Home Center in Danvers, Massachusetts.

9.   After the incident on or about November 8, 2001, at Lowes Home Center the Plaintiff continued working in the Return to Manufacturer Department.

10.  Following the incident on or about November 8, 2001, Plaintiff would arrive in the morning to find that his office had been used during the night. Plaintiff's office was supposed to remain locked until morning. Plaintiff would often find trash on the floor and on his desk when he would return to work the following day.

11.  Following the incident on or about November 8, 2001, Plaintiff would find all of the returns from the night before placed in front of his office. Plaintiff would often have to climb over sinks, bathtubs, refrigerators, furnaces, boxes of tile and other large products to reach his office door.

12.  On or about April 2002 Plaintiff was informed that he would be transferred to the Lawn and Garden Department and another employee would be filling his position in the Return to Manufacturer Department.

13.  Plaintiff had no training for his new position and would receive a completely different schedule.

14.  Plaintiff was not allowed to clean out his office.

15.  On or about October 2002, Plaintiff left his employment with the Defendant.

16.  Pursuant to Massachusetts General Laws, Chapter 151B, Section 9, Plaintiff has withdrawn his complaint filed with the Massachusetts Commission of Discrimination, allowing for this private action to be filed.

17.  At all times relevant to this Complaint, Plaintiff was an employee as defined by Massachusetts General Laws, Chapter 151 B.

18.  At all time relevant to this Complaint, Lowe's Home Centers, Inc., was an employer as defined

by Massachusetts General Laws, Chapter 151 B.

## COUNT I
## VIOLATION OF M.G.L., c. 151B Section 9  v. LOWE'S HOME CENTERS, INC.

19. Plaintiff restates, realleges and incorporates by reference paragraphs 1-18 as stated herein.

20. Plaintiff is a member of a protected class.

21. Plaintiff was discriminated against by employees of the Defendant, Lowe's Home Centers, Inc.

22. On or about November 8, 2001, while on duty at Lowe's Home Centers in Danvers, Massachusetts, Plaintiff found a hangman's noose on his desk upon returning to his office.

23. Following the incident on or about November 8, 2001, Plaintiff would arrive in the morning to find that his office had been used during the night. Plaintiff's office was supposed to remain locked until morning. Plaintiff would often find trash on the floor and on his desk when he would return to work the following day.

24. Following the incident on or about November 8, 2001, Plaintiff would find all of the returns from the night before placed in front of his office. Plaintiff would often have to climb over sinks, bathtubs, refrigerators, furnaces, boxes of tile and other large products to reach his office door.

25. Plaintiff was discriminated against because of his membership in a protected class in violation of Massachusetts General Laws, Chapter 151B, section 1.

26. One employee placed a noose on Plaintiff's desk to reference the hanging of black slaves.

27. Plaintiff was discriminated against because of his membership in a protected class by other employees of Lowes Home Center in Danvers, Massachusetts.

28. Plaintiff was discriminated against because of his membership in a protected class by the Management of Lowes Home Center in Danvers, Massachusetts.

29. Plaintiff has experienced emotional distress and associated symptoms as a result of the discrimination he experienced while employed by Lowe's Home Centers, Inc.

-3-

## COUNT II
## RETALIATION under M.G.L. c. 151B, section 9 v. LOWE'S HOME CENTERS, INC.

30.   Plaintiff restates, realleges and incorporates by reference paragraphs1-28 as stated herein.

31.   Plaintiff reported an incident of racial discrimination to his manager on or about November 8,
      2001.

32.   As a result, Defendant demoted Plaintiff from his position in the Return to Manufacturer
      Department to one in the Lawn and Garden Department because of said complaint in violation
      of Massachusetts General Laws, Chapter 151B, section 9.

33.   As a result, Plaintiff has experienced emotional distress and associated symptoms as a result of
      the discrimination he experienced while employed by Lowe's Home Centers, Inc.

### PLAINTIFF DEMANDS A TRIAL BY JURY ON COUNTS

Respectfully Submitted,
By Plaintiff's Counsel,

Christopher S. O'Connor
B.B.O. No.: 567646
RAINER, WALSH & O'CONNOR, LLP
60 V.F.W. Parkway
Revere, Massachusetts 02151
781-289-7900

-4-

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

### CIVIL ACTION NO: 04-1265-mel

|                              |   |
|------------------------------|---|
| **DAVID DEAN,**              | ) |
| **Plaintiff,**               | ) |
|                              | ) |
| **v.**                       | ) |
|                              | ) |
| **LOWE'S HOME CENTERS, INC.)** | |
| **Defendant.**               | ) |

### DEPOSITION SUBPOENA - M.R.C.P. Rule 30(a) & Rule 45

TO:    Daniel Puccio
       119 Fellsway West
       Medford, MA 02155

GREETINGS:

YOU ARE HEREBY COMMANDED in the name of the Commonwealth of Massachusetts in accordance with the provisions of Rule 45 of Massachusetts Rules of Civil Procedure to appear and testify on behalf of the plaintiff before a Notary Public of the Commonwealth, at the office of <u>RAINER & O'CONNOR, LLP, 60 V.F.W. Parkway, Revere, Massachusetts 02151;</u> on the 24th day of June, 2005 at 10:00 o'clock a.m. and to testify as to your knowledge, at the taking of the deposition in the above-entitled action.

Hereof fail not as you will answer your default under the pains and penalties in the law in that behalf made and provided.

DATED: 05-18-05

By Plaintiff's Attorney,

RAINER & O'CONNOR, LLP
Daniel C. Federico
B.B.O. #645717
60 V.F.W. Parkway
Revere, Massachusetts 02151
(781) 289-7900

## **CERTIFICATE OF SERVICE**

I, Daniel C. Federico, do hereby certify that I have on May 18, 2005 served a copy of the above documents by filing notice via first class mail, postage pre-paid, on the following:

David C. Casey, Esq.
LITTLER MENDELSON, P.C.
One International Place, Suite 2700
Boston, MA 02110

Daniel C. Federico, Esq.

## **CERTIFICATE OF SERVICE**

I, Daniel C. Federico, do hereby certify that I have on June 20, 2005 served a copy of the Motion for Summary Judgment Opposition by filing notice via first class mail, postage pre-paid, on the following:

David C. Casey, Esq.
LITTLER MENDELSON, P.C.
One International Place, Suite 2700
Boston, MA 02110